Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Cooper Alison-Mayne (SBN 343169)
cmayne@galipolaw.com
LAW OFFICES OF DALE K. GALIPO
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Tel: (818) 347-3333

Attorneys for Plaintiff
TANNER NAVAROLI

Algeria R. Ford (SBN 289016)
E-mail: aford@bwslaw.com
CITY ATTORNEY, CITY OF SIMI VALLEY
Lisa W. Lee (SBN 186495)
E-mail: llee@bwslaw.com
Natalie F. Price (SBN 279798)
E-mail: nprice@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
444 South Flower Street, 40th Floor
Los Angeles, California 90071-2942
Tel: 213.236.0600 Fax: 213.236.2700

Attorneys for Defendants
CITY OF SIMI VALLEY, TYLER WILLIAMSON and ERIC COOKE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

TANNER NAVAROLI,

Plaintiff,

v.

CITY OF SIMI VALLEY, TYLER WILLIAMSON, and ERIC COOK,

Defendants.

Case No. 2:25-cv-11601-MEMF (RAOx)

Hon. Maame Ewusi-Mensah Frimpong

**PARTIES' JOINT APPENDIX OF EVIDENCE**

*[Filed Concurrently with Joint Motion for Summary Judgment; Joint Statement of Disputed & Undisputed Facts; Decl. of Lisa W. Lee; Decl. of Tyler Williamson; Evidentiary Objections; Notice of Lodging; and [Proposed] Order]*

Date: November 5, 2026
Time: 10:00 am
Crtrm.: 8B

Trial Date: Februarv 22. 2027

**TO THE HONORABLE COURT:**

Each exhibit is submitted as a separate tabbed attachment. Exhibits A through F were designated by Defendants; Exhibits G through M are Plaintiff's evidence in opposition.

| Tab | Description | Authenticating Declaration |
|---|---|---|
| A | Consolidated excerpts of the Deposition of Tyler Williamson (May 19, 2026), with reporter's certification (58 pages) | Lee Decl. ¶ 2; Alison-Mayne Decl. ¶ 8 |
| B | Consolidated excerpts of the Deposition of Eric Cooke (May 19, 2026), including Exhibit 11, with reporter's certification (31 pages) | Lee Decl. ¶ 3; Alison-Mayne Decl. ¶ 8 |
| C | Consolidated excerpts of the Deposition of Tanner Navaroli (May 20, 2026), with the witness signature page and reporter's certificates (60 pages) | Lee Decl. ¶ 4; Alison-Mayne Decl. ¶ 8 |
| D | Surveillance Video 1, CITY 00061 (PD_Emp_Parking_Lot_-_West_#2, 2025-02-07 19:33:00) | Lee Decl. ¶ 5 |
| E | Surveillance Video 2, CITY 00062 (PD West Emp Gate, 2025-02-07 19:30:00) | Lee Decl. ¶ 6 |
| F | Body worn camera video of Officer Williamson, CITY 00054 | Lee Decl. ¶ 7; Williamson Decl. ¶ 6 |
| G | City of Simi Valley Incident Report GO#25-5366 prepared by Officer Williamson, CITY 00001-00009 | Alison-Mayne Decl. ¶ 2 |
| H | Simi Valley Police Department Policy 307, Vehicle Pursuits, CITY 00022-00033 | Alison-Mayne Decl. ¶ 3 |
| I | City's Responses to Requests for Production, Set One (Sept. 4, 2026), with CITY 00061, CITY 00091, CITY 00092-00095 | Alison-Mayne Decl. ¶ 4 |
| J | Declaration of Tanner J. Navaroli | Alison-Mayne Decl. ¶ 5 |
| K | Declaration of Cooper Alison-Mayne | |

| **Tab** | **Description** | **Authenticating Declaration** |
|---|---|---|
| L | Excerpts of Rule 26 Rebuttal Report of Edward T. Flosi (Sept. 9, 2026): cover, pp. 17-24, 27, 30, 32-34, signature page | Alison-Mayne Decl. ¶ 7 |
| M | Surveillance Video, CITY 00058 (City camera facing the Michael Clark Parkway / Alamo Street intersection, Feb. 7, 2025); lodged on USB | Alison-Mayne Decl. ¶ 6 |
| N | CHP Traffic Crash Report CITY00010-CITY 00021 | Lee Decl. ¶ 8 |
| O | Expert Edward Flosi's Rebuttal Report (Pg 15) | Lee Decl. ¶ 9 |

Dated: September 24, 2026

LAW OFFICES OF DALE K. GALIPO

By: /s/ Cooper Alison-Mayne
Dale K. Galipo
Cooper Alison-Mayne
Attorneys for Plaintiffs
T.J.N., a minor by and through his Guardian Ad Litem, WILLIAM NAVAROLI

Dated: September 24, 2026

BURKE, WILLIAMS & SORENSEN, LLP

By: /s/ Lisa W. Lee
Lisa W. Lee
Natalie F. Price
Attorneys for Defendant
CITY OF SIMI VALLEY

# SIGNATURE ATTESTATION

Pursuant to Local Rule 5-4.3.4(a)(2)(i), I hereby certify that the content of this document is acceptable to Cooper Alison-Mayne, counsel for Plaintiff Tanner Navaroli, and that I have obtained Mr. Mayne's authorizations to affix his electronic signature to this document

Dated: September 24, 2026

BURKE, WILLIAMS & SORENSEN, LLP

By: /s/ Lisa W. Lee

Lisa W. Lee
Natalie F. Price
Attorneys for Defendant
CITY OF SIMI VALLEY

# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

T.J.N., a minor by and through his Guardian Ad Litem WILLIAM NAVAROLI,

Plaintiff,

v. Case No. 2:25-cv-11601

CITY OF SIMI VALLEY; TYLER WILLIAMSON; and ERIC COOK,

Defendants.
_________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF

TYLER WILLIAMSON

TUESDAY, MAY 19, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 26831

APPEARANCES (Remote)

FOR THE PLAINTIFF:

LAW OFFICES OF DALE K. GALIPO
BY: DALE K. GALIPO, ESQ.
COOPER ALISON MAYNE, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
dalekgalipo@yahoo.com
cmayne@galipolaw.com

FOR THE DEFENDANT:

Lisa W. Lee
BURKE WILLIAMS AND SORENSEN, LLP
BY: LISA W. LEE, ESQ.
444 South Flower Street, 40th Floor
Los Angeles, CA 90071-2942
213-236-0600
llee@bwslaw.com

ALSO PRESENT:

Said Hofiani, Videographer

--oOo--

INDEX OF EXAMINATION

WITNESS: TYLER WILLIAMSON

EXAMINATION BY PAGE

MR. GALIPO................................5

EXHIBITS FOR REFERENCE

EXHIBIT DESCRIPTION PAGE

Ex 1 - Copy of photo.............................43

Ex 2 - Copy of photo.............................44

Ex 3 - Copy of photo.............................46

Ex 4 - Copy of photo.............................47

Ex 5 - Copy of photo.............................64

Ex 6 - Copy of photo.............................70

Ex 7 - Copy of photo.............................71

--oOo--

--oOo--

BE IT REMEMBERED, that set on Tuesday, the 19th day of May, 2026, commencing at the hour of 10:40 a.m., thereof, TYLER WILLIAMSON, appeared remotely in Simi Valley Beach, California, before me, Kimberly E. D'Urso, an RPR and Certified Shorthand Reporter of the State of California, the following deposition was stenographically reported by me:

(Whereby the Certified Shorthand Reporter introduced herself on the record and administered the oath to the deponent.)

THE VIDEOGRAPHER: Good morning. We're on record at 10:40 a.m. Today's date is May 19th, 2026. This is the recorded remote video deposition of Tyler Williamson, in the matter of Navaroli versus City of Simi Valley, Case No. 2:25-cv-11601.

This deposition is being held via web conference. My name is Said Hofiani. I'm the videographer with Focus Litigation Solutions. The court reporter is Kimberly D'Urso.

Counsel, please introduce yourselves and state whom you represent, after which the court reporter will state her CSR license number and swear in the witness.

MR. GALIPO: Dale Galipo with Cooper Mayne,

from my office, on behalf of the plaintiff.

MS. LEE: Hello. Good morning. Lisa Lee, on behalf of Defendants, City of Simi Valley, and Officers Williamson and Cook.

(Whereby the oath was administered by the Certified Shorthand Reporter.)

THE WITNESS: I do, yes.

MR. GALIPO: Okay. Thank you.

EXAMINATION

BY MR. GALIPO:

Q. Good morning.

A. Good morning.

Q. I asked you this off the record, but I just want to make sure, are you able to hear me okay so far?

A. Yes, sir.

Q. And I'm going to try to ask questions that are understandable, but if for some reason I ask you a question and you don't quite understand it, you just let me know, and I'll try to ask it in a better way.

Does that sound okay?

A. It does. Yes, sir.

Q. And if you have any trouble hearing me at any time, please let me know, and I'll try to speak louder so you can hear me.

Does that sound good?
A. Yes, sir.
Q. Finally, I usually go about an hour and take a short break, but if you need to take a break at any time for any reason before that, just let me know you need to take a break, and we'll take a break at that time.
Does that sound okay?
A. Yes, sir, it does.
Q. Have you reviewed any documents in preparation for the deposition, like maybe the traffic collision report or some video footage, things of that nature?
A. Yes, sir, I have.
Q. Can you please tell me what you have reviewed?
A. It was the -- the CHP traffic collision report, a city incident report. Then footage of the incident, I reviewed that.
Yeah, I believe it was those -- those documents that I reviewed.
Q. Okay. When you say "footage of the incident," are you referring to some video footage?
A. Yes, sir.
Q. And do you know what the source of the video footage was? Was it the body-worn camera of one of the officers or surveillance video or a combination?
A. It was -- it was a combination of both.

Q. Okay. Can you just tell me which video footage or what video footage you reviewed?
A. So, it was -- it was body-worn camera, and then surveillance footage.
Q. Did you -- were you driving the vehicle at the time?
A. Yes, sir.
Q. And did you have a body-worn camera on your person?
A. Yes, sir.
Q. And was yours activated at some point, to your knowledge?
A. Yes, sir, it was.
Q. Did you have a partner officer at the time?
A. Yes. Not in the car with me, but, yes, on scene.
Q. And who was that?
A. Officer Cook.
Q. Do you know if the vehicle you were driving is equipped with some type of a dash cam?
A. It is not, sir.
Q. What type of vehicle were you driving?
A. It was a marked police vehicle, equipped with emergency lights and sirens. It's a Ford Explorer.
Q. That's a four-door vehicle?

A. Yes, sir.
Q. SUV-type of a vehicle?
A. Yes. It is classified as an SUV.
Q. Okay. And then the city incident report, what is that, generally?
A. Typically, it's a report we make when there's damage to any sort of city -- city property. We just basically document how and why it was -- it was damaged, and we document the damage.
Q. Okay. So when it's damage to property, it's a report that's customarily generated?
A. Yes, sir.
Q. Did you, yourself, write any reports regarding this incident?
A. Just the city incident report regarding the damage.
Q. Okay. And did you give any statements that were recorded or taken down, that you're aware of, regarding this incident?
A. No, sir.
Q. You did give some type of a statement to the CHP officer?
A. Yes, sir.
Q. Do you know if that was recorded or not?
A. I --

A. 5'8".
Q. I see you have glasses on today. Do you wear those to help with vision?
A. Yes, sir.
Q. And does it help you see further away, closer, or both?
A. Further away.
Q. Do you recall if you were wearing your glasses at the time of the incident?
A. I wear my contacts when I work.
Q. Okay.
A. And, yes, I was wearing my contacts.
Q. Do you recall the date of the incident?
A. I don't recall the specific date off the top of my head.
Q. Okay. Let me see here.
According to the traffic collision report, it happened on a Friday. Does that sound right, or you don't recall?
A. I --
(Simultaneous speakers.)
MS. LEE: Objection.
But go ahead.
THE WITNESS: I don't recall the specific day.
BY MR. GALIPO:

Q. It has a date of February 7, 2025. Does that sound generally right, in February of last year?
A. Yes, sir. That sounds generally right. I know that was the beginning of last year.
Q. Okay. Do you have an estimate as to what time the incident occurred?
A. 7:00 p.m.-ish. I don't have an exact time -- I don't recall an exact time.
Q. Was it in the evening?
A. Yes, sir. I would say it was in the evening.
Q. Was it dark outside?
A. Yes, sir.
Q. By the way, when did you go to the police academy?
A. I started at the beginning of 2020. It was March 2020.
Q. And when did you graduate, approximately?
A. November, 2020. October or November.
Q. And where did you first go to work after graduating?
A. The Simi Valley Police Department.
Q. Did you have a period of field training?
A. Yes, sir, I did.
Q. How long was that for, approximately?
A. I would say approximately, five -- five months.

Q. And after field training was completed, were you assigned to patrol?
A. Yes, sir. I was.
Q. And have you pretty much been assigned to patrol since, or has your assignments changed?
A. I've been assigned to patrol since.
Q. Okay. Do you remember your general shift hours at the time?
A. The time of incident?
Q. Yes.
A. I believe I was on evening watch. So, for us, that's 2:00 p.m. to midnight.
Q. And did you get some type of a call related to this incident at some point?
A. Yes, sir. I did.
Q. Did that come over your police radio?
A. It did. Yes, sir.
Q. Have you listened to any of the radio dispatches related to this incident?
A. Yes, sir. I did.
Q. And when was the last time you listened to it? Was it generally recently, just to refresh your recollection?
A. Yes. I'd say within the past week.
Q. Can you tell me, generally, what information

you initially had regarding the call?
A. Yes.
MS. LEE: Vague and overbroad.
But go ahead.
THE WITNESS: So the -- the radio call came out of a group of what appeared to be juveniles, causing a disturbance over at what we call the "Regal Plaza," which is a shopping center.
(Reporter clarification.)
BY MR. GALIPO:
Q. And are you familiar or were you familiar at the time with the Regal Plaza?
A. Yes, sir.
Q. Did you have any more specifics as to the nature of the disturbance?
A. No, sir, just that the individuals were riding electric motorcycles.
Q. And you said you had information that they were juveniles?
A. From what I recall, I believe that's what came over the air.
Q. And when you think of juveniles, essentially individuals under 18?
A. Yes, sir.
Q. And where were you located when you got the

radio call?

A. I was at the police station when I got the radio call.

Q. And where is the police station in relation to the Regal Plaza?

A. Across the street.

Q. Were you assigned to the call, or did you just assign yourself? How did that work?

A. They -- they --

MS. LEE: Vague.

Officer, wait for me. I may have an objection, so take a breath after each question.

Vague. Overbroad.

But go ahead, you can answer.

THE WITNESS: I'm sorry. Could you ask the question, again?

BY MR. GALIPO:

Q. Sure. At some point, you responded to the call?

A. Yes.

Q. Were you assigned to the call?

A. I was sent the call, yes.

Q. Okay. And did you have an understanding as to whether your partner, Officer Cook, was also sent the call?

motorcycles or bikes on the sidewalk at the time?

MS. LEE: Vague. Overbroad. Incomplete hypothetical.

But go ahead.

THE WITNESS: From my understanding, the electric motorcycles, no.

BY MR. GALIPO:

Q. Okay. How about on the street?

MS. LEE: Same objections.

But go ahead.

And it's also vague.

Go ahead.

THE WITNESS: No.

BY MR. GALIPO:

Q. So your understanding is they could not ride those on the sidewalk or the street?

A. Correct.

Q. Is there anywhere that they could ride them, as you understood them -- understood it?

MS. LEE: Same objections.

But go ahead.

THE WITNESS: I mean, if they have private property -- their own private property, and maybe lived on a large -- you know, large land that they owned, but nowhere within the -- the city.

BY MR. GALIPO:

Q. Okay. So your understanding at the time is that, unless they were on their own private property, they shouldn't be driving those vehicles on public property. Is that generally your understanding at the time?

MS. LEE: Same objections. Asked and answered. Vague. Overbroad.

Go ahead.

THE WITNESS: Yes. That's -- that is my understanding.

BY MR. GALIPO:

Q. Is there a difference, in your mind, between an electric motorcycle and an electric bike?

MS. LEE: Vague.

Go ahead. You can answer.

THE WITNESS: Yes.

BY MR. GALIPO:

Q. Can you tell me your, kind of, understanding of the difference?

MS. LEE: Well, also vague.

But go ahead.

THE WITNESS: I know that there are different classes. I know that with an electric motorcycle, it's basically a -- a motorcycle or dirt bike that's fully

powered through a battery.

With electric bicycles, I know there are different classes in the sense of, you know, some bicycles have pedals, and the pedals generate power that could give you assist. There are also some electric bicycles that have a -- a throttle on it, so you still have to pedal, but it'll assist you in maybe going uphill or, you know, giving you a little bit more power.

BY MR. GALIPO:

Q. Did you see the bicycle or bike that you hit, at any time before you struck it?

MS. LEE: Well, hold on.

Lacks foundation. It's vague, and it's overbroad, and it's compound.

Go ahead.

THE WITNESS: I would say the bike that was -- well, the vehicle that was involved in the traffic collision was an electric motorcycle.

BY MR. GALIPO:

Q. Okay. And at some point, was there a contact between that electric motorcycle and your patrol car?

A. Yes.

Q. And what part of your patrol car made contact with the electric motorcycle?

MS. LEE: Well, foundation.

But go ahead. You can answer.

THE WITNESS: The electric motorcycle came across and hit the push bar of the patrol vehicle.

BY MR. GALIPO:

Q. The front push bar?

A. Yes, sir.

Q. Can you describe the push bar to me, how it's configured or looks?

A. The push bar is mounted to the -- the front of a patrol vehicle. It usually wraps around the -- the front bumper. So there would be, I guess, a bracket that goes around that way, and then there's two that go up and down, that sit in front of the vehicle. It's all one piece, but --

Q. And is it towards the center of the front -- attached to the center of the front bumper?

MS. LEE: Vague.

Go ahead.

THE WITNESS: I wouldn't -- well, you mean the whole entire push bar itself, or --

BY MR. GALIPO:

Q. In other words, if I'm looking at the front of your vehicle, is it more on the passenger side or driver's side, or it's kind of -- the way it's set up, it's kind of equal distance between the two sides?

A. It's mounted in the -- in the middle, so it's equal distance between the -- the two sides.

Q. If you know, did that push bar have any damage as a result of this incident?

A. It did.

Q. What damage did it have, that you could see?

A. The -- the push bar. Basically, part of a piece was hanging off, and then the -- the pillar that I was talking about that goes up and down, it basically got bent.

Q. And which direction was it bent?

A. If -- I guess if you're -- you're behind the wheel, the driver's side, it got pushed to -- towards the -- the passenger side.

Q. Do you know if pictures were taken of it, during the investigation, showing the damage?

A. Yes --

MS. LEE: Calls for speculation.

But go ahead. You can answer, if you know.

THE WITNESS: Yes, sir. Photographs were taken.

BY MR. GALIPO:

Q. Have you looked at some of those photographs in the last week or two?

A. Yes, sir, I have.

Q. How much time passed from the time you first saw the electric motorcycle and the time of the impact?

A. Hard to recall. A couple seconds.

Q. How far was the electric motorcycle from you when you first saw it?

A. That's also hard to state. I wouldn't be able to give an accurate answer as to how far it -- it was. I mean, on the other side -- basically, on the other side of the -- I would say maybe, 30, 40, feet.

Q. Could you tell which direction the electric motorcycle was traveling when you first observed it?

A. Northbound.

Q. And where was your vehicle positioned when you first observed the electric motorcycle?

A. I was going southbound.

Q. I think you told me before that the Regal Plaza was across the street from the police station. Did I understand that correctly?

A. Yes, sir.

Q. And is there a street there called Michael Clark Parkway?

A. Yes, sir, there is.

Q. And there's some type of an intersection there; correct? Near where this happened?

A. Yes, sir.

Q. And what are the two streets at that intersection?

A. So, the one you just mentioned, Michael Clark, that runs north to south. And then the one it intersects with is Alamo, that runs east to west.

Q. And you said you were southbound. Would that be on Michael Clark Parkway?

A. Yes, sir.

Q. And how many lanes are there going southbound as it is approaching the intersection of Alamo?

A. Two. There -- there's one that goes straight, from what I recall, and one to turn -- turn right, I believe.

Q. And which lane were you in when you first saw the electric motorcycle?

A. To go straight.

Q. And is that what you were intending to do, to go straight across the street?

A. Yes.

Q. And is there some type of traffic control that controls that intersection?

A. Yes, sir.

Q. And when you first approached the intersection, before entering it, do you recall what color the light was for your direction of travel?

A. Yes, sir.
Q. What color was it?
A. It was red.
Q. Did you momentarily stop at the light?
A. Yes, sir.
Q. And at this point, you don't have your body-worn camera turned on yet; is that correct?
A. Correct.
Q. And when you momentarily stopped for the red light, do you have an estimate as to how long you stopped?
A. A couple seconds, maybe a few seconds.
Q. Did you see the electric motorcycle while you were stopped for that red light?
A. No, sir.
Q. At some point, do you activate the lights in the patrol car?
A. Yes. I activated my overhead emergency red and blue lights.
Q. When you first activated your lights, were you still stopped at that red light?
A. Yes.
Q. Did you activate your lights, in part, because you were thinking of entering the intersection on the red?

A. Yes, sir.
Q. At the time you activated your overhead lights, had you seen the electric motorcycle yet?
A. No, sir.
Q. And after activating your overhead lights, you would have, then, proceeded into the intersection?
A. Correct.
Q. And your intent, at least initially, was to drive straight through the intersection to the Regal Plaza?
A. Yes, sir.
Q. Does that intersection have marked crosswalks, if you know?
A. It does. Yes, sir.
Q. And where do you believe you were, approximately, in the intersection, when you first observed the electric motorcycle?
A. Probably in the middle of -- or I would say in my lane, halfway through the -- the intersection.
Q. When you say "halfway through," you mean halfway from north to south?
A. Yes, sir.
Q. And you would have had your overhead lights on at that point?
A. Correct.

Q. And what would you estimate your speed to be at the time that you were halfway through the intersection, in your lane, and saw the electric motorcycle?

MS. LEE: Vague.

Go ahead.

THE WITNESS: Maybe 5 to 10 miles per hour.

BY MR. GALIPO:

Q. Did you have your foot slightly on the accelerator?

A. I can't recall.

Q. You don't recall if you were idling or had your foot on the accelerator?

MS. LEE: Vague, compound.

Go ahead.

THE WITNESS: No, I don't recall.

BY MR. GALIPO:

Q. Did you look left or right before entering the intersection, to make sure there were no vehicles approaching?

A. Yes, sir.

Q. And that would have been vehicles on Alamo that you were looking for?

A. Yes, sir.

Q. Were there any vehicles that you saw approaching on Alamo, either to the east or west?

MS. LEE: Vague as to time.
Go ahead.
THE WITNESS: I'm sorry. Could you ask the question, again?
BY MR. GALIPO:
Q. Sure. Let me back up for a second.
You're stopped for the red light for a few seconds, and you're thinking you're going to go through the intersection, on the red, but you activated your emergency lights to let others know that you're there and you're coming through. Is that generally correct?
A. Yes, sir.
Q. But even with your emergency lights, I take it, you wanted to look right and left before entering, just to make sure no vehicle was approaching, as far as a motor vehicle?
A. Correct.
Q. And when you looked to the right and left, before entering the intersection, did you see any vehicles approaching on Alamo?
A. Yes.
Q. Can you explain that to me, please?
A. From what I recall, there was traffic approaching both eastbound and westbound. But I activated my -- my overhead lights, you know, to give

them that warning that I was -- I was going through the intersection, and I then deemed it safe to do so.

Q. Did they appear to be slowing down as they approached the intersection, after you turned your lights on?

A. It appeared so.

Q. And you felt as if they were either stopping or coming to a stop at that point?

A. Yes, sir.

Q. And did you see the electric motorcycle for the first time some point after you looked to your right and left to check traffic on Alamo?

A. After I checked traffic, yes.

Q. So you're about halfway through the intersection in your lane, going somewhere, maybe, approximately, 5 or 10 miles an hour, when you first see the electric motorcycle? Am I understanding you correctly?

A. From what I recall, yes.

Q. And where was this -- the electric motorcycle when you first observed it?

A. Going northbound on Michael Clark, coming out of the plaza.

Q. Had it reached Alamo Street yet?

A. It was very close.

Q. When you say "very close," you're saying within, maybe, 5 or 10 feet? Something like that?
MS. LEE: Hold on.
I just want to instruct the witness don't guess. If you have an estimate, then please provided it. But go ahead. You can answer.
THE WITNESS: I -- I -- I don't have an exact estimate as to how far it was from the intersection.
BY MR. GALIPO:
Q. Okay. No one is expecting an exact, but since you were there and I wasn't, I'm just trying to get an idea. And as Counsel advised you, we don't want you to completely guess.
If I asked you what color the light was, and you weren't even at the scene, then that would be guessing. But you were there, and you might have an estimate. You can say 5 to 10 feet, 5 to 10 feet, whatever applies. If you feel you can't give any estimate at all, then it's okay to tell me that, too.
But I'm just wondering if you have any estimate as to how close the electric motorcycle was to Alamo when you first saw it?
A. Again, I don't want to guess or even give an estimate. Obviously, he wasn't super far away, but he was -- he was close approaching the -- the limit line of

the intersection.
Q. And is there -- and I think you said the electric motorcycle was initially going northbound?
A. Yes.
Q. And when you say "the limit line," are you talking about the area where the marked crosswalk lines are?
A. Yes, sir.
Q. And where -- how many lanes are there -- in the direction the electric motorcycle was coming, how many lanes are there?
A. I can't recall off the top of my head. It's either one or two.
Q. Was the electric motorcycle in the -- in the lane closest to the crosswalk where this incident occurred?
MS. LEE: Vague.
Go ahead.
THE WITNESS: The -- the electric motorcycle, when I first witnessed it was -- it appeared to be hugging and coming from the -- the east curb line. The traffic collision occurred on the west of the intersection.
BY MR. GALIPO:
Q. That's -- that's why I'm trying to say -- are

you saying that you -- you're not sure how many lanes there are going northbound at that point?

A. It's coming -- coming out of Michael Clark from the Regal?

Q. Right.

A. It's either one or two. I can't recall if it has a -- a turn lane to go right, and then a lane to go straight, but it's -- it's either one or two.

Q. And do you know in which lane the electric motorcycle was when you first saw it?

A. I just know that it was close to the -- the east curb line.

Q. And when you say "close," what distance do you have in mind?

A. Within 5 feet.

Q. And you're saying it was approximately 30 to 40 feet from YOU at that time?

MS. LEE: Well, hold on.

It's vague as to time.

But go ahead.

BY MR. GALIPO:

Q. When you first saw it.

A. Again, it's hard -- hard to -- to estimate. I'm trying to, you know, from what I recall and just give a rough estimate in my head. But, you know, maybe,

yeah, anywhere from 20 to 40.
Q. 20 to 40 feet? When you say "20 to 40," I'm assuming you're still referencing "feet"?
A. Yes, sir.
Q. Okay. And did the bike have any light on it, if you recall?
A. Not that I recall.
Q. Could you see if the driver of the bike was wearing a helmet at that time?
MS. LEE: Well, misstates the evidence.
But go ahead.
THE WITNESS: I -- I -- at that specific time, I don't recall what I saw in regards to a helmet, but I know that a helmet was worn.
Q. And what would you estimate the speed of the electric motorcycle when you first saw it?
A. Maybe, around, 30 miles per hour.
Q. And then after initially seeing it, what path did you see the electric motorcycle take?
A. It appeared to be going northbound, exiting the Regal Plaza.
Q. Did it continue due north?
A. No.
Q. Did it change direction at some point?
A. Yes, sir.

Q. And how long after initially seeing it did it change direction?

A. Within a couple seconds.

Q. And how did it change direction, based on your observation?

A. It made an abrupt left turn, so it went from that east curb line, and then made the left to go basically west -- westbound.

Q. And when it was going westbound, where was the electric motorcycle in relation to the crosswalk, going across Alamo?

MS. LEE: Vague.

Go ahead.

THE WITNESS: Which -- which crosswalk are we --

BY MR. GALIPO:

Q. I'm assuming -- I'm trying to get my directions correct. I'm assuming that between the east curb line and the west curb line of Michael Parkway, there's a crosswalk as you get to Alamo?

A. Uh-huh. Yes, sir.

Q. And that crosswalk would go east and west or west and east, depending on which way you're walking?

A. Yes.

Q. So when he was going west, was he in the area

of that marked crosswalk?

MS. LEE: Well, it's vague.

But go ahead.

THE WITNESS: I mean, to best explain, I mean, there's -- there's crosswalks going both north and south, and then east and west. So coming from, you know -- going -- the vehicle going north from Michael Clark and made the -- the left-hand turn; right? That seemed like it was relatively close to, I guess you would say, the south crosswalk that runs east and west, made the left-hand turn.

And I guess you could say the next crosswalk, it was approaching was the crosswalk on the west, that runs north to south.

Q. Okay. So when you saw the electric motorcycle moving from east to west, you would have still been in the middle of the intersection?

A. Roughly.

Q. Still going 5 to 10 miles an hour?

A. From what I recall, yes, sir.

Q. And are you saying that the electric motorcycle in going from east to west in the area of that marked crosswalk, that runs -- that goes east and west, was going 30 miles an hour?

A. Approximately.

MS. LEE: Dale, can you let me know when it's convenient for you to break? I need to make a call.

MR. GALIPO: Right now is fine, Lisa. Do you want to take a ten-minute break?

MS. LEE: Sure. Thank you.

Do you know how much longer you have?

MR. GALIPO: Probably an hour.

THE VIDEOGRAPHER: Going off record at 11:33 a.m.

(Break taken.)

THE VIDEOGRAPHER: Back on record at 11:45 a.m.

MR. GALIPO: Okay. Thank you.

Lisa, are you ready to continue?

MS. LEE: Yes, I am. Thank you.

MR. GALIPO: You're welcome.

BY MR. GALIPO:

Q. You indicated that when you first saw the electric motorcycle, it was going northbound; is that correct?

A. Yes, sir.

Q. For how long a period of time did you see the electric motorcycle going northbound?

A. A couple seconds.

Q. And what distance do you think you saw it traveling northbound?

MS. LEE: Well, it's vague.

Go ahead.

THE WITNESS: It's -- it's hard to say. But, again, when I first observed the -- the motorcycle, it was coming northbound, up Michael Clark. So it's hard to give, you know, an estimate of how -- how many feet; right? But it -- it was a short period of time that I -- I saw it going northbound.

Q. And you're estimating that short period of time to be a couple seconds that it was going northbound?

A. A couple to a few seconds.

Q. And then you saw it going westbound at some point?

A. So, I saw it going northbound and then making the abrupt left turn, to basically go westbound.

Q. And when you saw it going northbound, you were already entering the intersection?

A. I was already well within the intersection, yes.

Q. And when you saw it make this abrupt turn to go westbound, was it in the area of that marked crosswalk we talked about earlier, the east/west crosswalk?

MS. LEE: Vague.

Go ahead.

THE WITNESS: Again, to -- to explain it, I

guess, is it was going northbound out of the shopping center on Michael Clark, makes the abrupt left-hand turn near that intersection that goes east to west, on the south curb line. So it makes a left-hand turn to go westbound.

So then it's approaching the -- I guess the west crosswalk that runs north to south.

Q. Okay. But when you say it was in the area of the east/west intersection, you meant the east/west marked crosswalk?

MS. LEE: Well, vague, foundation.

Go ahead.

MR. GALIPO: Let me just ask it, again. I'm not trying to trick you. I just want to make sure I understand what you're saying.

BY MR. GALIPO:

Q. You said that it was initially going northbound, and then you saw it make an abrupt left turn. Do I have that part correct?

A. Yes.

Q. And when it made an abrupt left turn, it was then going westbound?

A. Yes. So when it was coming northbound, it made the left turn to then travel westbound.

Q. Right. And what I was asking -- and I think

you've answered it, but I want to make sure I'm understanding. When it made this abrupt left turn and started traveling westbound, it was in the area of where that east/west marked crosswalk is; is that correct?

A. On the -- the crosswalk that's on the south of the -- the south side of the intersection.

Q. Correct.

A. So, yes, I would say in that area.

Q. Okay. And are you saying that you saw it going westbound, almost from the east curb line to the west curb line?

A. I would say from the east curb line to turn to go towards the west. I wouldn't necessarily say the west curb line. I guess there is no west curb line in the middle of the intersection. There's a -- the west side crosswalk, but it --

Q. Correct, but -- go ahead. I'm sorry.

A. It -- it entered the crosswalk -- or sorry -- the intersection, you know, from Michael Clark, going northbound, made that abrupt left-hand turn, to then go westbound. So it entered the intersection, then it went to go west -- westbound.

Q. Okay. And then how -- how many seconds did you see it going westbound?

A. A couple, if that.

Q. And what distance do you think it traveled westbound?

A. I mean, whatever the distance is, I'd say, from the east curb line to that crosswalk on the -- on the west side.

Q. Okay. So let's just look at a few photos that I have, and this may help orient me. I know you're very familiar with the roadway. But we'll mark as Exhibit 1 -- and I'll see if Cooper can help share screen to see if we can all look at this together.

(Exhibit Number 1 was marked.)

MR. GALIPO: Thank you, Kimberly.

MR. MAYNE: One moment. I'm pulling it up. What page number? What page number, Dale?

MR. GALIPO: Exhibit 1. I'm going to try to go in order. I'm old school. That's how I do it.

MR. MAYNE: Okay. Exhibit 1 is showing.

MR. GALIPO: Thank you.

BY MR. GALIPO:

Q. Are you able to see this on your screen, Officer?

A. Yes.

Q. Does this look familiar to you, what's depicted here?

A. Yes.

the traffic collision report.

Q. Right. I'm just wondering whether you recall or not whether the traffic collision report indicates the impact happened in that marked crosswalk?

MS. LEE: Lacks foundation.

Go ahead.

THE WITNESS: From -- from what I recall reviewing the report, they either marked it within or near the crosswalk.

BY MR. GALIPO:

Q. Okay. All right. We'll get back to that.

Let's put Exhibit 4 back up, please.

Can you also see on Exhibit 4, a portion of the marked crosswalk, on the south side of this intersection, going east and west?

A. Yes, sir, I can.

Q. And is that the area where you saw the person riding the electric motorcycle make this abrupt left and move westbound?

MS. LEE: Vague.

Go ahead.

THE WITNESS: I would say -- I would say near it. Again, I can't recall specifically where -- sorry -- specifically where, but near -- near that area.

BY MR. GALIPO:

Q. When you first observed the electric motorcycle traveling northbound for a couple of seconds, did you slow your vehicle down at all?

MS. LEE: Foundation.

Go ahead.

THE WITNESS: Again, I can't recall, but I was -- I was coasting through the -- the intersection, I think, from what I recall. So, from my point of view, it appeared that the bike was going to go past -- past my vehicle.

BY MR. GALIPO:

Q. When it was going northbound?

A. Yes.

Q. Okay. How about when you saw the vehicle starting to turn and moving westbound? Did you brake or stop your vehicle at that point?

A. I mean, it all happened within a matter of seconds, so it's -- it's hard to recall.

Q. Do you recall if you braked your vehicle during the time it was going west -- the electric motorcycle was going westbound?

(Reporter clarification.)

THE WITNESS: Yes. I said: At some point, I did hit my brakes.

BY MR. GALIPO:

Q. Do you know when that was, whether it was before or after the impact?

A. From what I recall, right before.

Q. And when you say "right before," how much -- you can take -- yeah -- how much time passed from you hitting your brakes and the impact?

A. A sec- -- a second.

Q. Was your foot on the accelerator after -- strike that.

Was your foot on the accelerator when you first entered the intersection?

A. Again, I -- I can't recall if I just took my foot off the brake and proceeded forward, or if I had to, you know, touch the accelerator a little bit to get the vehicle to move through the intersection.

Q. Do you ever recall braking your vehicle at any time that the bicycle was moving northbound?

A. Not that I recall.

Q. Do you ever recall braking your vehicle during the time frame that the electric motorcycle was going across the -- going westbound in the area of that marked crosswalk, on the south side of the intersection?

MS. LEE: Vague.

Go ahead.

THE WITNESS: Again, I -- I mean, the best way

I could explain it is when I proceeded to go through the intersection, and I observed the vehicle, and then I observed the vehicle make the abrupt turn, you know, I tried to basically avoid the vehicle.

BY MR. GALIPO:

Q. And did you try to avoid the vehicle by immediately bringing your vehicle to a stop?

A. Immediate -- or I would say, bringing my vehicle to a stop and turning it out of the way.

Q. Was there anything, in your mind, prohibiting you from bringing your vehicle to an immediate stop if you were only going 5 to 10 miles an hour?

MS. LEE: Objection. It calls for speculation. May call for an expert opinion. Lacks foundation.

Go ahead.

THE WITNESS: I mean, the best way to answer it is I think going through -- through the intersection, right, my intent was to proceed through -- through the intersection to Michael Clark.

At no point -- or I didn't deem it, you know, necessary to brake in the middle of the intersection when there were, you know, oncoming vehicles from both east and westbound. I know they were slowing down, but still, being in the middle of an intersection can be a dangerous situation.

BY MR. GALIPO:

Q. Did you ever consider, when you saw the vehicle going westbound in front of your vehicle, turning to your left?

A. I -- I can't recall. It all happened within a matter of seconds, so I had to make a -- a split-second decision.

Q. When you -- you, at some point, turned your vehicle to the right; is that correct?

A. Yes, sir.

Q. And do you know if you ever braked your vehicle before turning it to the right?

A. From -- from what I recall, I -- I believe it happened all simultaneously.

Q. And when you turned your vehicle to the right, at that point did you observe the electric motorcycle going in the direction of the marked crosswalk that goes north and south?

MS. LEE: Vague.

Go ahead.

THE WITNESS: Again, when the -- when the vehicle came into the intersection, it happened, and the turn occurred very abruptly and quickly. So it all happened within a matter of seconds of it, you know, coming that direction.

BY MR. GALIPO:

Q. Right. I understand that. But you told me, I think, that you saw the vehicle going westbound at some point; correct?

A. Correct.

Q. And when it was going westbound, it was going, I take it, in the direction of the marked crosswalk that goes north/south?

MS. LEE: Well, vague. And foundation.

But go ahead.

THE WITNESS: I mean, again, it -- it happened all super quick. I was not expecting, you know, the motorcycle to make the turn that sharp, you know, and end up in the location it ended up.

BY MR. GALIPO:

Q. Right. All I'm trying to ask you right now is when you saw it going westbound, was it going in the direction of the marked crosswalk that runs north/south?

A. Well, I mean --

MS. LEE: Same objections.

But you can answer.

THE WITNESS: I mean, going -- going -- I mean, yes, it was going westbound. It was -- I mean, I couldn't predict where the bike, you know, was specifically going to end up.

I mean, going westbound, yeah, it was going generally towards that direction. I couldn't tell you the specific spot, you know, it was -- it was going or the direction of, you know, the specific path that it was trying to take.

(Reporter clarification.)

BY MR. GALIPO:

Q. Did you ever, at any time, see the electric motorcycle enter or get close to the marked crosswalk that runs north/south?

MS. LEE: Vague.

Go ahead.

THE WITNESS: I'm sorry. Could you ask it again or in a different way?

BY MR. GALIPO:

Q. Yeah. I can ask it in a different way.

Did you ever see the electric motorcycle get close to the marked crosswalk that runs north/south?

MS. LEE: Vague.

Go ahead.

THE WITNESS: I mean, again, from my -- my point of view, it made that abrupt turn to go westbound, and it ended up, you know, the path -- it ended up basically towards the, you know -- approaching my patrol vehicle.

right.

Q. When you turned your police vehicle to the right, how far was the front of that motorcycle from that east marked crosswalk line?

MS. LEE: Lacks foundation. May call for speculation.

But go ahead. Answer, if you know.

THE WITNESS: I mean, it happened within a matter of seconds, so it's hard for me to say specifically the amount of -- of how many feet it was away from that crosswalk.

MS. LEE: And once again, don't guess. If you have an estimate, give the estimate. But if you don't know, then you don't know.

THE WITNESS: I mean, if I had to estimate, I would say within 10 -- 10 feet.

BY MR. GALIPO:

Q. And when you saw it within 10 feet of that eastern line of the marked crosswalk, which direction was it traveling at that point?

A. I mean, again, it came and made the abrupt turn, so it was traveling westbound.

Q. Did you ever see it turn from a westbound direction, prior to impact, the bicycle?

MS. LEE: Misstates the evidence.

Go ahead.

THE WITNESS: Again, to explain it, the vehicle came from the shopping center, going northbound, made the abrupt left-hand turn, to go westbound. And all of that happened within a matter of seconds.

BY MR. GALIPO:

Q. But are you saying the vehicle was going westbound at the time of impact? That's what I'm wondering?

A. Yes. It was traveling westbound at the time of impact.

Q. And what part of the vehicle do you believe the front of your patrol car came in contact with?

MS. LEE: May lack foundation.

But go ahead.

THE WITNESS: The electric motorcycle ended up colliding with the front push bar of the -- of the patrol vehicle, on the side part of it.

BY MR. GALIPO:

Q. What side?

A. I guess, if -- from the -- the -- the driver's side, I guess, of the push bar.

Q. No, no, no. I'm talking about the motorcycle. Would it be the left side of the motorcycle, the right side, or the front? Where do you think the push bar

impacted the motorcycle?

MS. LEE: Lacks foundation. May call for speculation.

But go ahead.

THE WITNESS: The front of the motorcycle ended up colliding with the side of the push bar.

BY MR. GALIPO:

Q. The front tire of the motorcycle?

MS. LEE: Same objections.

But go ahead.

THE WITNESS: I can't specifically say what front part of it collided, but based on the -- the travel of the motorcycle, it would be the front -- some -- some part of the front of the vehicle.

BY MR. GALIPO:

Q. And how long -- how much time passed, from turning your wheel to the right and the time of impact?

A. A -- a -- a second.

Q. How fast were you going at the time of impact?

A. 5 to 10 miles an hour, prior to braking.

Q. How fast at the time of impact?

MS. LEE: Calls for speculation.

Go ahead.

THE WITNESS: I would say zero.

BY MR. GALIPO:

Q. You think your vehicle was completely stopped at the moment of impact?
A. From what I recall.
Q. And how long before the impact do you think you braked?
A. Again, a -- a second. It happened all simultaneously.
MR. GALIPO: Okay. Can we look at Exhibit 5 -- mark and look at Exhibit 5, please.
(Exhibit Number 5 was marked.)
THE WITNESS: Also, can we take a quick five-minute break prior to moving on?
MR. GALIPO: Yes. Yes, we can. Let's take a five-minute break.
THE VIDEOGRAPHER: Going off record at 12:22 p.m.
(Break taken.)
THE VIDEOGRAPHER: Back on record at 12:29 p.m.
MR. GALIPO: Thank you. Okay.
I think we're looking at Exhibit 5, I believe.
MR. MAYNE: That's correct.
BY MR. GALIPO:
Q. And we can see a little more clearly here the two marked crosswalks we've been talking about.
A. Yeah. I -- I can see the crosswalks. Yes,

south side of the intersection, that runs east and west.

Q. Did you ever see the electric motorcycle in this crosswalk?

A. Well, I mean, I had to pass it at some point to enter the intersection.

Q. Did you ever see it traveling west in this crosswalk?

A. No.

Q. So when you saw it traveling west, was it in the intersection, beyond the crosswalk?

A. Yes.

MR. GALIPO: Can we mark and look at Exhibit 7, please.

(Exhibit Number 7 was marked.)

BY MR. GALIPO:

Q. Is this looking north?

A. Yes.

Q. So are you saying that the electric motorcycle entered the intersection, past the marked crosswalk, and then made this abrupt turn to the left, going westbound?

A. Correct.

Q. And then, from your testimony, it was still traveling westbound at the time of the impact?

MS. LEE: Well, hold on.

Foundation.

But go ahead.
THE WITNESS: I mean, prior -- prior to, again, like I said, it all happened so quick, within a matter of seconds; but, yes, it was traveling westbound, prior to.
BY MR. GALIPO:
Q. And it would have been traveling from your left to right?
A. Yes.
Q. And then you turned to your right, and then shortly thereafter, in about a second, there was an impact?
MS. LEE: Well, hold on. That misstates the testimony.
Go ahead.
BY MR. GALIPO:
Q. Well, let me break it down.
Did you turn to your right?
A. I did.
Q. And was there an impact about a second after you turned to your right?
A. Again, it -- it pretty much happened simultaneously.
Q. You're saying you're turning to the right and the impact was almost simultaneous?
A. It was within a matter of a second or seconds.

Q. Well, that's what I'm trying to find out. From you turning to your right to the impact, I thought you told me before it was about a second; but if you have a different response, you can tell me.
A. Again, from -- from what I recall, it happened within a second.
Q. Okay.
A. If -- if that.
Q. Go ahead. I'm sorry.
A. I said: If that, as just an estimation.
MR. GALIPO: Okay. So I want to show you just a few pages of the traffic crash report. If we could put the front page up. We don't need to mark this at this time.
Can we make it bigger, Cooper, please?
BY MR. GALIPO:
Q. Okay. Can you see the top of the report, at least, on your screen?
A. Yes, I can.
Q. All right. And you see the name of the individual that was riding the electric motorcycle?
A. Yes, I can.
MR. GALIPO: And if we could scroll down, please.
BY MR. GALIPO:

talking about braking before the incident. Did you notice that when you reviewed the statement?

A. I mean, reading it -- reading it now, I notice it.

Q. Okay. Did you also notice that he listed your speed at 10 miles an hour?

A. Yes.

Q. There's a -- about on line 20, there's a reference to: "P-2 then observed P-1 riding V-1 at a high rate of speed towards him."

Do you see that?

A. Uh-huh. Yes.

Q. Did you tell the CHP officer that?

A. I told the CHP officer what we've been -- pretty much what I have been stating throughout today, that, you know, I was traveling through the intersection, and within a matter of seconds, the V-1 or the -- the motorcycle ended up going northbound and making the abrupt left-hand turn to go westbound.

And I would consider a vehicle doing, from what I estimated, 25 to 30 miles an hour, a high rate of speed.

Q. So when the vehicle -- I'm sorry. Go ahead.

A. I was just going to say, again, it happened within a matter of seconds.

Q. Right. When the vehicle was going westbound, was it going towards you, in your mind?

MS. LEE: Well, calls for speculation.

But go ahead.

THE WITNESS: I mean, again, I can't, you know, read the other person's mind. I -- I just knew that the direction of travel was going westbound. I didn't know specifically -- you know, the specific path of travel it was going to take, other than it was generally moving in a direction that goes westbound. I was just trying to get out of the way.

BY MR. GALIPO:

Q. You would agree you never told -- at least according to this summary, you never told the CHP officer that you tried to brake before the incident?

MS. LEE: Well, objection. That lacks foundation, and it misstates the evidence.

Go ahead.

THE WITNESS: I can't recall.

BY MR. GALIPO:

Q. Did you ever tell the CHP officer you swerved to the left?

MS. LEE: Misstates his testimony.

Go ahead.

THE WITNESS: I can't recall.

MR. GALIPO: Okay. Thank you. You can take that down, Cooper.

One more page I want to look at. Go to page 11, on line 20 -- this would be page 11. Yes.

On line 25, can you enlarge that little bit, please.

BY MR. GALIPO:

It says: "P-2 was unable to slow down in time prior to the crash."

Do you see where it says that?

A. Yes.

Q. You -- did you ever tell the CHP officer you were unable to slow down in time, prior to the crash?

MS. LEE: Lacks foundation.

Go ahead.

THE WITNESS: Not that I recall. Again, like I said, it -- it happened in a matter of seconds.

So, again, I was unable to move, you know, my vehicle out of the way of that. You know, that collision, of course, it ended up happening. Again, that happened within a matter of, you know, seconds. It happened very quickly.

Q. Okay.

A. I don't recall specifically what I told that CHP officer.

Tyler Williamson

traffic collision from occurring.

BY MR. GALIPO:

Q. You would agree, based on your training, it was important for you to do everything in power to prevent a collision from occurring?

MS. LEE: Well, objection. That lacks foundation, and it's argumentative.

But go ahead.

And vague.

But go ahead.

THE WITNESS: I mean, again, in that moment, and, you know, just being, you know -- just trying -- yeah, doing everything I can to avoid a collision, sometimes you're only faced with a limited amount of solutions or options that you can make in an attempt to avoid a collision.

BY MR. GALIPO:

Q. Right. Because obviously, given the size of your vehicle, you were aware if there was a collision between your vehicle and this person on this electric motorcycle, there could be potential for injuries?

MS. LEE: Lacks foundation. Incomplete hypothetical.

But go ahead.

THE WITNESS: Again, I -- I tried to do

everything in my power to avoid a traffic collision.

BY MR. GALIPO:

Q. Okay. Would you agree with me that if you had turned to the right to intentionally strike the electric motorcycle, that would have been inappropriate and contrary to your training?

MS. LEE: Okay. Objection. Incomplete hypothetical. Lacks foundation. May call for a legal conclusion. Vague and overbroad.

Go ahead.

THE WITNESS: Again, the -- the pattern I made, I did everything in my -- in my power and my ability to attempt to avoid a collision. I would obviously, you know, do everything in my -- in my power -- again, like I said, I mean, I feel I'm a little bit repeating myself -- but to avoid a collision, by, you know, the best of my ability.

BY MR. GALIPO:

Q. Right. What I'm just asking, and it's probably obvious, you would agree it would have been inappropriate to intentionally strike the motorcycle?

MS. LEE: Incomplete hypothetical. Calls for a legal conclusion. Vague and overbroad.

But you can answer.

THE WITNESS: I would -- again, I would never

intentionally cause any sort of traffic collision.

MR. GALIPO: Okay. Thank you. That's all the questions I have.

Lisa, I don't know if you have any today or not?

MS. LEE: No, I don't.

THE VIDEOGRAPHER: Going off record at 12:58 p.m.

THE CERTIFIED STENOGRAPHER: Ms. Lee, are you ordering a copy?

MS. LEE: Yes.

(12:58 p.m., deposition concluded.)

--oOo--

STATE OF CALIFORNIA)
                   ) ss:
COUNTY OF BUTTE    )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 28th day of May, 2026.

____________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

ERRATA SHEET

PAGE/LINE CHANGE REASON

# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

T.J.N., a minor by and through his Guardian Ad Litem WILLIAM NAVAROLI,

Plaintiff,

v. Case No. 2:25-cv-11601

CITY OF SIMI VALLEY; TYLER WILLIAMSON; and ERIC COOK,

Defendants.
_________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF

ERIC COOK

TUESDAY, MAY 19, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 26831

APPEARANCES (Remote)

FOR THE PLAINTIFF:

LAW OFFICES OF DALE K. GALIPO
BY: COOPER ALISON MAYNE, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
cmayne@galipolaw.com

FOR THE DEFENDANT:

BURKE WILLIAMS AND SORENSEN, LLP
BY: LISA W. LEE, ESQ.
444 South Flower Street, 40th Floor
Los Angeles, CA 90071-2942
213-236-0600
llee@bwslaw.com

ALSO PRESENT:

Said Hofiani, Videographer

--oOo--

INDEX OF EXAMINATION

WITNESS: ERIC COOK

EXAMINATION BY PAGE

MR. MAYNE.................................4

EXHIBITS FOR REFERENCE

EXHIBIT DESCRIPTION PAGE

Ex 8 - Copy of photo.............................35

Ex 9 - Copy of photo.............................36

Ex 10 - Annotated version of Exhibit 8...........38

Ex 11 - Annotated version of Exhibit 9...........39

--oOo--

--oOo--

BE IT REMEMBERED, that set on Tuesday, the 19th day of May, 2026, commencing at the hour of 2:02 p.m., thereof, ERIC COOK, appeared remotely in Simi Valley, California, before me, Kimberly E. D'Urso, an RPR and Certified Shorthand Reporter of the State of California, the following deposition was stenographically reported by me:

THE VIDEOGRAPHER: Good afternoon. We're on record at 2:02 p.m. Today's date is May 19th, 2026. This is the recorded remote video deposition of Eric Cook, in the matter of Navaroli versus City of Simi Valley, case No. 2:25-cv-11601.

This deposition is being held via web conference. My name is Said Hofiani. I'm the videographer with Focus Litigation Solutions. The court reporter is Kimberly D'Urso.

Counsel, please introduce yourselves and state whom you represent, after which the court reporter will state her CSR license number and swear in the witness.

MR. MAYNE: Good afternoon. I'm Cooper Mayne, one of the attorneys for the plaintiff in this case.

MS. LEE: Lisa Lee, appearing for on behalf of Defendants City of Simi Valley, and Officer Defendants

between when you first encountered Tanner and when the incident at issue in this suit happened?

MS. LEE: Same objections.

But Cooper, would you just allow me to have a standing objection so I don't have to keep interrupting that he's not here as a 30(b)(6) witness, the entity is not bound, and he's testifying pursuant to his own training and experience?

MR. MAYNE: Yes, that's fine.

MS. LEE: Okay. Go ahead.

THE WITNESS: Can you repeat the question, please, sir?

BY MR. MAYNE:

Q. Yes. We were talking about a kind of -- how did you describe it? Not a policy, but a -- in your words, what was it?

A. Oh, geez. It was kind of an understanding of all the traffic -- or the Traffic Bureau, how we would try and approach this, combat the problem of e-motorcycles. The -- the lack of education on both of rider and the parent's part, and then as well as including some enforcement.

Q. Right. So all I was asking is at the time of the incident at issue in this suit, had that approached changed, or was it same as when you first encountered

Tanner?

A. That approach was the same.

Q. Turning to the date of the incident, could you describe the initial call that you were responding to?

A. Yeah. I was -- I heard a call of a -- a disturbance near the Panda Express and the Regal Plaza go out. I believe the call indicated multiple juveniles seen on electric-motorcycles, recklessly -- recklessly driving in the parking lot.

Q. And could you describe where you were coming from when you made your approach to the scene? Were you coming from Tapo Canyon Road?

A. Correct.

Q. And if you could just describe your approach to the scene and your first observations of any of the kids who were there with their motorbikes?

MS. LEE: Compound. Calls for a narrative.

Go ahead.

THE WITNESS: I entered the southern part of the property. It's near a -- I'm not sure if you're familiar, or if you're looking at a map. There's a Carl's Junior beyond near the entrance exit. It's also in line with the westbound off-ramp of the 118 freeway. So that's the driveway I entered.

I -- I then made a right turn towards the --

how would I best describe it? I made a right turn to travel northbound along the businesses that border Tapo Canyon, so the eastern part of the parking lot.

And then right before -- I entered the aisle of the parking lot just -- I'm getting my directions right -- just southeast of the Panda Express. So if you were to -- if you were look at Panda Express from where I entered, it would be in the northern west -- western direction.

BY MR. MAYNE:

Q. Okay.

A. Okay.

Q. Go ahead. Go ahead. I didn't mean to cut you off.

A. No. I forgot you asked about the approach.

So as I went down that aisle, I then made a right turn when I reached the aisle where traffic flows north and south in the parking lot, and that's where I observed multiple e-motorcycles in a little grouping.

Q. So what business were they closest to when you observed them?

A. They were just southeast, probably closest to the Starbucks. And that's because Starbucks kind of is more towards -- more towards the parking lot.

If the Panda Express wasn't so -- I don't know

the correct term. Panda Express is kind of away from the parking lot. It was in line with the Panda Express, however, the closest business was Starbucks.

Q. And were the youths still -- I'll just say: Did you ever see them with your own eyes, driving their motorbikes recklessly?

MS. LEE: Objection. Foundation. Compound.

Go ahead.

THE WITNESS: Yes. When I -- when I first pulled up on scene, I did see multiple e-motorcycles doing wheelies -- or recklessly driving. Sorry.

Q. Were there some who were not engaging in that behavior of doing wheelies?

A. Correct.

Q. Was the youth that you later identified as Tanner, one of the individuals who was not doing wheelies?

A. Correct. He was not.

Q. So after you saw them engaging in, what you described as, reckless driving, what did you do next? Did you give out any orders, or describe in your own words what you did next?

A. Yeah. When -- when I first arrived on scene, I don't even -- I can't recall, but there was no time to give out orders or to identify myself. And then, that's

when a couple of the e-motorcycles had fled the area, fled away from the area.

Q. Did they all go in the same direction, or did some of them go in different directions?

A. My understanding was just two that turned around and then fled the area away from me. I -- to my best knowledge, I don't know if the rest of the group had stayed or went towards the south. I didn't -- I didn't see.

Q. Did you have your -- well, first of all, did your motorcycle have sirens or lights on it?

A. It was equipped --

MS. LEE: Compound.

Go ahead.

THE WITNESS: Sorry. My motorcycle was equipped with lights and sirens.

BY MR. MAYNE:

Q. Were either the sirens or the emergency lights activated?

A. At the time of the first contact, no.

Q. Okay. After you saw two bikes start moving north, what did you do?

A. I --

MS. LEE: Misstates the testimony.

Go ahead.

THE WITNESS: I proceeded past the -- the rest -- the remaining group of the e-motorcycles and continued to try and catch up to the -- the two e-motorcycles that left the area.

BY MR. MAYNE:

Q. When you were trying to catch up to them, approximately how fast were you going?

A. I do not recall my speed. I didn't look down at my speedometer. Yeah.

Q. Do you recall their speed?

A. One of them had -- one of the e-motorcycles had quickly yielded to the front of the Regal Movie Theater, which is just north of -- just north of Starbucks. That's when I continued after the last remaining e-motorcycle. I estimated his speed in the parking lot around 30 miles an hour, 30 to 35.

Q. So as that -- did you later learn that the individual who kept going was Tanner?

A. Yes, sir.

Q. So after what you just described, Tanner continuing to drive, what happened next? What did you see next?

MS. LEE: Vague. Overbroad.

Go ahead.

THE WITNESS: Would you like me to refer to him

as "Tanner" from now on?
BY MR. MAYNE:
Q. That's fine. Yeah.
A. Okay.
Q. "Mr. Navaroli" is too formal for somebody of his age. In my opinion.
A. Okay. As Tanner continued northbound on the e-motorcycle, he made a left turn in the parking lot -- which I'm not sure if this part of the roadway is considered Michael Clark yet -- but the -- this part of the parking lot ultimately turns into Michael Clark Park- -- Parkway.
After he made that left turn at an unsafe speed, he was traveling pretty quickly through that turn. He passed two vehicles, one traveling -- one traveling westbound and then one also trav- -- coming southbound and then eastbound in the parking lot.
Q. So that was the part I was having trouble within your statement, so I'm going to hope that you could break it down. Not all officers are always as good at directions as you are.
So when you saw him passing those cars, was that at the same time that he was -- he was passing those two cars at the same time, or was it separated by some time?

MS. LEE: Vague.
Go ahead.
THE WITNESS: I can't -- I can't recall if it was the same time or if it was -- or if he passed one and then immediately another one. I can give you my best guess.
MS. LEE: Well, don't guess. If you have an estimate, then give him the estimate, but we don't want you to guess.
THE WITNESS: Okay. Yeah. My best estimate as he passed the car traveling westbound, shortly -- shortly thereafter the eastbound car, the southbound car, he then passed, as well.
BY MR. MAYNE:
Q. So when you say the "eastbound car" or the "southbound car," that's the part that is throwing me off. What do you mean by that?
A. It's because Michael Clark, there's a -- there's a -- on the southern most -- the southern portion of the roadway before it enters the parking lot, it's a curve. So you travel south on Michael Clark, and then the road -- the parkway curves to the east. I'll refer to that as "eastbound car."
So he passed -- he passed the westbound car, and then shortly after passed a car traveling eastbound.

Q. Okay. So these events where he's passing the cars, did those happen before the curve, when the road's still in the parking lot, going in an east/west direction?

A. It happened --

MS. LEE: Vague. Foundation.

Go ahead.

THE WITNESS: It happened in the parking lot when they were traveling east and west, before the curve -- it curves north.

Q. Do you recall whether he passed on the left or on the right of the westbound car?

A. He passed on the left.

Q. And what about the eastbound car?

A. It passed him on the driver's side of the eastbound car.

Q. So when he passed the eastbound car, was he essentially just driving in the opposite direction of the eastbound car, in that the eastbound car was in its proper side of the lane and Tanner was in his proper side of the lane?

MS. LEE: Well, it's compound and vague.

Go ahead.

THE WITNESS: Correct.

BY MR. MAYNE:

Q. When he turned -- he was going northbound, and then he turned to go westbound on that smaller -- on that small street that eventually turns into Michael-something road, Michael Clark Parkway. When he made that initial left turn, did he slow down to make that turn?
A. Are you still talking about in the parking lot when he made the -- the first left?
Q. Yes. The first left in the parking lot.
A. I did not -- it -- the bike was not equipped with any brake lights, and I am not sure of any -- any brake activation. However, his turn -- his turn appeared unsafe. It was at a high rate of speed.
Q. What's your best estimate of the speed Tanner was going when he passed that first car, the westbound car?
A. Approximately, 30 miles an hour.
Q. And where were you, relative to him, when you witnessed that?
A. I was just beginning my left-hand turn to -- behind him.
Q. And was he going the same speed or a similar speed when he passed by the second car, the eastbound car?
A. The same, if not a little faster, a little

quicker.

Q. As he turned to go northbound on that street, the Michael Clark Parkway --

A. Uh-huh.

Q. -- do you recall what his speed was, whether he stayed the same speed, slowed down, or sped up?

A. It appeared he accelerated for a short amount of time. That's where I estimated his speed to be between 30 and 35 miles an hour.

Q. And then, as he continued going north on that Michael Clark Parkway, same question: Did you notice him slowing down, staying the same speed, or speeding up?

A. Same speed.

Q. What about when he reached Alamo? What did you see as he approached Alamo Street?

A. As he approached -- if you look at the -- if you look at a map or the roadway on the -- it's bordered by raised -- raised cemented curbs.

Tanner was -- but as an easier term, he was in the -- he was in the most -- the eastern most part of the roadway, hugging that eastern curb. As he approached the -- the intersection of Alamo, he had his left foot out, which indicated to me that he was going to make a left-hand turn.

Q. And did he eventually make a left-hand turn?
A. He began a left-hand turn. He never completed a turn, though.
Q. Did he start turning left before, or inside, or after the crosswalk?
MS. LEE: Vague.
Go ahead.
BY MR. MAYNE:
Q. I can clear that up. Did he begin his left-hand turn, before, inside, or after the crosswalk that goes across of the south side of Michael Clark Parkway?
A. He began his turning movement before the crosswalk.
Q. And did you notice any changes in his speed as he turned?
A. No, no noticeable changes. He kept he -- he kept a constant speed throughout the turning movement.
Q. Before I forget, the initial call, were there any injuries reported?
A. Of -- of the radio call for service?
Q. Yeah. Sorry to jump back, but when you were responding to the initial call, did it include information that there had been any injuries reported?
A. To my knowledge, no. It was just a disturbance

call, so just juveniles creating a disturbance. No injuries, to my knowledge, were reported.

Q. At any point during this interaction -- during this incident, did you subjectively think that Tanner knew you were driving behind him?

MS. LEE: Well, calls for speculation.

But you can answer.

THE WITNESS: I believe so, yes.

BY MR. MAYNE:

Q. At what point did you think that he was aware you were driving behind him?

MS. LEE: Same objections.

But you can answer.

THE WITNESS: At the initial contact when I first arrived on scene.

BY MR. MAYNE:

Q. And what gave you the impression that he knew that you were driving behind him?

A. Leaving the area at a high rate of speed.

Q. Was there anything else that gave you that impression?

MS. LEE: Vague.

Go ahead.

THE WITNESS: Other than just the continuation of reckless driving through the parking lot, led me to

believe that he -- to his knowledge, that I was trying to catch up to him.
BY MR. MAYNE:
Q. Did you ever see him look in your direction at any point?
A. No, I did not.
Q. When you first saw him, was his body facing you, or away, or at any other angle that you can describe or remember?
A. Are we -- is this going back to the first contact when I arrived on scene?
Q. Yes. When you first arrived.
A. He was faced southbound towards my direction. It appeared he was looking in my direction. I didn't ask him personally, but my best -- to my knowledge, he knew I was a police officer.
Q. Were you planning to stop Tanner?
A. Yes.
Q. And departments all have different definitions, so it can be tricky, so your -- based on your department's training, was this a pursuit?
A. It was not, no.
Q. And why not?
A. I was --
MS. LEE: Well, hold on. Hold on.

That's extremely vague, and may call for a legal conclusion.
But you may answer.
THE WITNESS: I never felt I was close enough to engage -- or to try to conduct a traffic enforcement stop. I was, for lack of a better term, still playing "catchup." I never felt close enough that I would -- that he would have the knowledge of me behind him, trying to conduct a traffic enforcement stop.
BY MR. MAYNE:
Q. So if he did have knowledge that you were behind him, trying to conduct a traffic enforcement stop, would that -- that's what would define a pursuit? Is that what you're saying?
MS. LEE: Objection. It calls for a legal conclusion. It's an incomplete hypothetical. It lacks foundation. Calls for speculation.
But go ahead.
THE WITNESS: Can you repeat the question one more time, sir?
BY MR. MAYNE:
Q. Yes. I can rephrase it, as well.
So I'm not a police officer, so I don't --
A. Uh-huh.
Q. -- engage in pursuits or things that are

similar to pursuits. So I'm just hoping you can describe, according to your training, when does an encounter with another vehicle raise to the level of being a quote-unquote "pursuit"?

MS. LEE: Incomplete hypothetical. Calls for a legal conclusion.

But go ahead.

THE WITNESS: In -- in this case, when I -- I can determine that the driver or the rider of the vehicle has knowledge that I'm -- my red lights or my blue and red emergency lights on my police motorcycle including my siren, that they have knowledge that I'm trying to conduct a traffic emergency stop, and they are failing to yield to my emergency lights and sirens.

BY MR. MAYNE:

Q. Understood.

And did you turn your lights and sirens on at any point during this incident?

A. I did not, no. The only time I turned to my lights were after the collision to help with medical aid and traffic.

Q. Could you describe your training -- my understanding is that there's a certain balancing that you're supposed to do when deciding whether to engage in a pursuit. Is that correct? And if so, can you explain

that?

MS. LEE: Well, extremely vague. Overbroad. Compound. Incomplete hypothetical. Calls for a legal conclusion.

But go ahead.

THE WITNESS: I'm not sure what you mean by "balancing."

BY MR. MAYNE:

Q. Let me take a quick look at a document, so I don't make things up.

(Pause.)

BY MR. MAYNE:

Q. Well, let's talk briefly about an intervention technique called "blocking." Could you describe, according to your training, what that technique is?

MS. LEE: Foundation. Compound. Vague.

Go ahead.

THE WITNESS: Blocking would just be the -- putting the -- or preventing the vehicle from continuing down -- down its path of travel.

BY MR. MAYNE:

Q. And according to your training, are you supposed to "consider the need to immediately stop the suspect vehicle or prevent it from leaving, and whether that reasonably appears to outweigh the risk of injury

or death to occupants of the suspect vehicle, officers, or other members of the public, before engaging in a blocking technique"?

MS. LEE: Incomplete hypothetical. Vague. Compound. Overbroad.

Go ahead.

THE WITNESS: I'm not too -- it's not a -- it's not a common practice that we use. It's highly dangerous. I'm not too sure I'm able to answer that question.

BY MR. MAYNE:

Q. The -- were you saying the blocking technique is highly dangerous?

A. Correct.

Q. Why is that?

MS. LEE: Well, objection. It calls for a legal conclusion, and it lacks foundation.

But go ahead.

THE WITNESS: You're putting yourself and your vehicle in front of the -- in front of the path of another vehicle. That's why it's dangerous. It could cause a collision.

BY MR. MAYNE:

Q. So it's dangerous to the suspect vehicle, but also the officer?

A. Correct.

MS. LEE: Also, lacks foundation. Incomplete hypothetical.

BY MR. MAYNE:

Q. At some point, did you see a police vehicle on the other side of Alamo Street, from -- from where you were?

A. Yes, I did.

Q. Did you pretty immediately realize that was a police vehicle versus a civilian vehicle?

A. Yes, I did.

Q. At some point, did that vehicle turn on its lights or sirens?

A. I know the vehicle turned on its Code 3 lights. I'm -- I don't recall a siren. When I'm on the motorcycle, it's -- it's hard to hear.

Q. Did you hear that vehicle honk at any point?

A. I did not hear it, no.

Q. At any point during the incident, did you hear the screeching of brakes?

MS. LEE: Calls for potentially an expert opinion.

But go ahead.

THE WITNESS: I don't recall hearing any screeching of tires.

BY MR. MAYNE:

Q. Do you recall seeing any tire skid marks, when you were at the scene of the collision, afterwards?

MS. LEE: Foundation. May call for an expert opinion.

Go ahead.

THE WITNESS: I can't recall if I observed any skid marks.

BY MR. MAYNE:

Q. So, at some point, did you see Tanner and the vehicle we're talking about, collide?

A. At some point, yes, I did.

Q. Was Tanner still in the process of turning left, or was he going straight at that point when you saw him collide with the other -- with the officer?

MS. LEE: Foundation.

Go ahead.

THE WITNESS: He was still conducting his left-hand turn. How -- however, there was an incline in the roadway, just south of the southern crosswalk, before you enter the intersection, which I believe may have caused a factor of why it pushed him so wide.

BY MR. MAYNE:

Q. Do you recall approximately what angle he was at, in terms of, you know, northwest, or -- or

southwest, or whatever you recall? I'm just trying to get a sense of -- you know, I know he was turning, but I'm wondering how far he was into his turn when the collision occurred.

MS. LEE: Foundation.

But go ahead.

THE WITNESS: I don't recall.

BY MR. MAYNE:

Q. At some point, did you see the police vehicle turn to its right?

A. I -- I don't recall a sudden turning movement. The lights on the vehicle are pretty bright. So it -- it -- I don't remember seeing the vehicle traveling straight and then abruptly turn right.

Q. So were the lights -- it sounds like you're saying the lights were part of what prevented you from seeing that; is that correct?

A. Correct.

MS. LEE: Well, hold on.

Lacks foundation.

But go ahead.

BY MR. MAYNE:

Q. And are you describing the headlights, or the emergency lights, or a combination?

A. Combination of both the emergency Code 3

lights, as well -- as well as the headlights.
Q. And how did that make it difficult to see the direction that the police vehicle was going?
A. I knew the police vehicle was traveling southbound, however, I -- I don't recall any sudden right turns. It wasn't until the collision occurred that I saw the vehicle had been in a south -- positioned in a southwest direction, or partially southwest direction.
Q. If the police vehicle had turned left to an eastern direction or a southeastern direction, would that have avoided the collision?
MS. LEE: Well, objection. Lacks foundation. Calls for speculation. Incomplete hypothetical. May call for an expert opinion.
Go ahead.
THE WITNESS: I don't -- I can't really say.
BY MR. MAYNE:
Q. You mentioned that it was a little difficult to see because of the lights, but could you see whether the police vehicle slowed down, sped up, or stayed the same speed as it -- as it crossed Alamo Street, just prior to colliding with Tanner?
MS. LEE: Foundation.
Go ahead.

THE WITNESS: It appeared it was traveling at a constant speed. I didn't see any rapid acceleration or braking.

BY MR. MAYNE:

Q. Did you see what happened to Tanner in the moments after the collision, in that, did you see his body, you know, flung somewhere? I mean, did you see the consequences of the collision for Tanner?

MS. LEE: Vague.

Go ahead.

THE WITNESS: I saw that he was ejected from his vehicle and then landed in the designated eastbound left-turn lane of the intersection.

BY MR. MAYNE:

Q. So when you say "ejected," does that mean at some point, he's, like, in the air?

A. It just means --

MS. LEE: Vague.

But go ahead.

THE WITNESS: It's more of like a traffic collision term. He left the driver's seat of the vehicle, and landed on the ground.

BY MR. MAYNE:

Q. The place where he eventually was resting on the ground, about how far do you think that was from the

police where you saw the collision?
Does that make sense?
A. Yes, it does.
MS. LEE: Foundation.
Go ahead.
THE WITNESS: My best estimate, approximately, 15 to 20 feet. And that's just going off the size of the traffic lane. I believe they're 10 to 12 feet.
BY MR. MAYNE:
Q. So, after he was ejected from his motorbike, his body traveled about that distance?
MS. LEE: Lacks foundation. Calls for speculation.
But you can answer, if you know.
THE WITNESS: I do not know. I didn't take the measurements. It was just my best estimate.
MR. MAYNE: Let's take a five-minute break. I'll look over and see if there is anything else I need to ask you, and then we can get out of here.
THE WITNESS: Okay, sir.
THE VIDEOGRAPHER: Going off the record at 2:51 p.m.
(Break taken.)
THE VIDEOGRAPHER: Back on record at 2:55 p.m.
BY MR. MAYNE:

Q. Okay. I'm sharing Exhibit 8, which is marked for the record.
(Exhibit Number 8 was marked.)
BY MR. MAYNE:
Q. And could you take a moment and just look at the exhibit and let me know when you are comfortable and you understand how it's oriented, relative to the incident?
A. Yes, sir.
(Pause.)
BY MR. MAYNE:
Q. So if -- if you can, use the tool on your screen, could you draw your best estimate of the path of Tanner's vehicle, according to your memory?
MS. LEE: That's vague and overbroad, and it lacks foundation for this diagram.
But go ahead.
THE WITNESS: Draw it on the picture?
BY MR. MAYNE:
Q. Yes, if you could.
A. Okay. I'm going to have to change the color. Hold on one second. Sorry.
Q. Take your time.
A. I'm not sure how to change the colors.
Q. I think right below the eraser, you'll see a

A. Yes.

Q. And now I'll do the same thing, which this will be Exhibit 11, which is an annotated version of Exhibit 9.

(Exhibit Number 11 was marked.)

BY MR. MAYNE:

Q. And is that an accurate depiction of what you drew?

A. Yes.

MR. MAYNE: Okay. I don't have any more questions for you today.

Ms. Lee, do you have any questions?

MS. LEE: No questions.

MR. MAYNE: Okay. Thank you for your patience, Officer Cook.

THE WITNESS: Thank you, sir.

MS. LEE: Thank you, Officer.

THE VIDEOGRAPHER: Going off record at 3:05 p.m.

THE CERTIFIED STENOGRAPHER: Ms. Lee, same order for you?

MS. LEE: Yes, please.

(3:05 p.m., deposition concluded.)

--oOo--

STATE OF CALIFORNIA)
                   ) ss:
COUNTY OF BUTTE    )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 28th day of May, 2026.

______________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

# EXHIBIT C

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| T.J.N. A minor by and through his Guardian Ad Litem WILLIAM NAVAROLI,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF SIMI VALLEY, TYLER WILLIAMSON, and ERIC COOK,<br><br>Defendants. | CASE NO. 2:25-cv-11601-MEMF (RAOx) |

VIDEOTAPED deposition of TANNER NAVAROLI, taken by the Defendants, City of Simi Valley, Tyler Williamson and Eric Cook, via Zoom Videoconference, in the City of Banning, County of Riverside, State of California, commencing at 9:23 a.m., WEDNESDAY, MAY 20, 2026, before KIMBERLY E. LEPINS, CSR No. 9592, RPR, for the State of California, pursuant to Notice.

---o0o---

A P P E A R A N C E S:

FOR THE PLAINTIFF:

LAW OFFICES OF DALE K. GALIPO
21800 BURBANK BOULEVARD
SUITE 310
WOODLAND HILLS, CALIFORNIA 91367
(818) 347-3333
BY: COOPER ALISON-MAYNE, ATTORNEY AT LAW
CMAYNE@GALIPOLAW.COM

FOR THE DEFENDANTS:

BURKE, WILLIAMS & SORENSEN, LLP
444 SOUTH FLOWER STREET
40TH FLOOR
LOS ANGELES, CALIFORNIA 90071-2942
(213) 236-0600
BY: LISA LEE, ATTORNEY AT LAW
LLEE@BWSLAW.COM

ALSO PRESENT:

WILLIAM NAVAROLI

THE VIDEO OPERATOR: BEST EVIDENCE VIDEO PRODUCTIONS
BY: BERKLEY KIELHACK

# I N D E X


| WITNESS | PAGE |
|---|---|
| TANNER NAVAROLI | |
| Examination by MS. LEE | 6 |
| Examination by MR. ALISON-MAYNE: | 102 |
| Examination by MS. LEE | 105 |


## INFORMATION REQUESTED

| PAGE | LINE |
|---|---|
| 26 | 7 |

## DOCUMENT REQUESTED

None

## QUESTION WITH AN INSTRUCTION NOT TO ANSWER

None

## E X H I B I T S


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 11 | Excerpt from CHP Report | 96 |
| 12 | Diagram with Witness Notations in Red and Blue | 101 |

09:41:38 A. Yes.
09:41:38 Q. Who did you tell?
09:41:40 A. My dad.
09:41:41 Q. And what did you tell him?
09:41:43 A. I told him I got pulled over and -- or I got stopped and that the guy told me that he rather me doing this than doing drugs or sitting at home playing video games all day, and he told me to ride up in the hills where it's more safe.
09:42:02 Q. And what was your dad's response when you told him that?
09:42:06 A. I don't remember.
09:42:09 Q. Did your father say he as well would rather you be riding up in hills than on public streets?
09:42:15 A. Yes.
09:42:18 Q. Did your father tell you that you were not allowed to ride on public streets anymore with this vehicle?
09:42:24 A. Yes.
09:42:25 Q. And did you take that seriously when your father told you that, that you shouldn't be riding on public streets with that vehicle?
09:42:36 MR. ALLISON-MAYNE: Objection, vague.
09:42:37 BY MS. LEE:
09:42:38 Q. Go ahead, you can answer.

09:42:40 A. Um, yes.
09:42:44 Q. Did you have any other contacts with anyone other officers regarding riding the electric motorcycle?
09:42:52 A. No.
09:42:53 Q. Do you know how many of your friends -- or did any of your friends ever tell you that they had been stopped or had contact with officers for riding electric motorcycles?
09:43:06 A. I don't remember.
09:43:12 Q. Okay.
09:43:13 Do you have any friends or family that are law enforcement officers?
09:43:16 A. No.
09:43:21 Q. Okay.
09:43:22 I want to talk about the incident date and when I say the incident date, I'm talking about the date of the collision. My understanding from all the records is that it occurred on February 7th, 2025.
09:43:36 Would you -- does that ring a bell for you?
09:43:38 A. Yes.
09:43:38 Q. And do you recall if that was a Friday?
09:43:42 A. Yes.
09:43:47 Q. And did you go to school that day --

A. Yes.
Q. -- earlier?
A. Yes.
Q. And how far is your school from your home?
A. Down the street.
Q. How -- do you norm -- how do you normally get to school? Do you walk or you're driven or how do --
A. I drive.
Q. And what do you drive to school?
A. A car.
Q. Were you driving a car to school on the date of the incident?
A. No.
Q. So you obtained that car after the incident; is that right?
A. Yes.
Q. On the date of the incident, how were you going to school?
A. Getting dropped off.
Q. And how long would it take for you to travel from your home to your school in a car?
A. Two minutes.
Q. Okay. So after you came home from school, at some point you rode your electric motorcycle on

09:44:53 that date; is that right?
09:44:55 A. Yes.
09:44:55 Q. What time did you leave your house with
09:44:58 that e-motorcycle?
09:45:01 A. I don't remember.
09:45:03 Q. Was it dark when you left your house or was
09:45:06 it still daylight?
09:45:07 A. Still daylight.
09:45:12 Q. Did you meet with friends?
09:45:14 A. Yes.
09:45:14 Q. Can you tell me the names of the friends
09:45:18 whom you -- who you met with when you were riding
09:45:21 your e-motorcycle?
09:45:22 A. Reef.
09:45:25 Q. Sorry?
09:45:26 A. Reef.
09:45:26 Q. Can you spell?
09:45:27 A. R-e-e-f.
09:45:28 Q. Last name, please.
09:45:30 A. I don't know his last name.
09:45:32 Q. Does he go to your school?
09:45:34 A. Uh, no, he's home-schooled.
09:45:40 Q. Do you know where he lives?
09:45:42 A. No.
09:45:45 Q. I take it you have his phone number because

09:45:47 that's how you contact him; is that right?
09:45:49 A. Uh, yes.
09:45:51 Q. Okay. So I'm going to leave a blank in the
09:45:55 deposition transcript and ask that you look -- to
09:45:58 provide me his phone number if you have it, okay?
09:46:01 A. Okay.
09:46:02 (INFORMATION REQUESTED: __________________.)
09:46:02 BY MS. LEE:
09:46:03 Q. Who else did you meet with other than Reef?
09:46:05 A. Just him.
09:46:09 Q. Okay. So did you call Reef and say, hey,
09:46:13 let's meet up here, or how did that conversation go?
09:46:21 A. Text.
09:46:21 Q. And was it you who texted him to meet up or
09:46:25 he texted you?
09:46:26 A. Him.
09:46:26 Q. And when he texted you, did he tell you
09:46:29 where to meet him?
09:46:31 A. Yes.
09:46:31 Q. And where did he tell you to meet him?
09:46:35 A. Regal Town Center or sorry, yeah, Regal.
09:46:43 Q. Had you been at this Regal Town Center
09:46:46 prior to the date of the incident?
09:46:48 A. Yes.
09:46:49 Q. And how many times had you been to the

09:57:35 the house to go meet your friend, Reef.
09:57:41 Where did you meet him?
09:57:43 A. Um, up in the hills.
09:57:47 Q. Is -- and these hills, can you give me your
09:57:50 best estimate as to where these hills are in
09:57:52 relation to your house, like how do you get there?
09:57:55 A. I -- I don't know.
09:58:03 Q. Okay. Well, you said it's about -- it's a
09:58:06 few minutes from your house; is that right?
09:58:08 A. Yes.
09:58:08 Q. How many minutes from your house is it?
09:58:10 A. Probably four or five minutes.
09:58:17 Q. And what type of property is it? Do you
09:58:21 know if it's private property or is it city
09:58:23 property, if you know?
09:58:24 A. City, I think.
09:58:27 Q. Is there -- I'm sorry, go ahead.
09:58:29 A. I think city.
09:58:31 Q. Okay. Is there like a name for these hills
09:58:34 or a name for the area?
09:58:36 A. I'm not sure.
09:58:41 Q. Do -- when you go riding there, do you see
09:58:44 other individuals riding --
09:58:46 A. Yes.
09:58:47 Q. -- there? Okay.

09:58:50 MR. ALLISON-MAYNE: Let her finish her question.
09:58:51
09:58:51 THE WITNESS: Okay.
09:58:52 BY MS. LEE:
09:58:52 Q. Is it a popular place for people to ride motorcycles?
09:58:56
09:58:56 A. Yes.
09:59:00 Q. So you met Reef up in these hills, and then tell me, did you meet any other persons while you were up in the hills with Reef?
09:59:03
09:59:06
09:59:07 A. Yes.
09:59:08 Q. Who -- who else did you meet with?
09:59:11 A. I don't know them.
09:59:16 Q. Was that -- so these other individuals, were these Reef's friends --
09:59:18
09:59:22 A. Yes.
09:59:22 Q. -- if you know?
09:59:24 How long were you riding in the hills on the date of this incidents?
09:59:27
09:59:28 A. I don't remember, not that long.
09:59:30 Q. Would you say like more than 30 minutes?
09:59:33 A. Yes.
09:59:34 Q. More than one hour?
09:59:38 A. Yes.
09:59:41 Q. More than an hour and a half?

09:59:43 A. No.
09:59:45 Q. So sometime -- sometime between one hour
09:59:48 and an hour and a half; is that your best estimate?
09:59:50 A. Yes.
09:59:52 Q. Now, after riding in these hills, was there
09:59:56 a discussion about going to the Regal or somewhere
09:59:59 else?
10:00:00 A. Yes.
10:00:00 Q. And tell me about that discussion.
10:00:05 A. I went to go get something to eat and he
10:00:09 text me telling me come to Regal, check out his new
10:00:13 bike. So that's when I went over there.
10:00:16 Q. Where did -- and when you went to go get
10:00:20 something to eat, where did you go?
10:00:21 A. To McDonald's.
10:00:23 Q. And can you tell me what street this
10:00:25 McDonald's is located?
10:00:27 A. I don't know.
10:00:29 Q. Can you give me your best estimate as to
10:00:32 the general location of where this McDonald's is?
10:00:35 A. Up the street from my house.
10:00:42 Q. Did you go alone to the McDonald's to eat?
10:00:45 A. Yes.
10:00:45 Q. And then you said that Reef texted you to
10:00:48 go meet him at the Regal so that you could see

10:00:51 Reef's new motorcycle; is that right?
10:00:53 A. Yes.
10:00:53 Q. Okay. And approximately what time did you leave McDonald's to go meet Reef at the Regal?
10:01:00 A. I don't remember.
10:01:02 Q. How long were you at the McDonald's?
10:01:07 A. 10, 15 minutes.
10:01:10 Q. So after you leave the McDonald's, you head towards the Regal; is that right?
10:01:15 A. Yes.
10:01:15 Q. And when you arrived at the Regal, can you tell me the area of the Regal that you arrived?
10:01:21 A. Uh, in the front of it.
10:01:26 Q. And how many other people were present when you were at the Regal?
10:01:36 A. Maybe four others.
10:01:38 Q. And these were all others on e-motorcycles, right?
10:01:42 A. Yes, except one pedal bike.
10:01:48 Q. I'm sorry?
10:01:49 A. Except one pedal bike.
10:01:51 Q. I see.
10:01:52 And other than Reef, you stated that you had never met these individuals before?
10:01:57 A. No.

10:01:57 Q. So you didn't know them; is that correct?
10:01:59 A. No.
10:02:00 Q. You did know them?
10:02:01 A. I didn't.
10:02:03 Q. I'm sorry, you did not know them?
10:02:05 A. I did not know them.
10:02:06 Q. Okay.
10:02:09 Have you spoken to any of these individuals after the incident?
10:02:17 A. Yes.
10:02:17 Q. Who did you speak with?
10:02:20 A. Reef.
10:02:20 Q. And did you tell Reef that you were involved in a collision after you left him?
10:02:26 A. He saw.
10:02:29 Q. When you say he saw, what do you mean?
10:02:33 A. He saw that I was in a collision.
10:02:41 Q. Do you know where he was when you were in the collision?
10:02:43 A. No.
10:02:43 Q. How do you know he saw it?
10:02:45 A. Because he told me.
10:02:46 Q. What did he tell you that he saw?
10:02:48 A. That he came up to the road and he saw my bike laying in the middle of the road.

10:02:58 Q. Did he tell you that he actually saw the collision or he saw you after the collision?

10:03:02 A. He saw me after.

10:03:06 Q. Do you remember seeing him after the collision while you were on scene?

10:03:10 A. No.

10:03:13 Q. Did you tell him about the collision, like what happened?

10:03:17 A. No.

10:03:21 Q. Did he ask you how you came to collide with the police car?

10:03:27 A. Not from what I remember.

10:03:32 Q. Did you speak with any other individuals about the incident after the incident other than Reef?

10:03:38 A. No.

10:03:39 Q. You didn't speak to any of the other individuals that were present on e-bikes; is that right?

10:03:46 A. No, sorry, I did.

10:03:47 Q. Okay. Who did you speak with?

10:03:49 A. I don't remember the names but all together they said I hope you feel better.

10:03:56 Q. And how did you have this conversation with them?

10:04:00 A. It was over a call.

10:04:02 Q. I see.

10:04:04 And do you have those individuals' phone numbers?

10:04:08 A. No.

10:04:09 Q. How did you come -- how did they come to call you?

10:04:12 A. They were all together.

10:04:15 Q. And they called you on your cell phone?

10:04:18 A. Yes.

10:04:21 Q. And other than asking or telling -- telling you that they hoped you felt better, what other conversations did you have with these individuals?

10:04:29 A. That was it.

10:04:31 Q. Okay.

10:04:35 Now while -- how long -- now at some point when you were at the Regal with these individuals, a police officer on a motorcycle approached you; is that right?

10:04:46 A. No.

10:04:48 Q. At some point when you were present at the Regal, a police officer on a motorcycle arrived at that area, right?

10:04:55 A. Yes.

10:04:58 Q. And you saw that it was a police motorcycle

10:05:02 because it had police motorcycle markings; is that
10:05:05 right?
10:05:05 A. Yes.
10:05:07 Q. Did you recognize that it was the same
10:05:10 police officer, Officer Cook, that you had a prior
10:05:13 contact with at the time that you were at the Regal?
10:05:17 A. No.
10:05:19 Q. But you did recognize -- but you did know
10:05:21 it was a police officer while you were at the Regal,
10:05:25 right?
10:05:25 A. Yes.
10:05:25 Q. Okay.
10:05:26 And how long were you at the Regal before
10:05:28 the police officer arrived?
10:05:31 A. Maybe 20 -- somewhere around 20, 30
10:05:36 minutes.
10:05:37 Q. While you were at the Regal, were other
10:05:42 riders doing any tricks at the Regal such as
10:05:46 wheelies that you saw?
10:05:50 A. Not from what I remember.
10:05:52 Q. While you were at the Regal, were the other
10:05:56 riders speeding?
10:05:59 A. I don't know.
10:06:01 MR. ALLISON-MAYNE: Objection, vague.
10:06:03

10:06:03 BY MS. LEE:
10:06:04 Q. Go ahead, you can answer.
10:06:06 A. I don't remember.
10:06:08 Q. Were the other riders riding in a way that
10:06:11 made you feel uncomfortable?
10:06:14 MR. ALLISON-MAYNE: Objection, vague.
10:06:23 BY MS. LEE:
10:06:24 Q. Go ahead, you can answer.
10:06:24 A. I don't know.
10:06:26 Q. Were the other riders -- did you see any
10:06:29 other riders doing wheelies at all?
10:06:31 A. No, I wasn't paying attention to them.
10:06:33 Q. Okay. So they could have been doing
10:06:36 wheelies but you just didn't see?
10:06:38 A. Yes.
10:06:40 Q. Were they doing any jumps or anything at
10:06:43 the Regal while you were there, the other riders?
10:06:45 A. Not from what I remember.
10:06:48 Q. So for the 20 or 30 minutes that you and
10:06:51 the other riders were at the Regal, what were you
10:06:54 doing on your e-motorcycle? Were you stopped and
10:06:56 talking? Were you riding around, or what were you
10:06:59 doing?
10:06:59 A. I was off my bike and talking.
10:07:01 Q. Who were you talking to?

10:07:03 A. Reef.
10:07:12 Q. While you were riding in the -- in the Regal before the officer arrived, how fast were you going on your motorcycle?
10:07:21 MR. ALLISON-MAYNE: Objection, calls for speculation.
10:07:25 BY MS. LEE:
10:07:25 Q. Give me your best estimate.
10:07:28 A. Um, somewhere in the 30s, 20s.
10:07:33 Q. Okay. Do you have some type of a speedometer or anything on that motorcycle that --
10:07:44 A. Yes.
10:07:44 Q. -- you can look at that indicates how fast you're going?
10:07:48 A. Yes.
10:07:51 Q. Was it operational on the date of the incident --
10:07:54 A. Yes.
10:07:55 Q. -- if you -- if you know?
10:08:03 A. Yes.
10:08:03 Q. Okay. Is it your custom and habit to monitor the speedometer to see how fast you're going when you're riding on the motorcycle?
10:08:10 A. No.
10:08:10 Q. Now, when the police officer arrived at the

10:08:12 Regal, did you see just one police officer or did
10:08:14 you see others?
10:08:15 A. Just one.
10:08:17 Q. Can you describe what the officer was
10:08:20 wearing?
10:08:21 A. I don't remember.
10:08:23 Q. Do you remember if he had a helmet?
10:08:27 A. Yes.
10:08:28 Q. Do you remember if he had a uni -- police
10:08:35 uniform of some type?
10:08:37 A. Yes.
10:08:45 Q. At the Regal when the police officer
10:08:48 arrived, did you hear the police officer give any
10:08:51 commands to you, like commands to stop or anything
10:08:54 like that?
10:08:55 A. No.
10:08:56 Q. Did you hear the police officer give any
10:08:59 commands to anybody?
10:09:01 A. No.
10:09:03 Q. When you saw the officer arrive, did you
10:09:08 think you were going to get in trouble?
10:09:10 A. No.
10:09:10 Q. When you saw the officer arrive, did you
10:09:14 stay and talk with the officer or did you leave?
10:09:18 A. I left.

10:09:19 Q. Why did you leave?
10:09:20 A. Because I was getting a call to come home.
10:09:24 Q. And who called you?
10:09:26 A. My mom.
10:09:28 Q. Did she call you on your cell -- cellular
10:09:31 phone?
10:09:32 A. Yes.
10:09:39 Q. Now in watching the videos from this
10:09:41 incident, it appears to me and I could be wrong so
10:09:44 correct me if I'm wrong, that your helmet transmits
10:09:48 some type of audio to you for phone calls; is that
10:09:51 right?
10:09:51 A. No.
10:09:51 Q. Okay. So how -- how did you answer your
10:09:56 mom's phone call?
10:09:57 A. Through AirPods.
10:09:58 Q. Oh, I see. Okay.
10:10:00 So your mom called you and you answered on
10:10:03 your earpod and was it when the officer arrived,
10:10:07 prior to the officer arriving or after the officer
10:10:09 arrived?
10:10:10 A. Before the officer arrived.
10:10:13 Q. And what did your mom tell you?
10:10:16 A. That I need to get home.
10:10:24 Q. Okay. And after the officer arrived, did

10:10:28 your friend also leave the area?
10:10:31 A. I don't know.
10:10:33 Q. So after the officer arrived, you exit -- you left the Regal; is that right?
10:10:38 A. Yes.
10:10:38 Q. How long after the officer arrived did you leave the Regal?
10:10:45 A. I don't remember.
10:10:47 Q. Was it immediately after the officer arrived that you left the Regal or was it like five minutes later?
10:10:54 A. It was right when he just came in, I think.
10:11:00 Q. Okay.
10:11:03 And you left the Regal because your mom asked you to go home; is that right?
10:11:07 A. Yes.
10:11:13 Q. How fast were you driving within the Regal area? When I say the Regal area, you understand that to be the Regal parking lot?
10:11:20 A. Yes.
10:11:20 Q. How fast were you driving when you left the Regal area?
10:11:24 A. Somewhere in the 20s.
10:11:27 Q. Okay. Which direction did you go?
10:11:33 A. Towards Kaiser.

10:11:37 Q. And that's in the north, right, northbound?
10:11:40 A. Yes.
10:11:43 Q. And did you at some point drive towards Alamo Street?
10:11:52 A. I'm not sure.
10:11:55 Q. Okay. But you headed northbound; is that fair to say?
10:12:00 A. Yeah.
10:12:01 Q. And tell me the route that you took within the Regal when you were traveling northbound?
10:12:06 A. I went past Regal, got to a stop sign and turned left and went towards Michael Clark to the police station.
10:12:18 Q. Okay. Did you go at the same speed level the entire time you were in the Regal area before Michael Clark?
10:12:33 A. Yes.
10:12:37 Q. And the route you took eventually would lead you -- I'm sorry. The route that you took would lead you eventually to an intersection of Alamo and Michael Clark.
10:12:49 Is that your understanding?
10:12:50 A. Yes.
10:12:51 Q. Okay. And so you were on -- northbound on Michael Clark while you were exiting; is that right?

10:12:58 A. I believe so.
10:13:00 Q. Okay.
10:13:05 Was there any discussion between you and the other riders as to what you were going to do when you arrived at the Regal?
10:13:12 A. No.
10:13:14 Q. So what was the purpose of meeting up at the Regal that -- from your understanding?
10:13:21 A. To see my friend's new bike.
10:13:31 Q. So you're going northbound and you said you're going somewhere in the 20s and you are headed towards the intersection of Alamo and Michael Clark, correct?
10:13:42 A. Yes.
10:13:42 Q. While you were driving northbound, did you know that the police officer was behind you?
10:13:48 A. Not from what I remember.
10:13:54 Q. So you didn't feel that you were being chased or anything like that --
10:13:58 A. No.
10:13:58 Q. -- is that fair to say?
10:14:00 A. Yes.
10:14:00 Q. Okay.
10:14:06 Did the -- did you know the police officer wanted to make contact with you?

10:14:09 A. No.
10:14:14 Q. So the route that you took, you're going northbound eventually on Michael Clark, you're headed towards the intersection, what was your intended path after you arrived at the intersection, like where did you intend to go?
10:14:30 A. Through the crosswalk and go across the street.
10:14:34 Q. So across the street into the street that goes into the police station?
10:14:40 A. Yes.
10:14:42 Q. Okay. And did you intend -- where did you intend to go after you crossed that crosswalk on Michael Clark?
10:14:51 A. To go straight for the police station.
10:14:54 Q. Okay. And why did you intend to go to the police station?
10:14:58 A. Because it's a shortcut home. It's the safest way.
10:15:03 Q. And tell me, had you taken the shortcut home before?
10:15:07 A. Yes.
10:15:09 Q. And can you describe where the shortcut is in relation to the police station? So after you cross the intersection of Michael Clark and Alamo

10:15:18 and you're going north, you would be -- you would -- the police station would be on right-hand side; is that correct?
10:15:26 A. Yes.
10:15:27 Q. Okay. Tell me where this shortcut path would be or is.
10:15:32 A. It goes straight through the police station. I take a right and go towards Township. Then I take a left up to Valley View and go through the back over there back to my house.
10:15:50 Q. Okay. So through the police station, I guess the parking lot. Is that -- is it a parking lot or is it a road?
10:15:58 A. It's a parking lot.
10:16:00 Q. Okay. You would go through the police station parking lot and then you said you would go towards Township; is that right?
10:16:06 A. Yes.
10:16:06 Q. Okay. And then you would make a left at Township?
10:16:13 A. Yeah, towards Valley View.
10:16:15 Q. I'm sorry, towards where?
10:16:17 A. Towards Valley View.
10:16:18 Q. Valley View?
10:16:20 A. Yes.

10:16:22 Q. And these are public streets, right? So these are like making a left at -- on Township and then going right on Valley View, these are public streets; is that right?
10:16:37 A. Yes.
10:16:37 Q. Okay. And based upon your experience where you've taken the shortcut before from the police station to your home, how long would it take you on your e-motorcycle?
10:16:48 A. Somewhere from probably around ten minutes.
10:16:52 Q. Okay.
10:16:55 Okay. So let's go back to the intersection. So you are traveling on Michael Clark. You approach the intersection of Michael Clark and Alamo.
10:17:08 Do you have that in your mind?
10:17:10 A. Yes.
10:17:11 Q. Okay.
10:17:12 If you traveled straight through the intersection, the police officer -- the police station would be on your right, correct?
10:17:18 A. Yes.
10:17:19 Q. Okay. Now as you're at this intersection of Michael Clark and -- and Alamo, how many times prior to this incident had you traveled this route

10:17:35 before?
10:17:37 A. One other time.
10:17:45 Q. Okay.
10:17:46 Was there a street light at this
10:17:52 intersection of Michael Clark and Alamo?
10:17:53 A. Yes.
10:17:53 Q. And what was the color of the light when
10:17:56 you approached the intersection?
10:17:57 A. I believe red.
10:17:58 Q. At the time that you approached the
10:18:00 intersection, was it still -- like the sun was
10:18:03 setting or was it dark?
10:18:04 A. It was dark.
10:18:07 Q. Did you stop at the intersection of Michael
10:18:11 Clark and Alamo?
10:18:12 A. I slowed down.
10:18:19 Q. But did you stop?
10:18:20 A. No.
10:18:20 Q. Why not?
10:18:22 A. Because I was rushing to get home.
10:18:30 Q. And you entered -- when you entered -- so
10:18:33 you entered the intersection that we're talking
10:18:35 about, Alamo and Michael Clark; is that correct?
10:18:36 A. Yes.
10:18:37 Q. And when you enter -- entered the

10:18:39 intersection, what was -- was the street light still
10:18:42 red --
10:18:43 A. Yes.
10:18:44 Q. -- as you were looking at it?
10:18:46 Okay. Did you see a police car at the
10:18:48 intersection when you entered the intersection?
10:18:50 A. Yes.
10:18:51 Q. Can you describe the police car you saw?
10:18:54 A. It was sitting at the light.
10:18:59 Q. And when you say it was sitting at the
10:19:02 light, it was not yet in the intersection but it was
10:19:04 sitting at the light before entering the
10:19:09 intersection; is that right?
10:19:09 A. Yes, yes.
10:19:10 Q. And did this police car look like a police
10:19:14 car to you, meaning it had police car markings?
10:19:17 A. Yes.
10:19:17 Q. And when you saw it sitting at the light,
10:19:22 did you see any lights or sirens on this police car?
10:19:26 MR. ALLISON-MAYNE: Objection, vague as to
10:19:28 time.
10:19:29 BY MS. LEE:
10:19:30 Q. While it's sitting -- while you say it's
10:19:33 sitting at the intersection, before it enters the
10:19:35 intersection, did you see any lights and sirens?

10:19:37 A. Like on?
10:19:38 Q. Correct.
10:19:39 A. No.
10:19:41 Q. At some point did you see any lights and
10:19:44 sirens on this police car?
10:19:46 MR. ALLISON-MAYNE: Objection, compound.
10:19:48 THE WITNESS: Yes.
10:19:50 BY MS. LEE:
10:19:50 Q. What time did you first see lights on the
10:19:53 police car?
10:19:55 A. A couple seconds before he came towards me.
10:20:02 Q. So while he was in the intersection; is
10:20:05 that right?
10:20:05 A. Yes.
10:20:06 Q. And what about sirens; when did you first
10:20:09 hear sirens from this police car?
10:20:11 MR. ALLISON-MAYNE: Objection, misstates
10:20:13 prior testimony.
10:20:17 BY MS. LEE:
10:20:18 Q. Go ahead.
10:20:18 A. When his lights turned on.
10:20:25 Q. Now, while you were -- while you entered
10:20:29 the intersection on this red light, was it your
10:20:32 intention to go left or to go straight?
10:20:35 A. To go straight.

10:20:37 Q. At some point, you tried to navigate a left
10:20:41 turn at the intersection; is that right?
10:20:45 A. I think.
10:20:48 Q. Okay. So at some point did you try to turn
10:20:56 left on the intersection?
10:20:58 A. Like in the middle of it?
10:21:00 Q. At anywhere in the intersection, did you
10:21:03 try to turn left?
10:21:04 A. I tried swerving left.
10:21:07 Q. Okay. And where were you when you tried to
10:21:10 swerve left? Like where were -- were you like in
10:21:14 the middle of the intersection --
10:21:15 A. I was --
10:21:15 Q. -- close to the curb?
10:21:17 A. -- in the crosswalk.
10:21:19 Q. And when you say in the crosswalk, I just
10:21:21 want to be sure, you're talking about the crosswalk
10:21:23 that goes north and south on Michael Clark on the
10:21:28 left-hand side?
10:21:29 A. Yes.
10:21:30 Q. Okay. And tell me what you did
10:21:34 specifically to try to turn left? So meaning did
10:21:40 you, you know, like turn your body? Did you turn
10:21:44 your bike or what -- tell me your motions in trying
10:21:47 to swerve left.

10:21:48 A. I turned my body, my bike left to swerve from getting hit.

10:21:55 Q. Did you put out your leg or anything like that to try to keep your balance?

10:22:00 A. No.

10:22:06 Q. When you make a left turn or a right -- a right turn on a motorcycle, you generally -- would it be fair to say that you generally move your body and move your bike in the direction of your turn so you can navigate the turn?

10:22:21 MR. ALLISON-MAYNE: Objection, misstates prior testimony.

10:22:26 He wasn't -- he doesn't know anything about motorcycles.

10:22:30 BY MS. LEE:

10:22:31 Q. I'm talking about the e-motorcycle. Is that what you do; do you move your body and the bike in that direction that you intend to turn?

10:22:38 A. Yes.

10:22:38 Q. Okay. And do you also put your leg out one way or the other to try to keep your balance when you're turning?

10:22:46 MR. ALLISON-MAYNE: Objection, vague.

10:22:48 THE WITNESS: Depends.

10:22:49

10:22:49 BY MS. LEE:
10:22:50 Q. Okay. But if -- is it fair to say that
10:22:54 sometimes you would put your leg out to try to keep
10:22:56 your balance during turns?
10:22:58 A. Yes.
10:22:59 Q. Okay. Is your -- the e-motorcycle that you
10:23:04 were on, was that equipped with any lights?
10:23:07 A. Yes.
10:23:08 Q. What type of lights was -- was it equipped
10:23:11 with?
10:23:12 A. It had a rear red light on it and a front
10:23:15 headlight on it.
10:23:16 Q. Were those on at the time of the incident?
10:23:20 A. Yes.
10:23:20 Q. Did -- does it have any like blinkers to
10:23:24 signal whether you're going left or right?
10:23:26 A. No.
10:23:29 Q. Is it equipped with some type of a horn?
10:23:32 A. Yes.
10:23:33 Q. Did you use your horn at any time during
10:23:36 the incident?
10:23:37 A. No.
10:23:38 Q. So when you were going straight or when you
10:23:42 intended to go straight through the intersection
10:23:45 towards the police station and it was a red light,

10:23:48 did you like honk your horn or anything to let
10:23:51 people know that you were entering the intersection?
10:23:53 A. Not from what I remember.
10:23:55 Q. Okay. At the time you entered the
10:23:58 intersection, how long -- you said that you -- you
10:24:03 slowed down, right? You didn't stop but you slowed
10:24:06 down, correct?
10:24:07 A. Yes.
10:24:07 Q. When you slowed down, did you have an
10:24:10 opportunity or did you -- strike that.
10:24:12 When you slowed down, did you look left to
10:24:15 see if there was any traffic coming?
10:24:17 A. I looked left and right.
10:24:20 Q. Okay. And when you looked left and right,
10:24:22 did you see any other cars?
10:24:27 A. No.
10:24:29 Q. Other than the police car that we've talked
10:24:33 about that was coming from the direction of the
10:24:35 police station, did you see any other cars while you
10:24:39 were at the intersection before the collision?
10:24:42 A. No.
10:24:43 Q. Okay.
10:24:46 Now this street, Alamo, are you familiar
10:24:51 that it has four lanes?
10:24:53 A. Yes.

10:24:54 Q. Okay. And between those -- between the two lanes, there's some type of like a -- like a island that separates the two lanes.
10:25:06 Is that your understanding?
10:25:07 A. Yes.
10:25:07 Q. Okay. And so is it your understanding there's two lanes to travel eastbound on Alamo and two lanes to travel westbound on Alamo?
10:25:18 A. Yes.
10:25:19 Q. So when you're at the intersection of Alamo and Michael Clark, you made a turn -- you -- you said that you made a turn or you attempted to make a turn; would that have been into the eastbound lane of Alamo?
10:25:38 A. I don't remember.
10:25:41 Q. Okay. So when you attempted to turn, it was before the island that separates those four lanes, right?
10:25:49 A. Yes.
10:25:49 Q. Okay. It was closer to the curb of -- of the direction from where you were coming; is that right?
10:25:59 A. Yes.
10:25:59 Q. Okay.
10:26:15 When you saw the police car at -- you said

10:26:17 stopped at the intersection, you know, on the light,
10:26:23 did you think the police car was coming to stop you
10:26:28 or doing anything relating to you?
10:26:31 A. No.
10:26:31 Q. Okay. And you didn't think that the
10:26:34 motorcycle police were behind you; is that right?
10:26:39 A. (Unintelligible.)
10:26:41 Q. Is that right?
10:26:42 A. Yes.
10:26:42 Q. Okay. So I -- so you didn't think that the
10:26:45 police were trying to take any actions against
10:26:48 you --
10:26:48 A. No.
10:26:48 Q. -- at that time; is that fair to say?
10:26:50 A. Yes.
10:26:51 Q. Okay.
10:26:56 Now, when you tried to turn left onto
10:27:03 Alamo, at some type -- at some time did you lose
10:27:07 your balance?
10:27:07 MR. ALLISON-MAYNE: Objection, misstates
10:27:09 prior testimony.
10:27:10 MS. LEE: It's just a question.
10:27:11 BY MS. LEE:
10:27:12 Q. Did you lose your balance; yes or no?
10:27:13 A. No.

10:27:14 Q. Okay.

10:27:14 At some time when you turned left onto Alamo, you had a collision with the police car; is that right?

10:27:20 MR. ALLISON-MAYNE: Objection, misstates prior testimony.

10:27:22 THE WITNESS: Yes.

10:27:23 BY MS. LEE:

10:27:23 Q. Go ahead.

10:27:24 Okay. Tell me where were you when you collided with the police car?

10:27:32 A. In the middle of the crosswalk.

10:27:34 Q. Okay. So this is the crosswalk that is on Alamo on the eastbound lanes; is that right?

10:27:45 A. Yes.

10:27:46 Q. Okay. And can you tell me where in the crosswalk you were when the collision occurred? Like was it in the middle of the crosswalk, further to the island that separates the two lanes or where was it?

10:28:02 A. I think in the middle.

10:28:03 Q. Okay. And tell me what you saw relating to the police car prior to the collision. So let me just -- I'll -- I'll be more specific.

10:28:17 You earlier testified that you saw the

10:28:20 police car at the light and it was stopped, correct?
10:28:24 A. Yes.
10:28:25 Q. Okay. And then at some point you saw the
10:28:27 police car enter the intersection; is that right?
10:28:29 A. Yes.
10:28:30 Q. And do you know how fast the police car was
10:28:34 going as it entered the intersection?
10:28:37 A. No, but really fast.
10:28:40 Q. Like what's your best estimate, if you have
10:28:43 one?
10:28:43 A. Maybe somewhere around 30.
10:28:45 Q. Okay.
10:28:46 And then when the police car entered the
10:28:49 intersection, where were you when the police car
10:28:52 entered the intersection, like crossed that plane
10:28:56 and went into the red light?
10:28:58 A. In the crosswalk.
10:29:01 Q. Okay.
10:29:02 And when the police car entered the
10:29:05 intersection, did you have any idea where the police
10:29:08 car was headed?
10:29:10 A. No.
10:29:11 Q. But you knew it was headed towards you,
10:29:14 right?
10:29:14 A. Yes.

10:29:15 Q. Okay. And did you try to navigate that left turn because you saw that police car?
10:29:21 A. Yeah.
10:29:22 Q. And when you tried to navigate that left turn, before your collision, did you feel that you were somehow unstable on your motorcycle?
10:29:35 A. No.
10:29:36 Q. Did you believe that you were going to be able to navigate that left turn onto the eastbound lane of Alamo?
10:29:45 MR. ALLISON-MAYNE: Objection, misstates prior testimony again. You --
10:29:49 BY MS. LEE:
10:29:50 Q. Go ahead.
10:29:51 A. I was going straight to the crosswalk.
10:29:55 Q. Okay.
10:29:56 Now you knew that if you made a left turn at that crosswalk, that you would be going -- headed towards incoming traffic, right, going on -- going eastbound on Alamo?
10:30:10 MR. ALLISON-MAYNE: Objection, misstates prior --
10:30:10 BY MS. LEE:
10:30:11 Q. You knew that, right?
10:30:12 MR. ALLISON-MAYNE: -- testimony again.

BY MS. LEE:
Q. Did you know that?
A. Not from what I remember.
Q. Okay.
Did you have a concern that if you made that left turn in that area at the crosswalk onto eastbound Michael Clark, that you could be hit by a car that was going eastbound? Did you have that concern?
MR. ALLISON-MAYNE: Objection, misstates prior testimony again. He's never said he took a left into Alamo. Those are your words, not his.
MS. LEE: That's -- the record stands.
BY MS. LEE:
Q. My question is, did you have a concern that if you made that left-hand turn that you could be hit by traffic that was going eastbound on Alamo? Did you have that concern?
A. I --
MR. ALLISON-MAYNE: Object --
THE WITNESS: (Unintelligible due to cross-talking.)
BY MS. LEE:
Q. Okay. When you collided with the police car, do you know what portion of your e-motorcycle

10:31:06 first made contact with the police car? So was it
10:31:09 like head on? Was it on the side? Do you know?
10:31:13 A. The side.
10:31:14 Q. Was it the right side or the left side?
10:31:17 A. The right side.
10:31:20 Q. Okay. Were you already navigating that
10:31:23 left turn or trying to navigate it when you had the
10:31:27 collision?
10:31:28 MR. ALLISON-MAYNE: Objection, vague,
10:31:30 misstates prior testimony.
10:31:32 You could just ask him if he was trying to
10:31:34 make a left onto Alamo Street.
10:31:36 MS. LEE: Counsel, please don't coach the
10:31:39 witness and -- and -- and make any comments for the
10:31:41 record other than your objections.
10:31:43 BY MS. LEE:
10:31:44 Q. So -- so my question stands: When you were
10:31:47 nav- -- swerving left -- you recall that you told me
10:31:50 you were swerving left. When you were swerving left
10:31:54 on Alamo, were you already in that left motion to go
10:32:01 left when the collision occurred?
10:32:02 MR. ALLISON-MAYNE: Objection --
10:32:03 THE WITNESS: No.
10:32:04 MR. ALLISON-MAYNE: -- vague, misstates
10:32:05 testimony, argumentative.

10:32:09 BY MS. LEE:
10:32:09 Q. Okay. What position was your motorcycle in when you had the collision?
10:32:15 A. What do you mean?
10:32:17 Q. So were you still headed straight across the --
10:32:20 A. Yes.
10:32:21 Q. -- intersection when you had the collision or were you already in the left-hand motion?
10:32:26 A. I was heading straight.
10:32:30 Q. Okay.
10:32:31 And it is your recollection that the collision occurred while you were heading straight?
10:32:36 A. Yes.
10:32:37 Q. Okay.
10:32:38 And it's your recollection that the part of your e-motorcycle that made contact with the police car was the right-hand side of your e-motorcycle, correct?
10:32:47 A. Yes.
10:32:48 Q. Okay.
10:32:49 And it's also your recollection that you attempted to swerve left at the time of the collision; is that right?
10:32:58 A. Yes.

10:32:59 Q. Okay.

10:33:20 (Discussion held off the record by the reporter to protect the record.)

10:33:22 MS. LEE: Okay. Do you want to take a break right now, Tanner, or Counsel?

10:33:30 THE WITNESS: Sure.

10:33:31 MS. LEE: You do, okay. Because you -- like I said, you could take a break any time so if you want to take a break, we can. I think we've been going for like an hour so why don't we take like a five-minute break.

10:33:44 Is that okay with the court reporter?

10:33:46 THE REPORTER: (Indicating yes.)

10:33:48 MS. LEE: Okay. Counsel, is that okay with you?

10:33:49 MR. ALLISON-MAYNE: That works.

10:33:51 MS. LEE: Okay. Great.

10:33:52 MR. ALLISON-MAYNE: What time do you want us back?

10:33:54 MS. LEE: Let's do 10:40, give you a seven-minute break. Is that fine?

10:34:00 MR. ALLISON-MAYNE: Great. See you at 10:40.

10:34:02 MS. LEE: Thanks.

10:34:03 THE VIDEO OPERATOR: All right. We're off

10:34:05 the record at 10:34 a.m.

10:34:09 (Recess taken.)

10:41:23 (A discussion was held off the record ` to inform counsel of an answer that was unintelligible.)

10:42:16 THE VIDEO OPERATOR: We are back on the record at 10:42 a.m.

10:42:25 MS. LEE: Okay. So I'm going to ask the court reporter, there was a -- a question as to testimony that we should clear up because of, I guess, people talking over people, so can you read back the question, the series of questions and answers, Madam Court Reporter?

10:42:42 THE REPORTER: Sure can. Stand by.

10:42:48 (Record read as follows:

"My question is, did you have a concern that if you made that left-hand turn that you could be hit by traffic that was going eastbound on Alamo? Did you have that concern?")

THE REPORTER: And I didn't get his answer but there was an objection, and then you came back and said okay and moved on to your next question.

10:43:31

10:43:31 BY MS. LEE:
10:43:31 Q. Okay. So Tanner, did you have a concern -- and you heard the question, right, so can you answer the question?
10:43:36 A. No, because I was going straight.
10:43:39 Q. Okay.
10:43:40 MS. LEE: Do you have that, Madam Court Reporter?
10:43:44 THE REPORTER: Yes.
10:43:46 MS. LEE: Okay.
10:43:46 BY MS. LEE:
10:43:47 Q. So at the -- when -- you at some point tried to swerve left so my question is, did you try to swerve left before the collision?
10:43:58 A. The -- when he was coming at me, to avoid getting hit.
10:44:03 Q. Okay. So before the collision; is that right?
10:44:05 A. Yes.
10:44:07 Q. How long before the collision did you attempt to swerve right, like how much time between the collision and you swerving left?
10:44:17 A. Like I don't know but it was really quick.
10:44:22 Q. Like seconds, minutes?
10:44:24 A. Like seconds.

Q. How many seconds? Can you give me your best estimate?
A. Maybe like four seconds before.
Q. Okay. Okay. When you attempted to go left, did you feel that there was a dip in the road in that area at all or did you feel the pavement was completely level?
A. No.
Q. No dip in the road?
A. No.
Q. Okay. Did you feel that the -- that there was anything uneven as you turned left on the road?
MR. ALLISON-MAYNE: Objection, vague.
THE WITNESS: No.
BY MS. LEE:
Q. Okay. So you didn't feel any bumps or any dips or anything like that when you were attempting to turn left?
A. No.
Q. Okay.
Do you feel that you lost control of your e-motorcycle at any time?
MR. ALLISON-MAYNE: Objection, vague.
THE WITNESS: Can you explain that, please?

BY MS. LEE:

Q. Yeah.

So at any time during the incident, did you feel like that you were not in control of the -- of your e-motorcycle?

A. No.

Q. Okay. When you -- after you collided with the police -- I'm sorry, strike that.

When you collided with the police vehicle, can you give me your best estimate as to how fast you were going?

A. Somewhere in the 20s.

Q. Okay. And can you give me your best estimate as to how fast the police vehicle was going?

A. Maybe high 20s, maybe almost 30.

Q. So you feel the police vehicle was going faster than you during the collision?

A. Yes.

Q. At the time of the collision, the police vehicle had the police overhead lights on; is that right?

A. Yes.

Q. And at the time of the collision, the police vehicle had the sirens on; is that right?

10:46:30 A. I'm not too sure about that.
10:46:32 Q. Okay.
10:46:35 When you turned -- attempted to turn left, you did so to try to avoid the police car.
10:46:41 Is that fair to say?
10:46:44 A. Yes.
10:46:51 Q. When you collided with the police car, were you -- had you completed your left-hand turn yet or not yet?
10:47:01 A. No.
10:47:06 MR. ALLISON-MAYNE: Objection. Same as before, misstates prior testimony.
10:47:11 BY MS. LEE:
10:47:13 Q. And when you turned or when you tried to turn left on Alamo, the light was still red; is that right?
10:47:20 MR. ALLISON-MAYNE: Objection, vague, misstates prior testimony.
10:47:24 THE WITNESS: Yes, but I was going straight.
10:47:27 BY MS. LEE:
10:47:28 Q. So you were -- okay. You were going straight through the red light; is that right?
10:47:33 A. Through the crosswalk.
10:47:35 Q. But through the red light, correct?

10:47:37 A. Yes.
10:47:38 Q. Okay.
10:47:41 Did you attempt to brake or to put on your brakes at all before the collision?
10:47:46 A. Yes.
10:47:48 Q. What did you do to try to brake before the collision?
10:47:51 A. I tried swerving to the left to avoid the car and tried getting on my brakes to slow down to try to avoid getting hit.
10:48:00 Q. And to -- applying the brakes to slow down on your e-motorcycle, is that like a hand grip or how do you apply the brakes?
10:48:12 A. Yeah, hand.
10:48:13 Q. Is it right hand or left hand?
10:48:16 A. It's left and right.
10:48:17 Q. Did you put your brakes on both left and right hand before the collision?
10:48:22 A. No.
10:48:23 Q. Which hand?
10:48:24 A. It would be my left hand.
10:48:29 Q. How many -- how much time passed between the time that you applied the brakes and the collision?
10:48:40 A. I don't know.

10:48:41 Q. Was it seconds, minutes?
10:48:44 A. It was seconds.
10:48:47 Q. But you do recall that you applied the brakes before the collision; is that right?
10:48:53 A. Yes.
10:48:53 Q. Did you hear the police car brake or believe that the police car applied their brakes before the collision?
10:49:03 MR. ALLISON-MAYNE: Objection, calls for speculation.
10:49:05 BY MS. LEE:
10:49:05 Q. If you know. If you heard something that you think is consistent with brakes.
10:49:09 A. I don't think I heard his brakes come on.
10:49:12 Q. Okay.
10:49:15 What happened after you collided with the police car?
10:49:19 A. I was laying on the floor and saw my bike on the ground.
10:49:26 Q. Okay. And how far did you land away from your bike after the collision?
10:49:31 A. Somewhere around 15 feet, I think.
10:49:35 Q. And after you landed on the ground after the collision, you had -- the officers made contact with you; is that right?

A. Yes.

Q. Okay. And you told the officers I'm sorry I ran; is that right?

A. Yes.

Q. And why did -- what did you mean by I'm sorry I ran?

A. I was scared and I was trying to get home and I didn't realize they were trying to stop me until I was on the floor.

Q. When you -- so you meant that you were sorry that you ran from the police; is that right?

A. No.

Q. Well, who -- when you say I'm sorry I ran, who was that directed to?

A. The cops.

Q. Okay. You also told the police officers don't take me to jail and you said that several times; is that right?

A. Yes.

Q. And you said that because you -- you were fearful that you were in trouble. Is that fair to say?

A. Yes.

Q. And it was at that time that you were -- after you were on the ground that you recognized

10:50:46 police officer Cook who you had prior contact with;
10:50:50 is that, right?
10:50:50 A. Yes.
10:50:51 Q. And when you said don't take me to jail,
10:50:57 you were worried that the police could potentially
10:51:00 take to you jail; is that right?
10:51:02 A. Yes.
10:51:04 Q. And you also said my dad's going to kick my
10:51:08 ass and you said that quite a few times; is that
10:51:11 right?
10:51:11 A. Yes.
10:51:11 Q. And what did you mean by that?
10:51:17 A. Meaning not like actually but that at the
10:51:23 moment all he knows was that I hit a cop or it
10:51:26 sounded like I hit a cop.
10:51:28 Q. And you were fearful that he -- he was
10:51:31 going to discipline you or you were going to be in
10:51:33 trouble for that; is that right?
10:51:34 A. Yes.
10:51:35 Q. And you also said they're causing mayhem
10:51:41 and I don't want to get caught up in that. Do you
10:51:44 recall making a statement like that to the police
10:51:46 officers after you were on the ground?
10:51:48 A. I don't remember.
10:51:51 Q. Did you review the video where you stated

11:15:28 Let me see if I have it.
11:15:45 Yes, I have it, okay. Okay, great. Thank
11:15:51 you for your help, Tanner, that's very helpful.
11:15:56 THE REPORTER: And the same thing, you'll
11:15:59 get me the number?
11:16:00 MS. LEE: I will.
11:16:01 THE REPORTER: Okay. Thank you.
11:16:01 (Deposition Exhibit 12 was marked
11:16:01 for identification and is attached
11:16:06 hereto.)
11:16:06 MS. LEE: Okay. I don't have any further
11:16:07 questions.
11:16:08 Tanner, thank you for your time and I
11:16:12 appreciate, you know, your attention. You know,
11:16:15 you've done very well for responding, especially for
11:16:19 a witness your age and, you know, I wish you the
11:16:23 best and I hope that you recover well and, you know,
11:16:28 and thank you again.
11:16:31 THE WITNESS: Thank you. I appreciate it.
11:16:33 MR. ALLISON-MAYNE: Ms. Lee, I just have a
11:16:34 couple follow-up questions.
11:16:35 MS. LEE: Oh, okay, sure.
11:16:35 //
11:16:35 //

**EXAMINATION**

BY MR. ALISON-MAYNE:

Q. Tanner, you mentioned during Ms. Lee's questioning that you had AirPods in your ears.

Do you remember that?

A. Yes.

Q. Were those in both of your ears or just one?

A. Just one.

Q. Which ear?

A. The right ear.

Q. Could you still hear what was happening outside?

A. Yes.

Q. During Ms. Lee's questioning, you agreed that you were going the same speed while in the Regal parking lot.

Do you remember saying that?

A. Yes.

Q. And you also agreed with her that there was a stop sign in the parking lot?

A. Yes.

Q. Did you slow down when you approached that stop sign?

A. Yes.

11:17:34 Q. And why did you slow down?
11:17:36 A. To make sure I was safe to go.
11:17:40 Q. In the Regal parking lot as you approach
11:17:43 that stop sign, how did you make sure it was safe to
11:17:47 go?
11:17:47 A. Looked both ways.
11:17:49 Q. Could you say that a little louder?
11:17:51 A. Looked both ways.
11:17:56 Q. Several times, maybe 20, Ms. Lee asked you
11:18:06 questions assuming that you were turning left onto
11:18:16 Alamo Street.
11:18:19 Were you ever turning left onto Alamo
11:18:22 Street?
11:18:22 A. No.
11:18:23 MS. LEE: Objection, argumentative,
11:18:25 misstates the evidence and also -- but go ahead, you
11:18:35 can answer.
11:18:36 THE WITNESS: No.
11:18:40 BY MR. ALISON-MAYNE:
11:18:43 Q. Many of Ms. Lee's questions described the
11:18:46 vehicle you were driving as a motorcycle or an
11:18:49 e-motorcycle.
11:18:51 Is that -- are those words you use to
11:18:54 describe the vehicle you were driving?
11:18:56 A. No.

11:18:57 Q. How would you describe the vehicle?
11:18:59 A. E-bike or electric bike.
11:19:15 Q. Ms. Lee said that you stated "sorry I ran" shortly after the collision.
11:19:27 Do you recall if you used those exact words or whether you used different words?
11:19:37 A. I think I used those words.
11:19:42 Q. Do you recall that independently or only from watching a video?
11:19:46 A. Um, the video, a little bit from what I can remember.
11:20:04 Q. You talked about a few of the ways this accident affected your life. Obviously, you had to get surgeries but could you list all the ways you can remember that this accident affected your life?
11:20:21 A. It made me depressed. I failed one of my classes. I was behind on work. I couldn't go do anything over the summer because it's usually water sports, couldn't run for almost a year and couldn't really hang out with friends because I was trapped inside.
11:20:52 Q. Did you miss two months of school?
11:20:54 A. Yes.
11:20:57 Q. And you failed one class partly because of this?

11:21:00 A. Yes.
11:21:01 MS. LEE: Leading, leading.
11:21:03 Go ahead.
11:21:05 BY MR. ALISON-MAYNE:
11:21:06 Q. Did -- were there any other academic
11:21:08 consequences in terms of your grades in other
11:21:12 classes?
11:21:12 A. No.
11:21:26 MR. ALLISON-MAYNE: Okay. That's all I
11:21:27 have.
11:21:29 MS. LEE: I just have one further follow-up
11:21:31 question.
11:21:31
11:21:31 **FURTHER EXAMINATION**
11:21:31 BY MS. LEE:
11:21:31 Q. Tanner, when you testified that you swerved
11:21:35 left, was it your intention to turn that way or was
11:21:39 that an accident?
11:21:42 A. I wasn't trying to turn that way.
11:21:45 Q. I'm sorry?
11:21:47 A. I wasn't trying to turn that way.
11:21:49 Q. You were -- I just didn't hear you. You
11:21:51 were trying to turn that way?
11:21:52 A. I wasn't trying to turn that way.
11:21:54 Q. So when you swerved left, was it just your

11:21:58 bike went left on its own or did you turn it in that
11:22:01 direction?
11:22:01 A. I was trying to avoid getting hit.
11:22:04 Q. Okay. But you did turn your bike in that
11:22:07 direction --
11:22:07 A. Yes.
11:22:07 Q. -- correct?
11:22:09 Okay.
11:22:10 MS. LEE: No further questions.
11:22:13 Okay. Thanks, Tanner, appreciate it.
11:22:15 And then I will get you the diagrams, the
11:22:19 exhibits, Madam Court Reporter, with the correct
11:22:21 exhibit numbers.
11:22:24 THE REPORTER: Let Berkley take us out.
11:22:28 THE VIDEO OPERATOR: Before we go off
11:22:30 record, would counsel like a synced video copy and a
11:22:30 transcript from today's deposition?
11:22:35 MR. ALISON-MAYNE: Um, not --
11:22:35 MS. LEE: Yes, please, video.
11:22:36 MR. ALLISON-MAYNE: Not at this point.
11:22:37 THE VIDEO OPERATOR: All right.
11:22:38 Then we're off the record at 11:22 a.m.
(Whereupon the aforementioned proceedings
concluded at: 11:22 a.m.)

--o0o--

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Executed on ____________________, 2026, at _________________________, California.

__________________________________
TANNER NAVAROLI

REPORTER'S CERTIFICATE

I, KIMBERLY E. LEPINS, Certified Shorthand Reporter for the State of California, hereby certify:

THAT the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth, and nothing but the truth;

THAT said deposition was written by me in stenotype and was thereafter reduced to printed matter under my direction and supervision;

THAT the foregoing transcript is a true record of the testimony given by the witness and of all objections made at the time of the examination, to the best of my ability.

I FURTHER CERTIFY that I am in no way interested in the outcome of said action.

IN WITNESS WHEREOF, I have hereunto subscribed my hand this 29th day of May, 2026.

Kimberly Lepins
_______________________________
KIMBERLY E. LEPINS
Certified Shorthand Reporter
Certificate No. 9592; RPR

REPORTER'S COPY CERTIFICATE

I, KIMBERLY E. LEPINS, Certified Shorthand Reporter for the State of California, hereby certify:

THAT the foregoing is a true and correct copy of the original record of the testimony given by the witness and of all objections made at the time of the examination, to the best of my ability.

I FURTHER CERTIFY that I am in no way interested in the outcome of said action.

IN WITNESS WHEREOF, I have hereunto subscribed my hand this 29th day of May, 2026

Kimberly Lepins
KIMBERLY E. LEPINS
Certified Shorthand Reporter
Certificate No. 9592; RPR

**[CITY 00061] [CONF.]** - PD Emp Parking Lot West -
PD_Emp_Parking_Lot_-_West_#2-2025-02-07_19h33min00s000ms.mp4

# EXHIBIT D

**[CITY 00062] [CONF.]** - PD West Emp Gate -
PD West Emp Gate-2025-02-07_19h30min00s000ms.mp4

# EXHIBIT E

**[CITY 00054] [CONF.]** - Ofcr. Williamson's Body Worn Video -
Axon_Body_3_Video_2025-02-07_1933_X60A73690.mp4

# EXHIBIT F

# EXHIBIT G

# CITY OF SIMI VALLEY INCIDENT REPORT (FOR INTERNAL USE ONLY)

USE THIS FORM TO REPORT ANY INCIDENT, COLLISION OR PROPERTY DAMAGE (VEHICULAR OR OTHERWISE) TO ANY CITY PROPERTY OR CITY PERSONNEL AND/OR PRIVATE PROPERTY OR PERSON(S).

- THE DEPARTMENT HEAD SHALL REVIEW AND SIGN THE INCIDENT REPORT. COPIES OF THE REPORT AND AVAILABLE PHOTOS SHALL BE SUBMITTED WITHIN 24 HOURS TO THE RISK MANAGER.

VEHICULAR COLLISION REPORTING PROCEDURES:

- THIS REPORT IS TO BE FILLED OUT BY THE EMPLOYEE AT THE TIME AND SCENE OF THE INCIDENT, IF POSSIBLE, OR NO LATER THAN THE END OF THE EMPLOYEE'S WORK SHIFT. THIS REPORT IS INTENDED FOR INTERNAL INVESTIGATIVE AND LEGAL COMMUNICATIVE USE ONLY; ANY OTHER USE IS PROHIBITED.
- THE POLICE AGENCY HAVING JURISDICTIONAL RESPONSIBILITY WHERE THE COLLISION OCCURRED SHALL BE NOTIFIED AND REQUESTED TO CONDUCT A FULL INVESTIGATION INTO THE CAUSE OF THE COLLISION.
- THE CITY ATTORNEY AND THE RISK MANAGER SHALL IMMEDIATELY BE NOTIFIED WHEN BODILY INJURY RESULTS TO ANY PARTY.
- CITY EMPLOYEES SHALL NOT MAKE ANY STATEMENTS TO ANY PARTY(IES) NOT ASSOCIATED WITH THE CITY, EXCEPT INVESTIGATING POLICE OFFICERS. NO ADMISSION OF FAULT SHOULD BE MADE TO ANY PARTY OR THE POLICE.
- COPIES OF THE INCIDENT REPORT SHALL ALSO BE DISTRIBUTED TO:
  A) EQUIPMENT MAINTENANCE SUPERINTENDENT (PUBLIC WORKS)
  B) MAINTENANCE SERVICES COORDINATOR (POLICE) - WHEN A POLICE VEHICLE IS INVOLVED.

| | | | |
|---|---|---|---|
| NAME OF CITIZEN/EMPLOYEE: Tyler Williamson | AGE: 29 | DEPARTMENT OR HOME ADDRESS: SVPD/3901 Alamo St. | PHONE NUMBER: [redacted] |
| DATE OF INCIDENT: 02/07/2025 | TIME OF INCIDENT: 1934 | LOCATION OF INCIDENT: Alamo St./Michael Clark Memorial Pk | CITY VEHICLE #: 41 |
| PLACE OF DEPARTURE: | | DESTINATION: | |
| NAME OF WITNESS, IF ANY: Eric Cooke | ADDRESS: 3901 Alamo St. Simi Valley, CA | | PHONE NUMBER: |
| NAME OF WITNESS, IF ANY: | ADDRESS: | | PHONE NUMBER: |

DESCRIPTION OF INCIDENT (ALSO COMPLETE REVERSE SIDE FOR VEHICULAR ACCIDENTS

On 02/07/2025, I (Officer Williamson) was working uniformed patrol in a marked black and white police vehicle (# 41) for the Simi Valley Police Department. At approximately 1932 hours, I responded to a disturbance at 2667 Tapo Canyon Rd. of multiple Class 3 electric dirt bikes traveling at high rates of speed. Officer Cooke arrived on scene and put out radio traffic of a class 3 electric dirt bike fleeing the scene toward Alamo St. I was stopped at the intersection of Michael Clark Memorial Parkway/Alamo St., facing S/B. I turned on my on emergency lights and sirens to proceed through the intersection and stop traffic in complaince of California vehicle code 21055. As I am almost through the intersection, I observe a black class 3 electric dirt bike with no lights come toward my direction at a high rate of speed going N/B. I quickly hit my brakes to avoid the class 3 electric dirt bike. The class 3 electric dirt bike entered the intersection against a red traffic light and attempted to turn in front of my vehicle going W/B into opposing E/B traffic. The class 3 electric dirt bike collided into the side of the front push bar of my vehicle. The driver side of the push bar is where the initial contact occurred. CHP handled the traffic collision.

SUPERVISOR'S SUGGESTED MEASURES/TRAINING TO PREVENT THIS TYPE OF INCIDENT (USE ADDITIONAL SHEETS AS NECESSARY

N/A

EXTENT OF LOSS OR DAMAGE (INCLUDE PHOTOS)

Push bar to Unit # 41 in bent approximately 45 degrees.

| | |
|---|---|
| ESTIMATED COST FOR REPAIR/REPLACEMENT (PROVIDE ITEMIZATION OF COSTS): $500 | DID THE OTHER PARTY ADMIT FAULT? ☐ YES ☒ NO |

| | | | |
|---|---|---|---|
| WAS A POLICE AGENCY NOTIFIED: ☒ YES ☐ NO | NAME OF POLICE AGENCY: California Highway Patrol | | |
| POLICE REPORT NO.: 25-5366 | INVESTIGATING OFFICER: Officer Rios | | ID NUMBER: 23577 |
| NAME OF PERSON REPORTING (LAST, FIRST, MIDDLE): Williamson, Tyler, J | | DEPARTMENT/DIVISION: SVPD/Patrol | EXTENSION: 8502P |
| SIGNATURE OF PERSON REPORTING: [signature] | DATE: 02/08/25 | SIGNATURE OF DEPARTMENT HEAD: [signature] | DATE: 2/10/25 |

| | CITY VEHICLE | OTHER VEHICLE | OTHER VEHICLE |
|---|---|---|---|
| YEAR AND MAKE: | 2022 FORD EXPLORER | CLASS 3 ELETRIC DIRT BIKE | |
| LICENSE NUMBER | 1626739 | CTL5500R0003661 | |
| DIRECTION OF TRAVEL | SOUTH | NORTH | |
| SIDE OF STREET OR HIGHWAY | | | |
| APPROXIMATE SPEED | 5MPH | 30MPH | |

UNIT IDENIFICATION NUMBER OF CITY VEHICLE: 41

WEATHER CONDITION(S): clear

CONDITION OF ROADWAY: clear

EXTENT OF LOSS OR DAMAGE TO CITY VEHICLE: 500

| NAME OF DRIVER OF CITY VEHICLE | DEPARTMENT/DIVISION | NO. OF PASSENGERS | EXTENSION |
|---|---|---|---|
| Tyler Williamson | SVPD/Patrol | 0 | 6950 |

EXTENT OF LOSS OR DAMAGE TO OTHER VEHICLE (B):

| NAME OF DRIVER OF OTHER VEHICLE(B) | ADDRESS | NO. OF PASSENGERS |
|---|---|---|
| Tanner Navaroli | 5420 Placerita Dr., Simi Valley CA 93063 | 0 |

| PHONE NUMBER – DRIVER B | DRIVER'S LICENSE NUMBER | NAME OF INSURANCE COMPANY |
|---|---|---|
| 818-634-1993 | None | N/A |

EXTENT OF LOSS OR DAMAGE TO OTHER VEHICLE (C):

| NAME OF DRIVER OF OTHER VEHICLE(C) | ADDRESS | NO. OF PASSENGERS |
|---|---|---|
| | | |

| PHONE NUMBER – DRIVER C | DRIVER'S LICENSE NUMBER | NAME OF INSURANCE COMPANY |
|---|---|---|
| | | |

| | ADDRESS | PHONE NUMBER |
|---|---|---|
| NAME OF OCCUPANT IN CITY VEHICLE, IF ANY | | |
| ADDITIONAL OCCUPANT IN CITY VEHICLE, IF ANY | | |
| NAME OF OCCUPANT IN OTHER VEHICLE, IF ANY | | |
| ADDITIONAL OCCUPANT IN OTHER VEHICLE, IF ANY | | |

| NAME OF INJURED PERSON, IF ANY | ADDRESS | PHONE NUMBER |
|---|---|---|
| Tanner Navaroli | 5420 Placerita Dr., Simi Valley CA 93063 | 818-634-1993 |

| VEHICLE | EXTENT OF INJURY |
|---|---|
| Talaria Power Tech class 3 eletric dirt bike | broken right leg |

| ADDITIONAL INJURED PERSON, IF ANY | ADDRESS | PHONE NUMBER |
|---|---|---|
| | | |

| VEHICLE | EXTENT OF INJURY |
|---|---|
| | |

WAS INJURED PERSON TRANSPORTED TO HOSPITAL OR CLINIC: ☒ YES ☐ NO ☐ UNKNOWN

IF SO, PROVIDE NAME OF HOSPITAL OR MEDICAL CLINIC: Los Robles Regional Medical Center

PERSON(S)/AMBULANCE FIRM TRANSPORTING INJURED PERSON: AMR

DIAGRAM OF ACCIDNT (USE ADDITIONAL SHEETS AS NECESSARY




41
Y626739


SEFTINA
CA EXEMPT
1626739
41


SETIN


1626739

# CALIFORNIA HIGHWAY PATROL

*Providing safety through service*

ALEXANDER [illegible]

California Highway Patrol 770
610 Spring Road
Moorpark, CA 93021
(805) 553-0800

## CRASH REPORT INFORMATION

| CRASH DATE | CRASH TIME |
|---|---|
| 2/7/25 | 1934 |
| **NCIC NUMBER** | **OFFICER'S ID NUMBER** |
| 770 | R2105 23577 |

OFCR INVOLVED

YOUR VEHICLE CAN BE LOCATED AT SVPD 25-5366

Crash reports will normally be available online for a party of interest within eight business days from the date of crash. Please scan the QR code to obtain a copy of the crash report. A crash report involving a fatal injury will not be available online and must be obtained in person from any CHP office (excluding communications centers and commercial inspection facilities). Crash reports are retained for a minimum of four years. Additional information and frequently asked questions can be found by visiting the CHP website at www.chp.ca.gov.

crashes.chp.ca.gov

fb.com/CHP California Highway Patrol @CHP_HQ

# REQUEST FOR CONTACT

The following person(s) is requested to contact CHP Officer ______________________
(Name and ID Number)

at: ☐ Address/Phone number on the front side of this card ☐ ______________________
(Phone number/E-mail)

Person(s):

☐ ______________________
(Name)

☐ The owner(s) of the following vehicle: ______________________
(License Plate/Year/Make/Model)

# FINANCIAL RESPONSIBILITY AND CIVIL LIABILITY

**California's Financial Responsibility Law** requires you to report to the Department of Motor Vehicles (DMV) any crash which results in an injury or death or damages over $1,000 to any one person's property. Use Form **SR-1** which is available at all CHP and DMV offices. Law enforcement reports do **not** satisfy the DMV report requirement. **Failure to submit the Form SR-1 to DMV may lead to the suspension of your driving privilege.**

**Section 17150** of the **California Vehicle Code** makes **every owner** of a motor vehicle **liable and responsible** for the death or injury to a person or property resulting from a negligent or wrongful act or omission in the operation of the motor vehicle, in the business of the owner or other-wise, by any person using or operating the same with the permission, express or implied, of the owner.

# EXHIBIT H

# Vehicle Pursuits

## 307.1 POLICY

It is the policy of this department to balance the importance of apprehending suspects who unlawfully flee from law enforcement against the risks associated with vehicle pursuits.

## 307.2 PURPOSE AND SCOPE

This policy provides guidelines for vehicle pursuits in order to protect the safety of involved officers, the public, and fleeing suspects.

### 307.2.1 DEFINITIONS

**Blocking** - A low-speed tactic where one or more authorized police department emergency vehicles intentionally restrict the movement of a suspect vehicle, with the goal of containment or preventing a pursuit. Blocking is not boxing in or a roadblock.

**Boxing-in** - A tactic designed to stop a suspect's moving vehicle by surrounding it with law enforcement vehicles and then slowing all vehicles to a stop. **This is not a pursuit intervention tactic approved for use by this department.**

**Pursuit Intervention** - An attempt to stop the suspect's ability to continue to flee in a vehicle through tactical application of technology, tire deflation devices, blocking or vehicle intercept, boxing-in, the PIT (known as Pursuit Intervention Technique or Precision Immobilization Technique), ramming, or roadblock procedures.

**Pursuit Intervention Technique (PIT)** - A low-speed tactic intentionally applied to cause the suspect vehicle to spin out and terminate the pursuit.

**Ramming** - The deliberate act of impacting a suspect's vehicle with another vehicle to functionally damage or otherwise force the suspect's vehicle to stop.

**Roadblocks** - A tactic designed to stop a suspect's vehicle by intentionally placing an emergency vehicle or other immovable object in the path of the suspect's vehicle. **This is not a pursuit intervention tactic approved for use by this department.**

**Tire deflation device** - A device that extends across the roadway designed to puncture the tires of the pursued vehicle, sometimes referred to as spike strips.

**Terminate** - To discontinue a pursuit or stop chasing fleeing vehicles.

**Trail** - Following the path of the pursuit at a safe speed while obeying all traffic laws and without activating emergency equipment. If the pursuit is at a slow rate of speed, the trailing vehicle will maintain sufficient distance from the pursuit vehicles so as to clearly indicate an absence of participation in the pursuit

**Vehicle Pursuit** - An event involving one or more law enforcement officers attempting to apprehend a suspect, who is attempting to avoid arrest while operating a motor vehicle by using

Copyright Lexipol, LLC 2023/06/21, All Rights Reserved.
Published with permission by Simi Valley Police Department

high-speed driving or other evasive tactics, such as driving off a highway, turning suddenly, or driving in a legal manner but willfully failing to yield to an officer's signal to stop.

**307.3 OFFICER RESPONSIBILITIES**

Vehicle pursuits shall only be conducted using authorized police department emergency vehicles that are equipped with and displaying emergency lighting and sirens as required by Vehicle Code § 21055. Officers are responsible for continuously driving with due regard and caution for the safety of all persons and property (Vehicle Code § 21056).

307.3.1 WHEN TO INITIATE A PURSUIT

Officers are authorized to initiate a pursuit when the officer reasonably believes that a suspect, who has been given appropriate signal to stop by a law enforcement officer, is attempting to evade arrest or detention by fleeing in a vehicle.

Factors that should be considered in deciding whether to initiate a pursuit include:

(a) The seriousness of the known or reasonably suspected crime and its relationship to community safety.

(b) The importance of protecting the public and balancing the known or reasonably suspected offense and the apparent need for immediate capture against the risks to officers, innocent motorists, and others.

(c) The safety of the public in the area of the pursuit, including the type of area, time of day, the amount of vehicular and pedestrian traffic (e.g., school zones), and the speed of the pursuit relative to these factors.

(d) The pursuing officers' familiarity with the area of the pursuit, the quality of radio communications between the pursuing units and the dispatcher supervisor, and the driving capabilities of the pursuing officers under the conditions of the pursuit.

(e) Whether weather, traffic, and road conditions unreasonably increase the danger of the pursuit when weighed against the risk of the suspect's escape.

(f) Whether the identity of the suspect has been verified and whether there is comparatively minimal risk in allowing the suspect to be apprehended at a later time.

(g) The performance capabilities of the vehicles used in the pursuit in relation to the speeds and other conditions of the pursuit.

(h) Emergency lighting and siren limitations on unmarked police department vehicles that may reduce visibility of the vehicle, such as visor or dash-mounted lights, concealable or temporary emergency lighting equipment, and concealed or obstructed siren positioning.

(i) Suspect and officer vehicle speeds.

(j) Other persons in or on the pursued vehicle (e.g., passengers, co-offenders, hostages).

(k) Availability of other resources such as air support or vehicle locator or deactivation technology.

Copyright Lexipol, LLC 2023/06/21, All Rights Reserved.
Published with permission by Simi Valley Police Department

### 307.3.2 WHEN TO TERMINATE A PURSUIT

Pursuits should be terminated whenever the totality of objective circumstances known or which reasonably ought to be known to the officer or supervisor during the pursuit indicates that the present risks of continuing the pursuit reasonably appear to outweigh the risks resulting from the suspect's escape.

The factors listed in this policy on when to initiate a pursuit will apply equally to the decision to terminate a pursuit. Officers and supervisors must objectively and continuously weigh the seriousness of the offense against the potential danger to innocent motorists, themselves, and the public when electing to continue a pursuit.

In addition to the factors that govern when to initiate a pursuit, other factors should be considered in deciding whether to terminate a pursuit, including:

(a) The distance between the pursuing vehicle and the fleeing vehicle is so great that further pursuit would be futile or require the pursuit to continue for an unreasonable time and/or distance.

(b) The pursued vehicle's location is no longer definitely known.

(c) The pursuing vehicle sustains damage or a mechanical failure that renders it unsafe to drive.

(d) The pursuing vehicle's emergency lighting equipment or siren becomes partially or completely inoperable.

(e) Hazards to uninvolved bystanders or motorists.

(f) The danger that the continued pursuit poses to the public, the officers, or the suspect, balanced against the risk of allowing the suspect to remain at large.

(g) The identity of the suspect is known and it does not reasonably appear that the need for immediate capture outweighs the risks associated with continuing the pursuit.

(h) Extended pursuits of violators for misdemeanors not involving violence, risk of serious harm, or weapons (independent of the pursuit) are generally discouraged.

### 307.3.3 SPEED LIMITS

The speed of a pursuit is a factor that should be evaluated on a continuing basis by the officer and supervisor. Evaluation of vehicle speeds should take into consideration public safety, officer safety, and the safety of the occupants of the fleeing vehicle.

Should high vehicle speeds be reached during a pursuit, officers and supervisors should also consider these factors when determining the reasonableness of the speed of the pursuit:

(a) Pursuit speeds have become unreasonably unsafe for the surrounding conditions.

(b) Pursuit speeds have exceeded the driving ability of the officer.

(c) Pursuit speeds are beyond the capabilities of the pursuit vehicle thus making its operation unsafe.

Copyright Lexipol, LLC 2023/06/21, All Rights Reserved.
Published with permission by Simi Valley Police Department

CITY 00024

**307.4 PURSUIT UNITS**

When involved in a pursuit, unmarked police department emergency vehicles should be replaced by marked emergency vehicles whenever practicable

Vehicle pursuits should be limited to three vehicles (two units and a supervisor); however, the number of units involved may vary with the circumstances.

An officer or supervisor may request additional units to join a pursuit if, after assessing the factors outlined above, it reasonably appears that the number of officers involved may be insufficient to safely arrest the suspects. All other officers should stay out of the pursuit, but should remain alert to its progress and location. Any officer who drops out of a pursuit may then, if necessary, proceed to the termination point at legal speeds, following the appropriate rules of the road.

307.4.1 MOTORCYCLE OFFICERS

When involved in a pursuit, police department motorcycles should be replaced by marked four-wheel emergency vehicles as soon as practicable.

307.4.2 VEHICLES WITHOUT EMERGENCY EQUIPMENT

Officers operating vehicles not equipped with red light and siren are prohibited from initiating or joining in any pursuit.

307.4.3 UNMARKED UNITS AND PICKUP TRUCKS

Unmarked vehicles and pickup trucks should generally avoid initiating or joining in any pursuit. However, if a pursuit is initiated officers should terminate their involvement immediately upon arrival of sufficient emergency police vehicles or any helicopter.

307.4.4 PRIMARY UNIT RESPONSIBILITIES

The initial pursuing unit will be designated as the primary pursuit unit and will be responsible for the conduct of the pursuit unless the officer is unable to remain reasonably close to the suspect’s vehicle. The primary responsibility of the officer initiating the pursuit is the apprehension of the suspects without unreasonable danger to any person.

The primary unit should notify the dispatcher commencing with a request for priority radio traffic, that a vehicle pursuit has been initiated, and as soon as practicable provide information including but not limited to:

(a) The location, direction of travel, and estimated speed of the suspect's vehicle.

(b) The description of the suspect's vehicle including license plate number, if known.

(c) The reason for the pursuit.

(d) Known or suspected weapons. Threat of force, violence, injuries, hostages, or other unusual hazards.

(e) The suspected number of occupants and identity or description.

(f) The weather, road, and traffic conditions.

(g) The need for any additional resources or equipment.

Copyright Lexipol, LLC 2023/06/21, All Rights Reserved.
Published with permission by Simi Valley Police Department

(h) The identity of other law enforcement agencies involved in the pursuit.

Until relieved by a supervisor or secondary unit, the officer in the primary unit is responsible for the broadcasting of the progress of the pursuit. Unless circumstances reasonably indicate otherwise, the primary pursuing officer should, as soon as practicable, relinquish the responsibility of broadcasting the progress of the pursuit to a secondary unit or air support joining the pursuit to minimize distractions and allow the primary pursuing officer to concentrate foremost on safe pursuit tactics.

### 307.4.5 SECONDARY UNIT RESPONSIBILITIES

The second officer in the pursuit will be designated as the secondary unit and is responsible for:

(a) Immediately notifying the dispatcher of entry into the pursuit.

(b) Remaining a safe distance behind the primary unit unless directed to assume the role of primary pursuit vehicle or if the primary pursuit vehicle is unable to continue the pursuit.

(c) Broadcasting the progress, updating known or critical information, and providing changes in the pursuit, unless the situation indicates otherwise.

(d) Identifying the need for additional resources or equipment as appropriate.

(e) Serving as backup to the primary pursuing officer once the suspect has been stopped.

### 307.4.6 PURSUIT DRIVING

The decision to use specific driving tactics requires the same assessment of the factors the officer considered when determining whether to initiate and/or terminate a pursuit. The following are tactics for units involved in the pursuit:

(a) Officers, considering their driving skills and vehicle performance capabilities, will space themselves from other involved vehicles such that they are able to see and avoid hazards or react safely to maneuvers by the fleeing vehicle.

(b) Because intersections can present increased risks, the following tactics should be considered:

1. Available units not directly involved in the pursuit may proceed safely to controlled intersections ahead of the pursuit in an effort to warn cross traffic.

2. Pursuing units should exercise due regard and caution when proceeding through controlled intersections.

(c) As a general rule, officers should not pursue a vehicle driving left of center (wrong way) against traffic. In the event that the pursued vehicle does so, the following tactics should be considered:

1. Requesting assistance from available air support.

2. Maintain visual contact with the pursued vehicle by paralleling it on the correct side of the roadway.

3. Request other units to observe exits available to the suspects.

Copyright Lexipol, LLC 2023/06/21, All Rights Reserved.
Published with permission by Simi Valley Police Department

(d) Notify the California Highway Patrol (CHP) and/or other law enforcement agency if it appears that the pursuit may enter its jurisdiction.

(e) Officers involved in a pursuit should not attempt to pass other units unless the situation indicates otherwise or they are requested to do so by the primary unit and with a clear understanding of the maneuver process between the involved units.

### 307.4.7 PURSUIT TRAILING

In the event the initiating unit from this agency either relinquishes control of the pursuit to another unit or jurisdiction, that initiating unit may, with permission of a supervisor, trail the pursuit to the termination point in order to provide information and assistance for the arrest of the suspects and reporting the incident.

### 307.4.8 AIR SUPPORT ASSISTANCE

When available, air support assistance should be requested. Once the air unit has established visual contact with the pursued vehicle, the unit should assume control over the pursuit. The primary and secondary ground units, or involved supervisor, will maintain operational control but should consider whether the participation of air support warrants the continued close proximity and/or involvement of ground units in the pursuit.

The air unit should coordinate the activities of resources on the ground, report progress of the pursuit and provide officers and supervisors with details of upcoming traffic congestion, road hazards, or other pertinent information to evaluate whether to continue the pursuit. If ground units are not within visual contact of the pursued vehicle and the air support unit determines that it is unsafe to continue the pursuit, the air support unit should recommend terminating the pursuit.

### 307.4.9 UNITS NOT INVOLVED IN THE PURSUIT

There should be no paralleling of the pursuit route. Officers are authorized to use emergency equipment at intersections along the pursuit path to clear intersections of vehicular and pedestrian traffic to protect the public. Officers should remain in their assigned area and should not become involved with the pursuit unless directed otherwise by a supervisor.

The primary and secondary units should be the only units operating under emergency conditions (red light and siren) unless other units are assigned to the pursuit.

## 307.5 SUPERVISORY CONTROL AND RESPONSIBILITIES

Available supervisory and management control will be exercised over all vehicle pursuits involving officers from this department.

The field supervisor of the officer initiating the pursuit, or if unavailable, the nearest field supervisor will be responsible for:

(a) Immediately notifying involved unit and the dispatcher of supervisory presence and ascertaining all reasonably available information to continuously assess the situation and risk factors associated with the pursuit.

(b) Engaging in the pursuit, when appropriate, to provide on-scene supervision.

Copyright Lexipol, LLC 2023/06/21, All Rights Reserved.
Published with permission by Simi Valley Police Department

(c) Exercising management and control of the pursuit even if not engaged in it.

(d) Ensuring that no more than the required number of units are involved in the pursuit under the guidelines set forth in this policy.

(e) Directing that the pursuit be terminated if, in the supervisor's judgment, it is unreasonable to continue the pursuit under the guidelines of this policy.

(f) Ensuring that assistance from air support, canines, or additional resources is requested, if available and appropriate.

(g) Ensuring that the proper radio channel is being used.

(h) Ensuring that the Watch Commander is notified of the pursuit as soon as practicable.

(i) Ensuring the notification and/or coordination of outside agencies if the pursuit either leaves or is likely to leave the jurisdiction of this department.

(j) Controlling and managing Simi Valley Police Department units when a pursuit enters another jurisdiction.

(k) Preparing a post-pursuit review and documentation of the pursuit.

1. Supervisors should initiate follow up or additional review when appropriate.

### 307.5.1 WATCH COMMANDER RESPONSIBILITIES

Upon becoming aware that a pursuit has been initiated, the Watch Commander should monitor and continually assess the situation and ensure the pursuit is conducted within the guidelines and requirements of this policy. Once notified, the Watch Commander has the final responsibility for the coordination, control, and termination of a vehicle pursuit and shall be in overall command.

The Watch Commander shall review all pertinent reports for content and forward to the Assistant Chief.

## 307.6 COMMUNICATIONS

If the pursuit is confined within the City limits, radio communications will be conducted on the primary channel unless instructed otherwise by a supervisor or dispatcher. If the pursuit leaves the jurisdiction of this department or such is imminent, involved units should, whenever available, switch radio communications to a tactical or emergency channel most accessible by participating agencies and units.

### 307.6.1 COMMUNICATIONS BUREAU RESPONSIBILITIES

Upon notification or becoming aware that a pursuit has been initiated, the dispatcher is responsible for:

(a) Clearing the radio channel of non-emergency traffic.

(b) Coordinating pursuit communications of the involved units and personnel.

(c) Broadcasting pursuit updates as well as other pertinent information as necessary.

(d) Ensuring that a field supervisor is notified of the pursuit.

(e) Notifying and coordinating with other involved or affected agencies as practicable.

Copyright Lexipol, LLC 2023/06/21, All Rights Reserved.
Published with permission by Simi Valley Police Department

(f) Notify the Watch Commander as soon as practicable.

(g) Assigning an incident number and logging all pursuit activities.

307.6.2 LOSS OF PURSUED VEHICLE

When the pursued vehicle is lost, the primary unit should broadcast pertinent information to assist other units in locating suspects. The primary unit or supervisor will be responsible for coordinating any further search for either the pursued vehicle or suspects fleeing on foot.

**307.7 INTER-JURISDICTIONAL CONSIDERATIONS**

When a pursuit enters another agency's jurisdiction, the primary officer or supervisor, taking into consideration distance traveled, unfamiliarity with the area and other pertinent facts, should determine whether to request the other agency to assume the pursuit. Unless entry into another jurisdiction is expected to be brief, it is generally recommended that the primary officer or supervisor ensure that notification is provided to each outside jurisdiction into which the pursuit is reasonably expected to enter, regardless of whether such jurisdiction is expected to assist.

307.7.1 ASSUMPTION OF PURSUIT BY ANOTHER AGENCY

Officers will relinquish control of the pursuit when another agency has assumed the pursuit, unless the continued assistance of the Simi Valley Police Department is requested by the agency assuming the pursuit. Upon relinquishing control of the pursuit, the involved officers may proceed, with supervisory approval, to the termination point of the pursuit to assist in the investigation. The supervisor should coordinate such assistance with the assuming agency and obtain any information that is necessary for any reports. Notification of a pursuit in progress should not be construed as a request to join the pursuit. Requests to or from another agency to assume a pursuit should be specific.

307.7.2 PURSUITS EXTENDING INTO THIS JURISDICTION

The agency that initiates a pursuit is responsible for conducting the pursuit. Units from this department should not join a pursuit unless specifically requested to do so by the pursuing agency and with approval from a supervisor. The exception to this is when a single unit from the initiating agency is in pursuit. Under this circumstance, a supervisor may authorize units from this department to join the pursuit until sufficient units from the initiating agency join the pursuit or until additional information is provided allowing withdrawal of the pursuit.

When a request is made for this department to assist or take over a pursuit that has entered the jurisdiction of Simi Valley Police Department, the supervisor should consider:

(a) The public's safety within this jurisdiction.

(b) The safety of the pursuing officers.

(c) Whether the circumstances are serious enough to continue the pursuit.

(d) Whether there is adequate staffing to continue the pursuit.

(e) The ability to maintain the pursuit.

Copyright Lexipol, LLC 2023/06/21, All Rights Reserved.
Published with permission by Simi Valley Police Department

As soon as practicable, a supervisor or the Watch Commander should review a request for assistance from another agency. The Watch Commander or supervisor, after considering the above factors, may decline to assist in, or assume the other agency's pursuit.

Assistance to a pursuing allied agency by officers of this department will terminate at the City limits provided that the pursuing officers have sufficient assistance from other sources. Ongoing participation from this department may continue only until sufficient assistance is present.

In the event that a pursuit from another agency terminates within this jurisdiction, officers should provide appropriate assistance to officers from the allied agency including but not limited to scene control, coordination and completion of supplemental reports, and any other reasonable assistance requested or needed.

## 307.8 WHEN PURSUIT INTERVENTION IS AUTHORIZED

Whenever practicable, an officer shall seek approval from a supervisor before employing any intervention to stop the pursued vehicle. In deciding whether to use intervention tactics, officers/ supervisors should balance the risks of allowing the pursuit to continue with the potential hazards to the public arising from the use of each tactic, the officers, and persons in or on the pursued vehicle to determine which, if any, intervention tactic may be reasonable.

### 307.8.1 USE OF FIREARMS

An officer should only discharge a firearm at a moving vehicle or its occupants when the officer reasonably believes there are no other reasonable means available to avert the threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others.

Officers should not shoot at any part of a vehicle in an attempt to disable the vehicle (see the Use of Force Policy).

### 307.8.2 INTERVENTION STANDARDS

Any intervention tactic, depending upon the conditions and circumstances under which it is used, may present dangers to the officers, the public, or anyone in or on the vehicle being pursued. Certain applications of intervention tactics may be construed to be a use of force, including deadly force, and subject to the policies guiding such use. Officers should consider these facts and requirements prior to deciding how, when, where, and if an intervention tactic should be employed.

(a) Blocking should only be used after giving consideration to the following:

  1. The technique should only be used by officers who have received training in the technique.
  2. The need to immediately stop the suspect vehicle or prevent it from leaving reasonably appears to outweigh the risks of injury or death to occupants of the suspect vehicle, officers, or other members of the public.
  3. It reasonably appears the technique will contain or prevent the pursuit.

(b) The PIT should only be used after giving consideration to the following:

Copyright Lexipol, LLC 2023/06/21, All Rights Reserved.
Published with permission by Simi Valley Police Department

1. The technique should only be used by officers who have received training in the technique, including speed restrictions.
2. Supervisory approval should be obtained before using the technique.
3. The need to immediately stop the suspect vehicle reasonably appears to outweigh the risks of injury or death to occupants of the suspect vehicle, officers, or other members of the public.
4. It reasonably appears the technique will terminate or prevent the pursuit.

(c) Ramming a fleeing vehicle should only be done after giving consideration to the following:

1. Supervisory approval should be obtained before using the technique.
2. The need to immediately stop the suspect vehicle reasonably appears to substantially outweigh the risks of injury or death to occupants of the suspect vehicle, officers, or other members of the public.
3. It reasonably appears the technique will terminate or prevent the pursuit.
4. Ramming may be used only under circumstances when deadly force would be authorized.
5. Ramming may be used when all other reasonable alternatives have been exhausted or reasonably appear ineffective.

(d) Before attempting to box a suspect vehicle during a pursuit the following should be considered:

1. The technique should only be used by officers who have received training in the technique.
2. Supervisory approval should be obtained before using the technique.
3. The need to immediately stop the suspect vehicle reasonably appears to outweigh the risks of injury or death to occupants of the suspect vehicle, officers, or other members of the public.
4. It reasonably appears the technique will terminate or prevent the pursuit.

(e) Tire deflation devices should only be used after considering the following:

1. Tire deflation devices should only be used by officers who have received training in their use.
2. Supervisory approval should be obtained before using tire deflation devices.
3. The need to immediately stop the suspect vehicle reasonably appears to outweigh the risks of injury or death to occupants of the suspect vehicle, officers, or other members of the public.
4. It reasonably appears the use will terminate or prevent the pursuit.
5. Tire deflation devices should not be used when the pursued vehicle is a motorcycle, a vehicle transporting hazardous materials, or a school bus transporting children, except in extraordinary circumstances.

Copyright Lexipol, LLC 2023/06/21, All Rights Reserved.
Published with permission by Simi Valley Police Department

6. Due to the increased risk to officers deploying tire deflation devices, such deployment should be communicated to all involved personnel.

(f) Roadblocks should only be used after considering the following:

1. Roadblocks should only be used by officers who have received training in their use.
2. Supervisory approval should be obtained before using the technique.
3. The need to immediately stop the suspect vehicle reasonably appears to substantially outweigh the risks of injury or death to occupants of the suspect vehicle, officers, or other members of the public.
4. It reasonably appears the technique will terminate or prevent the pursuit. Roadblocks may be used only under circumstances when deadly force would be authorized.
5. Roadblocks may be used when all other reasonable alternatives have been exhausted or reasonably appear ineffective.

307.8.3 CAPTURE OF SUSPECTS

Proper self-discipline and sound professional judgment are the keys to a successful conclusion of a pursuit and apprehension of evading suspects. Officers shall use only that amount of force, which reasonably appears necessary under the circumstances, to accomplish a legitimate law enforcement purpose.

Unless relieved by a supervisor, the primary pursuing officer should coordinate efforts to apprehend the suspects following the pursuit. Officers should consider safety of the public and the involved officers when formulating plans for setting up perimeters or for containing and capturing the suspects.

### 307.9 REPORTING REQUIREMENTS

All appropriate reports should be completed to comply with applicable laws, policies, and procedures.

(a) The primary officer should complete appropriate crime/arrest reports.

(b) The Records Bureau Manager shall ensure that an Allied Agency Vehicle Pursuit Report (form CHP 187A) is filed with the CHP not later than 30 days following the pursuit (Vehicle Code § 14602.1). The primary officer should complete as much of the required information on the form as is known and forward the report to the Watch Commander for review and distribution.

(c) After first obtaining the available information, the involved, or if unavailable on-duty, field supervisor shall promptly complete a Supervisor's Log or interoffice memorandum, briefly summarizing the pursuit to the Chief of Police or the authorized designee. This log or memorandum should include, at a minimum:

1. Date and time of pursuit.
2. Initial reason and circumstances surrounding the pursuit.

Copyright Lexipol, LLC 2023/06/21, All Rights Reserved.
Published with permission by Simi Valley Police Department

3. Length of pursuit in distance and time, including the starting and termination points.

4. Involved units and officers.

5. Alleged offenses.

6. Whether a suspect was apprehended, as well as the means and methods used.

7. Any use of force that occurred during the vehicle pursuit.

   (a) Any use of force by a member should be documented in the appropriate report (See the Use of Force Policy).

8. Any injuries and/or medical treatment.

9. Any property or equipment damage.

10. Name of supervisor at scene or who handled the incident.

(d) The Deputy Chief or designee shall review the reports submitted to ensure all portions of this policy, as well as applicable laws, have been followed. This review will also focus on further need to improve or refine this policy and/or provide additional training to department members.

Annually, the Chief of Police should direct a documented review and analysis of department vehicle pursuit reports to minimally include policy suitability, policy compliance, and training or equipment needs.

### 307.9.1 REGULAR AND PERIODIC PURSUIT TRAINING

The Training Coordinator shall make available to all officers initial and supplementary Police Officer Standard Training (POST) training on pursuits required by Penal Code § 13519.8, Vehicle Code § 17004.7(d), and 11 CCR 1081, and no less than annual training addressing:

(a) This policy.

(b) The importance of vehicle safety and protecting the public.

(c) The need to balance the known offense and the need for immediate capture against the risks to officers and others.

### 307.9.2 POLICY REVIEW

Officers of this department shall certify in writing that they have received, read, and understand this policy initially, upon any amendments, and whenever training on this policy is provided. The POST attestation form, or an equivalent form, may be used to document the compliance and should be retained in the member’s training file.

Copyright Lexipol, LLC 2023/06/21, All Rights Reserved.
Published with permission by Simi Valley Police Department

# EXHIBIT I

Algeria R. Ford (SBN 289016)
E-mail: aford@bwslaw.com
CITY ATTORNEY, CITY OF SIMI VALLEY
Lisa W. Lee (SBN 186495)
E-mail: llee@bwslaw.com
Natalie F. Price (SBN 279798)
E-mail: nprice@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
444 South Flower Street, 40th Floor
Los Angeles, California 90071-2942
Tel: 213.236.0600 Fax: 213.236.2700

Attorneys for Defendants
CITY OF SIMI VALLEY, TYLER WILLIAMSON and ERIC COOKE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| T.J.N., a minor by and through his Guardian Ad Litem WILLIAM NAVAROLI,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SIMI VALLEY, TYLER WILLIAMSON, and ERIC COOK,<br><br>Defendants. | Case No. 2:25-cv-11601-MEMF (RAOx)<br><br>Hon. Maame Ewusi-Mensah Frimpong<br><br>**DEFENDANT CITY OF SIMI VALLEY'S RESPONSES TO PLAINTIFF TANNER NAVAROLI'S REQUESTS FOR PRODUCTION, SET ONE** |

PROPOUNDING PARTY: Plaintiff TANNER NAVAROLI

RESPONDING PARTY: Defendant CITY OF SIMI VALLEY

SET NO: One

Defendant CITY OF SIMI VALLEY responds to plaintiff TANNER NAVAROLI'S Requests for Production, set one, as follows:

**PRELIMINARY STATEMENT**

These responses are made solely for the purpose of this action. Defendant has not completed its investigation of the facts or discovery in this action. The following responses are based upon a diligent investigation by Defendant and upon such information available as of the date on which these responses are made. These responses are made without prejudice to Defendant's rights to conduct further investigation and discovery and to offer at trial subsequently discovered evidence.

The documents and/or other tangible things produced are produced subject to Defendant's right to conduct further investigation and discovery and to offer at trial subsequently discovered evidence. Defendant makes no incident or implied admissions regarding the contents of any document referred to in these responses.

**RESPONSES TO REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1:**

All DOCUMENTS sufficient to identify the PATROL VEHICLE, including its year, make, model, and vehicle identification number; all data recording systems installed in or on the PATROL VEHICLE at the time of the INCIDENT, including any event data recorder, telematics system, GPS or automatic vehicle location system, in-car camera system, and emergency light or siren controller; and the weight of the PATROL VEHICLE as equipped at the time of the INCIDENT.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Objection. Vague, ambiguous, compound and overbroad.

Notwithstanding these objections, Responding Party will produce the following:

DMV Registration for Vehicle – [CITY 00061]

Unit 41 MFD Label – [CITY 00091]

Purchase Order No. 41700700 – [CITY 00092-CITY 00095]

**REQUEST FOR PRODUCTION NO. 2:**

All data recorded by any event data recorder ("EDR"), airbag control module, restraint control module, powertrain control module, or other electronic control module installed in the PATROL VEHICLE that REFERS OR RELATES TO the INCIDENT, including all pre-crash and post-crash data, produced in native format.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

Objection. Vague, ambiguous, compound and overbroad. The request as phrased is beyond the scope of permissible discovery, and grossly disproportionate to the needs of this case, and therefore harassing. This request is not calculated to lead to the discovery of admissible evidence.

Notwithstanding these objections, Responding Party responds as follows:

Responding Party is not in possession of any recorded data relating to the incident.

**REQUEST FOR PRODUCTION NO. 3:**

All Bosch Crash Data Retrieval ("CDR") reports and all other downloads, extractions, or imaging of data from the PATROL VEHICLE, including the native data files (e.g., .CDR or .CDRX) and all complete reports generated from those files.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

Objection. Vague, ambiguous, compound and overbroad. The request as phrased is beyond the scope of permissible discovery, and grossly disproportionate to the needs of this case, and therefore harassing. This request is not calculated to lead to the discovery of admissible evidence.

Notwithstanding these objections, Responding Party responds as follows:

Responding Party is not in possession of any CDR reports relating to the incident.

**<u>REQUEST FOR PRODUCTION NO. 4</u>:**

All DOCUMENTS that REFER OR RELATE TO the speed, velocity, acceleration, or deceleration of the PATROL VEHICLE during the period from sixty minutes before through sixty minutes after the INCIDENT, including data from any onboard module, telematics system, fleet management system, GPS, or automatic vehicle location system.

**<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 4</u>:**

Objection. Vague, ambiguous, compound and overbroad. The request as phrased is beyond the scope of permissible discovery, and grossly disproportionate to the needs of this case, and therefore harassing. This request is not calculated to lead to the discovery of admissible evidence.

Notwithstanding these objections, Responding Party responds as follows:

Responding Party is not in possession of documents relating to the speed of the patrol vehicle relating to the incident.

**<u>REQUEST FOR PRODUCTION NO. 5</u>:**

All DOCUMENTS that REFER OR RELATE TO braking by the PATROL VEHICLE during the INCIDENT, including brake switch status, brake pedal application or position, antilock braking system activation, and electronic stability control activation.

**<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 5</u>:**

Objection. Vague, ambiguous, compound and overbroad. The request as phrased is beyond the scope of permissible discovery, and grossly disproportionate to the needs of this case, and therefore harassing. This request is not calculated to

lead to the discovery of admissible evidence.

Notwithstanding these objections, Responding Party responds as follows:

Responding Party is not in possession of any documents relating to the braking of the patrol vehicle relating to the incident.

**<u>REQUEST FOR PRODUCTION NO. 6</u>:**

All video and audio recorded by any camera system installed in or on the PATROL VEHICLE that REFERS OR RELATES TO the INCIDENT, together with all associated metadata, including recorded vehicle speed, brake status, emergency light status, siren status, GPS coordinates, and event trigger logs, produced in native format.

**<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 6</u>:**

Objection. Vague, ambiguous, compound and overbroad. The request as phrased is beyond the scope of permissible discovery, and grossly disproportionate to the needs of this case, and therefore harassing. This request is not calculated to lead to the discovery of admissible evidence.

Notwithstanding these objections, Responding Party responds as follows: Responding Party is not in possession of any vehicle video or audio recordings relating to the incident.

**<u>REQUEST FOR PRODUCTION NO. 7</u>:**

All data, logs, or DOCUMENTS that REFER OR RELATE TO the activation or deactivation of the PATROL VEHICLE's emergency lights or siren on the date of the INCIDENT, including data from any siren controller, light controller, or camera trigger system.

**<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 7</u>:**

Objection. Vague, ambiguous, compound and overbroad. The request as phrased is beyond the scope of permissible discovery, and grossly disproportionate

to the needs of this case, and therefore harassing. This request is not calculated to lead to the discovery of admissible evidence.

Notwithstanding these objections, Responding Party responds as follows:

Responding Party is not in possession of any documents relating to the activation of the patrol vehicle's emergency lights or siren relating to the incident.

**REQUEST FOR PRODUCTION NO. 8:**

All DOCUMENTS that REFER OR RELATE TO any inspection, download, extraction, or preservation of data from the PATROL VEHICLE after the INCIDENT, including the identity of each PERSON who performed it, the date performed, the hardware and software used, and all chain of custody records.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Objection. Vague, ambiguous, compound and overbroad. The request as phrased is beyond the scope of permissible discovery, and grossly disproportionate to the needs of this case, and therefore harassing. This request is not calculated to lead to the discovery of admissible evidence.

Notwithstanding these objections, Responding Party responds as follows:

Responding Party is not in possession of any extraction of data from the patrol vehicle after the incident.

Responding Party also refers to Response to Request No. 9, herein.

**REQUEST FOR PRODUCTION NO. 9:**

All maintenance, inspection, and repair records for the PATROL VEHICLE for the period one year before the INCIDENT through the present, including all records that REFER OR RELATE TO its braking system.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

Objection. Vague, ambiguous, compound and overbroad. The request as phrased is beyond the scope of permissible discovery, and grossly disproportionate

to the needs of this case, and therefore harassing. This request is not calculated to lead to the discovery of admissible evidence.

Notwithstanding these objections, Responding Party will produce the following:

Maintenance Logs for Unit 41 – [CITY 00062-CITY 00090].

**REQUEST FOR PRODUCTION NO. 10:**

The complete, original video and audio file(s) recorded by the PATROL VEHICLE's camera system that REFER OR RELATE TO the INCIDENT, produced in the native, proprietary file format in which the recording system stores them, with all embedded metadata and telemetry intact, including all data indicating brake application, vehicle speed, emergency light status, siren status, and GPS position, together with any software, codec, viewer, or instructions necessary to display the video with its telemetry indicators visible.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

Objection. Vague, ambiguous, compound and overbroad. The request as phrased is beyond the scope of permissible discovery, and grossly disproportionate to the needs of this case, and therefore harassing. This request is not calculated to lead to the discovery of admissible evidence.

Notwithstanding these objections, Responding Party responds as follows:

Responding Party is not in possession of any vehicle camera recordings relating to the incident.

**REQUEST FOR PRODUCTION NO. 11:**

The exact video file(s), copies, or exports of the PATROL VEHICLE's camera footage that WILLIAMSON viewed at any time after the INCIDENT, including any version that displayed an onscreen icon, indicator, or overlay showing brake application or other vehicle telemetry, produced in the same format and with

the same display features as the version WILLIAMSON viewed.

**<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 11</u>:**

Objection. Vague, ambiguous, compound and overbroad. The request as phrased is beyond the scope of permissible discovery, and grossly disproportionate to the needs of this case, and therefore harassing. This request is not calculated to lead to the discovery of admissible evidence.

Notwithstanding these objections, Responding Party responds as follows:

Responding Party is not in possession of any vehicle camera recordings relating to the incident.

**<u>REQUEST FOR PRODUCTION NO. 12</u>:**

All DOCUMENTS that REFER OR RELATE TO the make, model, configuration, and capabilities of the camera system installed in the PATROL VEHICLE at the time of the INCIDENT, including user manuals, specification sheets, configuration or settings records, and all DOCUMENTS describing what vehicle telemetry the system records or displays, including brake status.

**<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 12</u>:**

Objection. Vague, ambiguous, compound and overbroad. The request as phrased is beyond the scope of permissible discovery, and grossly disproportionate to the needs of this case, and therefore harassing. This request is not calculated to lead to the discovery of admissible evidence.

Notwithstanding these objections, Responding Party responds as follows:

Responding Party is not in possession of any vehicle camera recordings relating to the incident.

///

///

///

///

Dated: September 4 2026

BURKE, WILLIAMS & SORENSEN, LLP

By: ______________________

Lisa W. Lee
Natalie F. Price
Attorneys for Defendants
CITY OF SIMI VALLEY, TYLER WILLIAMSON and ERIC COOKE

# PROOF OF SERVICE

***William Navaroli v. City of Simi Valley, et al.***
**2:25-cv-11601-MEMF (RAOx)**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 444 South Flower Street, 40th Floor, Los Angeles, CA 90071-2942.

On September 4, 2026, I served true copies of the following document(s) described as ***DEFENDANT CITY OF SIMI VALLEY'S RESPONSES TO PLAINTIFF TANNER NAVAROLI'S REQUESTS FOR PRODUCTION, SET ONE*** on the interested parties in this action as follows:

| | |
|---|---|
| Dale K. Galipo<br>Cooper Alison-Mayne<br>LAW OFFICES OF DALE K. GALIPO<br>21800 Burbank Blvd., Suite 310<br>Woodland Hills, California 91367<br>Tel: 818-347-3333<br>dalekgalipo@yahoo.com<br>cmayne@galipolaw.com<br>dgilbert@galipolaw.com | Attorneys for Plaintiff<br>*T.J.N., a minor by and through his Guardian Ad Litem, WILLIAM NAVAROLI* |

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address rcole@bwslaw.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on September 4, 2026, at Los Angeles, California.

Rhonda M. Cole

REGISTRATION CARD VALID FROM: 00/00/0000 TO: 12/31/2099

| MAKE | YR MODEL | YR 1ST SOLD | VLF CLASS | TYPE VEH | TYPE LIC | LICENSE NUMBER |
|---|---|---|---|---|---|---|
| FORD | 2022 | 2022 | KN | 110 | 13 | 1626739 |

| BODY TYPE MODEL | MP | MO | VEHICLE ID NUMBER |
|---|---|---|---|
| UT | F | DA | 1FM5K8AB3NGA08165 |

| TYPE VEHICLE USE | DATE ISSUED | CC/ALCO | DT FEE RECVD | PIC |
|---|---|---|---|---|
| AUTOMOBILE<br>PERM EXEMPT | 01/15/22 | 56 | 01/15/22 | 5 |

REGISTERED OWNER
CITY OF SIMI VALLEY
2929 TAPO CANYON ROAD

SIMI VALLEY
CA 93063

AMOUNT PAID
$NFEE

AMOUNT DUE
$ NONE

AMOUNT RECVD
CASH :
CHCK :
CRDT :

LIENHOLDER

A00 VB0 K6 0000000 0002 CS A00 011522 13 1626739 165


MFD. BY FORD MOTOR CO.
DATE: 11/21
GVWR: 2933 KG ( 6465 LB)
FRONT GAWR:
1383 KG ( 3050 LB)
255/60R18 108V
18x8.0J
AT 250 kPa/ 36 PSI COLD
WITH
TIRES
RIMS
REAR GAWR:
1613 KG ( 3555 LB)
255/60R18 108V
18x8.0J
AT 250 kPa/ 36 PSI COLD
WITH
TIRES
RIMS
THIS VEHICLE CONFORMS TO ALL APPLICABLE FEDERAL MOTOR
VEHICLE SAFETY STANDARDS IN EFFECT ON THE DATE OF
MANUFACTURE SHOWN ABOVE.
VIN: 1FM5K8AB3NGA08165
TYPE: MPV
F0239
T0113

CITY OF SIMI VALLEY

# Purchase Order



THIS PURCHASE ORDER NUMBER MUST APPEAR ON ALL INVOICES, PACKING LISTS, CARTONS, AND CORRESPONDENCE RELATED TO THIS ORDER

Purchase Order # **41700700**

BILL TO
City of Simi Valley
Accounts Payable
2929 Tapo Canyon Rd
SIMI VALLEY, CA 93063-2199
Email: [redacted]

VENDOR
ADAMSON POLICE PRODUCTS
10764 NOEL ST
LOS ALAMITOS, CA 90720
Email: [redacted]

SHIP TO
Simi Valley Police Department
Maintenance
3901 Alamo Street
SIMI VALLEY, CA 93063-2102
Email: [redacted]

| Vendor Phone Number | Payment Terms | Requisition Number | Buyer Name | Buyer Phone Number |
|---|---|---|---|---|
| [redacted] | NET 0 | 11701422 | Sandy Tate | [redacted] |

| Date Ordered | Vendor Number | Date Required | Freight Method | Department/Location |
|---|---|---|---|---|
| 06/02/2017 | 49 | 06/15/2017 | F.O.B. SIMI VALLEY 0 | Police Department |

| Item# | Description/PartNo | QTY | UOM | Unit Price | Extended Price |
|---|---|---|---|---|---|
| | Auto Accessories | | | | |
| 1 | Setina PB450L push bumper w/4 Whelen Ion split rd/blu<br>GL Account: 1005395 - 42560<br>Project Account: | 8.0 | EA | $648.25 | $5,186.00 |
| 2 | Setina 825/GK2001E Dual Weapon mnt system w/single Lock Blac-Rac Lock 1080 E,butt plate PG0895, T-Rail butt plate driver side PG6380, T-Rail sm/lrg lock attachment bracket PG6379<br>GL Account: 1005395 - 42560<br>Project Account: | 7.0 | EA | $583.75 | $4,086.25 |
| 3 | Havis 21" console C-VS1308INUT with faceplates C-EB25-XTL-1P, C-EB40-CCS-1P and blanks<br>GL Account: 1005395 - 42560<br>Project Account: | 9.0 | EA | $255.25 | $2,297.25 |
| 4 | Havis C-CUP2-1 Beverage holder<br>GL Account: 1005395 - 42560<br>Project Account: | 9.0 | EA | $29.85 | $268.65 |
| 5 | Whelen Legacy Duo Lightbar w/mnt kit for 2017 Ford SUV, with Cencom Sapphire #CCSRNTA3<br>GL Account: 1005395 - 42560<br>Project Account: | 8.0 | EA | $2,425.50 | $19,404.00 |
| 6 | ES100 Siren Speaker & mount MT-ESB-EXPO7<br>GL Account: 1005395 - 42560<br>Project Account: | 9.0 | EA | $153.25 | $1,379.25 |
| 7 | Troy rear cargo partition w/ABS plastic seat PS-FDUV-OS-R incl seatbelts & drvr & pass window guards<br>GL Account: 1005395 - 42560<br>Project Account: | 7.0 | EA | $1,057.95 | $7,405.65 |
| 8 | Troy weapon box w/push button lock & 2 drawer latch handles CP-GB40-PB 40x32x12 | 7.0 | EA | $1,095.00 | $7,665.00 |

**CONTINUED ON NEXT PAGE**

CITY OF SIMI VALLEY

# Purchase Order



THIS PURCHASE ORDER NUMBER MUST APPEAR ON ALL INVOICES, PACKING LISTS, CARTONS, AND CORRESPONDENCE RELATED TO THIS ORDER

Purchase Order # **41700700**

BILL TO
City of Simi Valley
Accounts Payable
2929 Tapo Canyon Rd
SIMI VALLEY, CA 93063-2199
Email: [redacted]

VENDOR
ADAMSON POLICE PRODUCTS
10764 NOEL ST
LOS ALAMITOS, CA 90720
Email: [redacted]

SHIP TO
Simi Valley Police Department
Maintenance
3901 Alamo Street
SIMI VALLEY, CA 93063-2102
Email: [redacted]

| Vendor Phone Number | Payment Terms | Requisition Number | Buyer Name | Buyer Phone Number |
|---|---|---|---|---|
| [redacted] | F.O.B. SIMI... | 11701422 | Sandy Tate | [redacted] |

| Date Ordered | Vendor Number | Date Required | Freight Method | Department/Location |
|---|---|---|---|---|
| 06/02/2017 | 49 | 06/15/2017 | F.O.B. SIMI VALLEY 0 | Police Department |

| Item# | Description/PartNo | QTY | UOM | Unit Price | Extended Price |
|---|---|---|---|---|---|
| | GL Account: 1005395 - 42560<br>Project Account: | | | | |
| 9 | Troy rear cargo mount shock style<br>GL Account: 1005395 - 42560<br>Project Account: | 7.0 | EA | $266.50 | $1,865.50 |
| 10 | Troy SUV tray electronics under cargo mount AC-UV-TRAY-H<br>GL Account: 1005395 - 42560<br>Project Account: | 7.0 | EA | $185.75 | $1,300.25 |
| 11 | Troy Partition w/recess panel TP-E-SL-6-US-SS w/footpockets and opening screen<br>GL Account: 1005395 - 42560<br>Project Account: | 7.0 | EA | $537.10 | $3,759.70 |
| 12 | Troy KP-FDUV-SS lower kick panel<br>GL Account: 1005395 - 42560<br>Project Account: | 7.0 | EA | $98.25 | $687.75 |
| 13 | Troy steel door panel set DP-FDUV-DS&PS<br>GL Account: 1005395 - 42560<br>Project Account: | 7.0 | EA | $171.75 | $1,202.25 |
| 14 | Troy AC-UV-Hatch rear tailgate window guard sq. hole<br>GL Account: 1005395 - 42560<br>Project Account: | 8.0 | EA | $84.50 | $676.00 |
| 15 | Troy rear pass and driver side window bars<br>GL Account: 1005395 - 42560<br>Project Account: | 7.0 | EA | $171.95 | $1,203.65 |
| 16 | Whelen WIONJ light red/blue<br>GL Account: 1005395 - 42560<br>Project Account: | 48.0 | EA | $69.90 | $3,355.20 |

**CONTINUED ON NEXT PAGE**

CITY OF SIMI VALLEY

# Purchase Order



THIS PURCHASE ORDER NUMBER MUST APPEAR ON ALL INVOICES, PACKING LISTS, CARTONS, AND CORRESPONDENCE RELATED TO THIS ORDER

Purchase Order # **41700700**

**BILL TO**
City of Simi Valley
Accounts Payable
2929 Tapo Canyon Rd
SIMI VALLEY, CA 93063-2199
Email: [redacted]

**VENDOR**
ADAMSON POLICE PRODUCTS
10764 NOEL ST
LOS ALAMITOS, CA 90720
Email: [redacted]

**SHIP TO**
Simi Valley Police Department
Maintenance
3901 Alamo Street
SIMI VALLEY, CA 93063-2102
Email: [redacted]

| Vendor Phone Number | Payment Terms | Requisition Number | Buyer Name | Buyer Phone Number |
|---|---|---|---|---|
| [redacted] | F.O.B. SIMI... | 11701422 | Sandy Tate | [redacted] |

| Date Ordered | Vendor Number | Date Required | Freight Method | Department/Location |
|---|---|---|---|---|
| 06/02/2017 | 49 | 06/15/2017 | F.O.B. SIMI VALLEY 0 | Police Department |

| Item# | Description/PartNo | QTY | UOM | Unit Price | Extended Price |
|---|---|---|---|---|---|
| 17 | Whelen WIONA light amber<br>GL Account: 1005395 - 42560<br>Project Account: | 6.0 | EA | $69.90 | $419.40 |
| 18 | Whelen IONGROM<br>GL Account: 1005395 - 42560<br>Project Account: | 18.0 | EA | $4.35 | $78.30 |
| 19 | Whelen VTX609 light red/blue<br>Per Bid Spec # PD 17-05<br>Approved by City Manager<br>GL Account: 1005395 - 42560<br>Project Account:<br>Per Bid Spec # PD 17-05<br>Approved by City Manager on 05/16/17 | 16.0 | EA | $69.90 | $1,118.40 |

| | |
|---|---|
| Total Ext. Price | $63,358.45 |
| Total Sales Tax | $4,593.49 |
| Total Freight | $880.50 |
| **PO Total** | **$68,832.44** |

Subject to City of Simi Valley standard terms and conditions for purchasing transactions

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

CITY OF SIMI VALLEY

PURCHASE ORDER TRANSMITTAL PAGE

FOLLOWING THIS TRANSMITTAL PAGE IS A PURCHASE ORDER ("P.O.") ISSUED BY THE CITY. THIS P.O. IS SUBJECT TO THE FOLLOWING STANDARD TERMS AND CONDITIONS FOR PURCHASING TRANSACTIONS:

**1. General:** If the goods, materials and/or services ("Items") ordered herein are the result of a Request for Quotation, Request for Proposal or Notice Inviting Bids, a Contract or other binding agreement (collectively, "Binding Agreement") issued by the City of Simi Valley ("City"), the Terms and Conditions ("T&Cs") set forth in this document shall be considered to be in addition to the requirements and specifications stated in the Binding Agreement. To the extent that the T&Cs and the Binding Agreement conflict, the Binding Agreement shall govern. It is understood that all Items provided shall be in compliance with all applicable Federal, State, County, City, and Special District Laws, Ordinances, and Regulations.

**2. Inspection and Rejection:** All Items shall be subject to City inspection, testing, and acceptance ("Inspection"). Items rejected by City shall be held subject to Contractor's instruction, and may be returned at Contractor's risk and expense. Unless otherwise specified herein, title to and risk of loss on all Items shall pass to City upon City's Inspection of such Items on City property. Contractor shall supply MSDS sheets for applicable Items.

**3. Freight Charges:** All shipments are F.O.B. Simi Valley, unless otherwise specified in the P.O. If City agrees to pay freight it shall be prepaid and itemized on invoice. In that case, a copy of the paid freight bill shall be attached to the invoice.

**4. Payment Terms:** The City's payment terms are 30 days from the receipt of an original invoice referencing the City's P.O. number, and acceptance of the Items. Prices are firm. Contractor's delivery of an acknowledgement, or of any Items, or receipt of payment constitutes acceptance by Contractor.

**5. Taxes:** The P.O. is subject to all applicable California sales and use taxes. The City is exempt from Federal Excise Tax and will furnish an exemption certificate upon request.

**6. Delivery:** Contractor shall deliver the Items as detailed in the P.O. free from all claims, debts, or demands whatsoever, and without substitutions or changes unless approved in writing by City. The City reserves the right to cancel all or any part of the P.O. if not shipped within 30 days of P.O. issuance or as otherwise specified in the P.O. The City is not responsible for any Items shipped or provided by Contractor without a valid City P.O.

**7. Indemnification:** Contractor agrees to defend, indemnify, and hold harmless the City, its officers, officials, employees, agents, and volunteers from and against any and all claims, demands, actions, losses, damages, injuries, and liability, including those arising out of alleged or actual intellectual property infringement (and further including all attorney's fees and other litigation expenses) arising out of the Contractor's performance or delivery of the Items specified in the P.O.

**8. Labor Compliance Requirements (Prevailing Wage, SB 854, etc.):** If the performance of the P.O. is part of an applicable "public works" or "maintenance" project, then pursuant to Labor Code sections 1725.5 and 1771.1, Contractor and any subcontractors working under it must be registered with the Department of Industrial Relations (DIR). The performance of the P.O. may also be subject to compliance monitoring and enforcement by the DIR. It is the Contractor's sole responsibility to comply with all applicable registration and labor compliance requirements, including the submission of payroll records directly to the DIR. Contractor is an independent contractor to the City.

**9. Invoices:** Invoices shall at a minimum contain the following information: Contractor's name, invoice number and date, P.O. number, item number and description of Items, quantities, units of measure, unit prices and extended totals, applicable taxes, and total amount due. Invoices without a valid City P.O number may be withheld for payment. Invoices shall be submitted by the same Contractor identified on the P.O. **All invoices shall be e-mailed or mailed to:**

E-mail: [redacted]
Address: CITY OF SIMI VALLEY
ATTENTION ACCOUNTS PAYABLE
2929 TAPO CANYON ROAD
SIMI VALLEY, CA 93063-2199

**10. Safety:** All Items provided as a result of the P.O. shall comply with all Federal, State, and local safety rules and regulations. Contractor warrants the reliability and suitability of the product, and that it is free from destructive or malicious content or defects. Contractor shall possess product liability insurance.

**11. Insurance:** If work is to be performed or labor is to be furnished on any City-owned property without a Binding Agreement, Contractor shall obtain and keep in full force and effect during the performance period under the P.O., insurance coverage acceptable to the City. Coverage shall be on an occurrence basis with a minimum combined single limit of $1,000,000 for General Liability, and $1,000,000 for Auto Liability and include an additional insured endorsement covering the City, its agents, and employees. Coverage shall also include Workers' Compensation insurance to the statutory minimum. If the work is to be performed under a Binding Agreement, Contractor shall procure and maintain insurance as required by the Binding Agreement.

**12. Applicable Law:** All matters relating to the P.O. shall be governed by California law, without regard to conflict of laws principles. Venue shall lie in Ventura County, California. In case of dispute, each party shall bear its own fees and costs (including attorneys' fees).

**13. No Additional Terms/Assignment:** By accepting this P.O., Contractor understands and agrees that any additional terms and conditions that are added or sent by the Contractor beyond these T&Cs and the P.O. shall not be binding on the City and shall have no force and effect. This P.O. is not assignable by Contractor without the written consent of City.

# EXHIBIT J

Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Cooper Alison-Mayne (SBN 343169)
cmayne@galipolaw.com
LAW OFFICES OF DALE K. GALIPO
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Tel: (818) 347-3333

Attorneys for Plaintiff
TANNER NAVAROLI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| TANNER NAVAROLI,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SIMI VALLEY, TYLER WILLIAMSON, and ERIC COOK,<br><br>Defendants. | Case No. 2:25-cv-11601-MEMF (RAOx)<br>Hon. Maame Ewusi-Mensah Frimpong<br><br>**DECLARATION OF TANNER NAVAROLI IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**DECLARATION OF TANNER NAVAROLI**

I, Tanner J. Navaroli, declare as follows:

1. I am the Plaintiff in this action. I was sixteen years old on February 7, 2025, and I am now eighteen. I have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them.

2. On the evening of February 7, 2025, I was riding my electric bike. I was wearing a helmet. My e-bike had a headlight in front and a red light in back, and both lights were on.

3. Earlier that evening I rode to the Regal Plaza shopping center to meet my friend Reef. Other riders were there. I was not doing wheelies or tricks.

4. While I was at the Regal, and before any police officer arrived, my mother called me and told me I needed to come home. I answered the call through my AirPods.

5. A police officer on a motorcycle then arrived at the Regal. I did not hear him give any commands to me or to anyone else, and I did not think I was in trouble. I left because my mother had told me to come home.

6. I did not realize that any officer was trying to stop me until after the collision, when I was lying on the ground.

7. I rode north on Michael Clark Parkway toward the intersection with Alamo Street. I planned to cross Alamo Street in the crosswalk on the west side of intersection, continue north on Michael Clark Parkway, and cut through the police station parking lot on the other side, which is a shortcut to my house and the route I consider the safest way home.

8. I slowed down as I approached the intersection, but I did not stop, because I was rushing to get home. I looked to my left and to my right. I did not see any cars at the intersection other than the police car described below.

9. Before I reached the intersection I began turning to my left. I did that so that I would reach the beginning of the crosswalk on the west side of the intersection. My plan was to turn back to my right at the crosswalk and straighten out, so that I would be heading north through the crosswalk and across Alamo Street, and then continue past the police station on my way home. I was not turning left onto Alamo Street.

10. As I did so, I saw a police car coming from the direction of the police

station, on the other side of the intersection. I first saw its emergency lights a couple of seconds before it came toward me.

11. As I reached the crosswalk and was about to turn back to my right, the police car turned to its right, toward me, and into the path I was taking. I did not expect it to do that. It did not stop, and I could tell it was coming at me.

12. To try to avoid being hit, I tried to veer further to my left, away from the police car, and I squeezed my brake. I was not able to avoid the collision.

13. When the police car hit me I was in the crosswalk on the west side of the intersection, in the eastbound lanes of Alamo Street. I was no longer in the lanes of Michael Clark Parkway in which the police car had been traveling. For the police car to reach me where I was, it had to turn to its right, out of its lane and into the crosswalk. If it had continued straight in the direction it was already going, it would have passed behind me and it would not have hit me.

14. The right side of my e-bike hit the front of the police car. I was thrown off the bike and landed in the street.

15. I did not intend to hit the police car, and I was not trying to get away from the police. I was trying to get home.

16. My right leg was broken in the collision, and the injury required surgery.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on Sep 22, 2026, 2026, at 2:10, California.

Tanner Navaroli (Sep 22, 2026 14:09:22 PDT)

Tanner J. Navaroli

# EXHIBIT K

Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Cooper Alison-Mayne (SBN 343169)
cmayne@galipolaw.com
LAW OFFICES OF DALE K. GALIPO
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Tel: (818) 347-3333

Attorneys for Plaintiff
TANNER NAVAROLI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

TANNER NAVAROLI,

Plaintiff,

v.

CITY OF SIMI VALLEY, TYLER WILLIAMSON, and ERIC COOK,

Defendants.

Case No. 2:25-cv-11601-MEMF (RAOx)
Hon. Maame Ewusi-Mensah Frimpong

**DECLARATION OF TANNER NAVAROLI IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**DECLARATION OF TANNER NAVAROLI**

I, Tanner J. Navaroli, declare as follows:

1. I am the Plaintiff in this action. I was sixteen years old on February 7, 2025, and I am now eighteen. I have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them.

2. On the evening of February 7, 2025, I was riding my electric bike. I was wearing a helmet. My e-bike had a headlight in front and a red light in back, and both lights were on.

3. Earlier that evening I rode to the Regal Plaza shopping center to meet my friend Reef. Other riders were there. I was not doing wheelies or tricks.

4. While I was at the Regal, and before any police officer arrived, my mother called me and told me I needed to come home. I answered the call through my AirPods.

5. A police officer on a motorcycle then arrived at the Regal. I did not hear him give any commands to me or to anyone else, and I did not think I was in trouble. I left because my mother had told me to come home.

6. I did not realize that any officer was trying to stop me until after the collision, when I was lying on the ground.

7. I rode north on Michael Clark Parkway toward the intersection with Alamo Street. I planned to cross Alamo Street in the crosswalk on the west side of intersection, continue north on Michael Clark Parkway, and cut through the police station parking lot on the other side, which is a shortcut to my house and the route I consider the safest way home.

8. I slowed down as I approached the intersection, but I did not stop, because I was rushing to get home. I looked to my left and to my right. I did not see any cars at the intersection other than the police car described below.

9. Before I reached the intersection I began turning to my left. I did that so that I would reach the beginning of the crosswalk on the west side of the intersection. My plan was to turn back to my right at the crosswalk and straighten out, so that I would be heading north through the crosswalk and across Alamo Street, and then continue past the police station on my way home. I was not turning left onto Alamo Street.

10. As I did so, I saw a police car coming from the direction of the police

station, on the other side of the intersection. I first saw its emergency lights a couple of seconds before it came toward me.

11. As I reached the crosswalk and was about to turn back to my right, the police car turned to its right, toward me, and into the path I was taking. I did not expect it to do that. It did not stop, and I could tell it was coming at me.

12. To try to avoid being hit, I tried to veer further to my left, away from the police car, and I squeezed my brake. I was not able to avoid the collision.

13. When the police car hit me I was in the crosswalk on the west side of the intersection, in the eastbound lanes of Alamo Street. I was no longer in the lanes of Michael Clark Parkway in which the police car had been traveling. For the police car to reach me where I was, it had to turn to its right, out of its lane and into the crosswalk. If it had continued straight in the direction it was already going, it would have passed behind me and it would not have hit me.

14. The right side of my e-bike hit the front of the police car. I was thrown off the bike and landed in the street.

15. I did not intend to hit the police car, and I was not trying to get away from the police. I was trying to get home.

16. My right leg was broken in the collision, and the injury required surgery.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on Sep 22, 2026, 2026, at 2:10 __________, California.

Tanner Navaroli (Sep 22, 2026 14:09:22 PDT)

Tanner J. Navaroli

# EXHIBIT L

Algeria R. Ford (SBN 289016)
E-mail: aford@bwslaw.com
CITY ATTORNEY, CITY OF SIMI VALLEY
Lisa W. Lee (SBN 186495)
E-mail: llee@bwslaw.com
Natalie F. Price (SBN 279798)
E-mail: nprice@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
444 South Flower Street, 40th Floor
Los Angeles, California 90071-2942
Tel: 213.236.0600 Fax: 213.236.2700

Attorneys for Defendants
CITY OF SIMI VALLEY, TYLER WILLIAMSON and ERIC COOKE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| T.J.N., a minor by and through his Guardian Ad Litem WILLIAM NAVAROLI,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SIMI VALLEY, TYLER WILLIAMSON, and ERIC COOK,<br><br>Defendants. | Case No. 2:25-cv-11601-MEMF (RAOx)<br><br>Hon. Maame Ewusi-Mensah Frimpong<br><br>**DEFENDANTS' REBUTTAL EXPERT DISCLOSURES PURSUANT TO F.R.C.P. 26(a)(2)(A** |

///
///
///
///
///
///
///

Based on the temporal and spatial association of the call for service and the initial observations of Cook, it can be reasonably deduced that T.J.N. was involved in the reported activities.

TJ.N. testified that there were about three other "e-bike" riders and one pedal bike rider present prior to the incident. He only knew one as "Reef." T.J.N. did not recall if the riders were doing tricks (e.g., "wheelies") or speeding because he was not paying attention to them. At some point, T.J.N. saw a motorcycle officer arrive in the area.

Mr. Bryce noted that Cook had previously contacted T.J.N. about 2 months prior. This would have no bearing on Cook's legitimate law enforcement purpose to contact T.J.N. again based on the current facts and circumstances. It is noted that T.J.N. was wearing a helmet on the night of the incident.

Although Cook testified that he did not believe that he was in pursuit of T.J.N., in order to determine if Cook was in pursuit of T.J.N. as defined in the first situation described in the definition, there are factors in Cook's deposition that could lead a reasonable officer to determine that he was not.

Cook testified that he was planning to stop T.J.N.[7]

Cook's statement that he "never felt I was close enough to engage - - or to try to conduct a traffic enforcement stop. I was, for lack of a better term, still playing 'catchup.' I never felt close enough that I would - - that he would have the knowledge of me behind him, trying to conduct a traffic enforcement stop"

The remaining variable would be if Cook believed that T.J.N. was "attempting to avoid arrest by using high speed driving or other evasive tactics, such as driving off a highway, turning suddenly." Cook testified that he did not believe that T.J.N.'s driving behaviors were motivated by avoiding an arrest.

T.J.N. testified as to his belief that he was not "attempting to avoid arrest by using high speed driving or other evasive tactics, such as driving off a highway, turning suddenly" as described in the first situation in the definition of a vehicle pursuit:

- T.J.N. testified that when he saw the motorcycle offer arrive, the officer did not give him any commands to stop.
- T.J.N. did not believe that he was in trouble.
- He left the area because it was time for him to go home and his mother was calling him to go home.
- T.J.N. turned left out of the parking lot and drove northbound towards Kaiser at approximately "in the 20's" mph.
- T.J.N. was not aware that the officer was behind him.
- T.J.N. was not aware that the officer wanted to contact him.

[7] Cook Deposition; 24: 17-18

It is noted that the approximate roadway distance from the area of the Regal Theaters/Panda Express to the intersection of Michael Calrk Parkway and Alamo is 750 feet.

The following is a screenshot from Google Satillite View showing the Regal Plaza and the intersection of the collision. It is noted that there is a slight bend in the roadway that could cause a visual obstruction of northbound vehicles approaching the intersection.




It is my professional opinion that Cook was not engaged in a vehicle pursuit – as defined above – with T.J.N. at the moments leading into the collision.

**Mr. Bryce Opinion #2: Officer Williamson used his patrol vehicle to block T.J.N.'s path of travel as T.J.N. was making a left turn at the intersection of Michael Clark Parkway and Alamo Street.**

I respectfully disagree with Mr. Bryce's opinion as written.

The SVPD policy defining "blocking" reads, "A low-speed tactic where one or more authorized police department emergency vehicles intentionally restrict the movement of a suspect vehicle, with the goal of containment or preventing a pursuit. Blocking is not boxing in or a roadblock." This is clearly defined as an intentional act.

The SVPD policy defining "pursuit intervention" reads, "An attempt to stop the suspect's ability to continue to flee in a vehicle through tactical application of technology, tire deflation devices, blocking or vehicle intercept, boxing-in, the PIT (known as Pursuit Intervention Technique or Precision Immobilization Technique), ramming, or roadblock procedures."

The SVPD policy defining "ramming" reads, "The deliberate act of impacting a suspect's vehicle with another vehicle to functionally damage or otherwise force the suspect's vehicle to stop." This is clearly defined as an intentional act.

Mr. Bryce writes, "Overhead surveillance video clearly shows Officer Williamson ramming his patrol vehicle into the electric bicycle of T.J.N. as T.J.N. attempts to make a left turn within the intersection of Michael Clark Parkway and Alamo Street." This language is inflammatory and speculative at best.

The only person that can truly know Williamson's intention is Williamson. A person watching a video file with the benefit of hindsight and at a different angle of view for the officer from the comfort of a desk without the pressure of real-time decision making limitations can only speculate as to Williamson's intent.

Williamson testified that when he activated his emergency lights, his intention was to drive straight through the intersection to the Regal Plaza. It can therefore be reasonably deduced that Williamson was not aware of T.J.N. driving towards the intersection and Cook attempting to catch up to T.J.N.

Williamson testified that he activated his emergency lights to clear the intersection. It is noted that the north/south traffic on Michael Clark Parkway had a solid red facing light. A reasonable officer would not anticipate northbound traffic coming from the south to proceed through the red light. A reasonable officer under these circumstances would believe that on-coming vehicle hazards would be traveling east-west on Alamo, therefore more focal attention would be given to potential east-west traffic. Williamson said that he looked left and right to clear the intersection before entering the intersection. Williamson proceeded through the intersection when he determined that is would be safe based on the east-west traffic approaching.

It is noted that officers are trained to clear the intersection for hazards prior to entering the intersection and while crossing the intersection. Therefore, it is likely that Williamson was also clearing east-west lanes while entering the intersection.

Williamson testified that he was about halfway through the intersection when he saw the eMoto. Williamson testified that he was traveling at approximately 5-10 mph. The eMoto was northbound on Michael Clark Parkway and was "very close" to Alamo and approaching the limit line near the east curb line. Williamson believed that the eMoto was going to continue northbound and pass him.

Williamson testified that the eMoto was approximately 20-40 feet away when he first saw it and was traveling at approximately 30 mph. After seeing the eMoto and within a couple seconds, the eMoto changed directions and abruptly turned left to go westbound. At that point, Williamson was "already well within the intersection." He was not expecting the eMoto to "make that sharp turn."

Williamson testified that he believed he began to brake just prior to the collision as he turned the vehicle to the right. Williamson testified that he believes that his vehicle was not travelling at the time of the collision.

Regarding the moments immediately leading into the collision, Williamson testified, "It happened within a matter of seconds. Being in a vehicle that large, only, you know, a limited amount of ability to move it within a certain direction, I just know that I tried to maneuver it in a way that I deemed best, in order to attempt to prevent a traffic collision from occurring."

Wiliamson continued, "I mean, again, in that moment, and, you know, just being, you know -- just trying -- yeah, doing everything I can to avoid a collision, sometimes you're only faced with a limited amount of solutions or options that you can make in an attempt to avoid a collision."

Williamson added, "I tried to do everything in my power to avoid a traffic collision."

Mr. Bryce writes about what Cook's observations were regarding; (1) T.J.N. putting his left leg out indicating preparing for a left turn, and (2) the speed of Williamson's vehicle. Mr. Bryce writes about Cook's understanding of the blocking technique as well. While these factors are informative to Cook's perceptions and understandings, they have no bearing on what Williamson perceived and/or understood prior to the collision. A reasonably trained evaluator would understand that it is the perceptions/knowledge of the officer that must be used to evaluate the actions of the officer.

The following is an analysis of the timing from; (1) when Williamson was approximately in the middle of the intersection to, (2) the time when Williamson began to turn to the right, using Camtasia. Camtasia is a video editing program that allows the user to advance the video one frame at a time and references the frame time within the video. This video has 30 frames per second. With Camtasia, the user can view all 30 frames within the second of video. The program will display which frame is showing on a format similar to a standard video playing program with the addition of the frame number within the second. For example, 0:00:22;23 would translate to zero minutes and 22 23/30 seconds into the video.

<u>[CITY 00059] CONFIDENTIAL - PD Alamo Entr- PTZ-2025-02-07 19h33min00s000ms</u>

At approximately frame 0:00:22;23, Williamson's vehicle is seen entering the frame from the left. The vehicle makes a left turn towards the intersection of Michael Clark Parkway and Alamo. The traffic light from the traffic on Michael Clark Parkway is red.

At approximately frame 0:00:31;09, Williamson's vehicle stopped at the intersection facing south.

At approximately frame 0:00:37;10, Williamson's vehicle begins to very slowly move forward and into the intersection.

At approximately frame 0:00:39;07, the eMoto is seen approaching the intersection northbound from the south. The eMoto does not appear to have a headlight activated and the eMoto is black, and the rider appears to be dressed in black.




At approximately frame 0:00:40;03, The emergency lights are activated.




At approximately frame 0:00:40;24, the eMoto appears to start to turn left into the path of Williamson's vehicle. The eMoto is obscured by the tree in the foreground.

At approximately frame 0:00:41;23, the eMoto is visible again and is moving west towards the path of Williamson's vehicle. Williamson's vehicle appears to be nearing the middle of the intersection.




At approximately frame 0:00:42;03, Williamson's vehicle appears to reach the middle of the intersection.



At approximately frame 0:00:43;00, Williamson's vehicle appears to veer slightly to the right based on the direction of the emergency lights. The vehicle continued to move to the right before the collision.

It is not possible to determine the exact frame that shows the impact moment as the emergency lights glare obscures the view. A zoomed in angle (175%) appears to show the eMoto falling from the front of Williamson's vehicle at approximately frame 0:00:44;00.




According to Williamson, he first saw the eMoto as he was in the middle of the intersection, it can be deduced that he had only approximately less than one second to make a decision in order to attempt to avoid the eMoto.

There is a well-known training principle in law enforcement referred to as the reactionary gap. This is the time that it takes a person to perceive a stimulus and then react to that stimulus. On the average, it takes a person approximately 0.7-1.5 seconds to perceive and react to the stimulus. These times may vary depending on certain factors, but one thing is consistent within the principle. The person that creates the stimulus (actor) is always ahead of the person having to react to the stimulus (reactor).

There are examples of this response time gap. A person is ending a phone call and is reaching for the end button when the other caller says, "Oh, one more thing" but your finger hits the button, ending the call. You heard it, it registered in your brain at some level, but your brain could not catch up to the motor program already being executed to stop it. Another example is a basketball player going up on a layup, but the ball is rejected by a defender. The shooter's hands still complete the motion of the shot, even though the ball is no longer in his or her hands. It takes time to register the change in stimuli and generate a response.

It has been known for decades that reaction time will increase proportionally to the number of possible responses until a point in which it maintains constant despite the increases in possible responses. This is known as Hick's Law, named after William E. Hick, who discovered it in 1952.

Tueller drill published in 1983. It's the principle that an average person can sprint 21 feet in roughly 1.5 seconds. That's about the same time it takes an officer to perceive the threat and draw a firearm and fire two unaimed shots. The drill has been replicated by other researchers.

In the 2026 Winter Olympic Games, the sport of hockey recognized the reactionary gap in their "dead in the head" rule. "Dead in the head" in hockey refers to a referee's determination to stop play, typically during a goal-mouth scramble, because they believe the goalie has frozen the puck, even if the whistle has not officially blown yet. It describes the moment play is deemed dead due to a lost sightline of the puck and recognizes the measurable amount of time from the assumption/perception that the puck has been frozen to the moment that the whistle has been brought to the mouth and blown.

I have received advanced training in the reactionary gap and have read various studies on this topic. I have seen and experienced this reactionary gap in practice. I have personally witnessed this reactionary gap thousands of times in training scenarios that I conducted with in-service and recruit officers.

I was a lead instructor for Use of Force – cognitive (California POST Learning Domain 20) at the South Bay Regional Training Consortium and/or the San Jose Police Department Academy for approximately nine years. In my capacity as a Use of Force – cognitive instructor for the San Jose Police Department, I commonly taught the legal aspects of an officer's use of force and policy concerns as they relate to use of force. In total, I have taught law enforcement use of force for about 20 years. As a use of force instructor, I commonly taught and trained officers on perception-reaction time and on the ways officers could enhance their reaction time. In POST LD 20, officers are taught that "[s]elf-control reflects one's confidence in their skills and abilities which can be improved through training, practice, and experience; thereby enhancing decision-making and reaction time." In my teachings on LD 20, I have used lecture-based learning to reinforce tactics and techniques to mitigate/shorten reaction times based on my education on the topic and on my own personal experiences. As an instructor, I used scenario-based training to observe human performance issues and to create strategies to mitigate reaction time and stress factors. In these scenario training settings, I have witnessed perception/reaction time gaps thousands of times and used those examples in the debriefing of the officer taking the training, including possible tactics/techniques to mitigate the gap in future encounters. I have also been directly involved as a California POST committee member in two prior revisions of the Learning Domain 20 Workbook and participated remotely in the 2015 revision.

I am a POST certified Force Options Simulator (FOS) instructor. In order to become a Force Options Simulator instructor, I had to attend a 40-hour instructor level course.

I was the lead FOS instructor for the SJPD In-Service Training Unit. I trained thousands of officers in Santa Clara County.

I was the POST "Train the Trainer" instructor for this block of instruction.

It is my professional opinion that there is no independent and objective evidence to support Mr. Bryce's opinion that Williamson intentionally "used his patrol vehicle to block T.J.N.'s path of travel as T.J.N. was making a left turn at the intersection of Michael Clark Parkway and Alamo Street."

Indeed, there is evidence that there was no intention by Williamson to intentionally use his patrol vehicle to block T.J.N.'s path of travel as T.J.N. was making a left turn at the intersection of Michael Clark Parkway and Alamo Street and that the collision was unintentional due to the facts and circumstances at the time and the time allowed for decision making choices by Williamson.

**Mr. Bryce's Opinion #3: The use of a patrol vehicle to block or strike the rider of an e-bike is a use of force capable of causing serious bodily injury or death, and the use of that force against T.J.N. was contrary to POST training standards, Penal Code section 835a, and generally accepted law enforcement standards.**

I respectfully disagree with Mr. Bryce's opinion as written.

Mr. Bryce simply cites some of the training guidelines and principles listed in California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation. Specifically, Mr. Bryce focuses on deadly force standards.

Mr. Byrce then simply states that none of the listed guidelines/principles were present so therefore, Williamson's "use of a patrol vehicle to block or strike the rider of an e-bike is a use of force capable of causing serious bodily injury or death, and the use of that force against T.J.N. was contrary to POST training standards, Penal Code section 835a, and generally accepted law enforcement standards."

Peace officers are trained that they are permitted to use reasonable force to effect an arrest, prevent the escape or to overcome the resistance of a suspect:

> Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to:
>
> - effect the arrest,
> - prevent escape, or
> - overcome resistance.
>
> A peace officer who makes or attempts to make an arrest:
>
> - need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested
> - shall not be deemed an aggressor
> - shall not lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance.[8]

[8] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

| | | |
|---|---|---|
| Life-threatening | Any action likely to result in serious bodily injury or death of the officer or others | - Utilizing firearms or any other available weapon or action in defense of self and others to stop the threat |

Other factors that have been identified and that officers have been trained to understand that may or may not be applicable to the specific situation are:

1. Number of Officers vs. Suspects
2. Were cover officers enroute or on-scene?
3. Access to Potential Weapons
4. Age; Size; Relative Strength
5. Special Knowledge or Skill Level
6. Injury or Exhaustion
7. Mental Illness or Drug Usage
    a. Higher pain tolerance
    b. Unable to understand commands
8. Prior Contacts
9. Environmental Factors
    a. Lighting, space limitations, footing, crowds, traffic
10. Availability of other reasonable force options
11. Was there an opportunity to warn and was there a warning given?
12. Was the subject able to cease resistance and/or comply with commands?

Officers are trained that there are three general categories of force options, including:

- Non-Deadly Force: Force which creates a minimal risk of injury
- Intermediate (Non-Deadly) Force: Force which has a significant risk of injury[15]
- Deadly Force: Force which has a substantial risk of serious bodily injury or death[16]

Understanding the importance of what an officer reasonably believed based on facts and circumstances known or perceived is paramount to the analysis of any force response by an officer. As previously stated, the force must be judged from the perspective of a reasonable officer and examined through the eyes of an officer on the scene at the time the force was applied. To understand the perspective, one must understand the perception of the officer on scene. While it is important to learn the perception of other involved parties to better understand the incident in an overall sense, the

[15] In Black's Law Dictionary and general legal contexts, deadly force refers to force that is intended or likely to cause death or great bodily injury. Black's Law Dictionary defines non-deadly force as force that is neither intended nor likely to cause death or serious bodily harm, or force intended to cause only minor bodily harm. While Black's Law Dictionary doesn't offer a specific entry for "intermediate force," legal context defines intermediate force as a level of physical force that causes significant pain, physiological effects, and a foreseeable risk of physical injury, though it's not intended to cause death or serious injury. This term is used in use-of-force analysis, distinguishing it from lesser forms of force and from deadly force.

[16] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

content of the workbook and I base my opinions on these writings. In the 2015 update, I participated remotely.

Police officers are taught that deadly force is force that creates a substantial risk of causing death or serious bodily injury.[18]

Police officers are trained that they may use deadly force under certain circumstances.

Deadly Force Training Standards: "Force on Force"

"Force on Force" refers to a situation when an officer perceives that a subject is presenting an imminent threat of serious bodily injury or death to the officer or to others based on the totality of the facts and circumstances known/perceived by the officer at the time.

Officers are trained that they are justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary per California Penal Code §835a(c).[19]

Officers are trained that they are justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary… to defend against an imminent threat of death or serious bodily injury to the officer or to another person per California Penal Code Section 835a(c)(1)(A).[20]

Officers are trained that imminent means, "a threat of death or serious injury is "imminent" when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed."[21]

As far as "apparent intent" is concerned, officers are trained that the apparent intent need not be vocalized or specifically signaled. The apparent intent is to be evaluated based on the totality of facts and circumstances known/perceived by the officer at the time and would another reasonable officer also believe that the subject was demonstrating the apparent intent.

As far as "fear of future harm," officers are trained that this would not be controlled by an immediate future that is about to happen within seconds. Imminent harm is one that from appearance must be instantly confronted and addressed to prevent that harm.

This is taught as "to protect life" and reads in relevant part, "a peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the

[18] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[19] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[20] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[21] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

circumstances, that such force is necessary to defend against an imminent threat of death or serious bodily injury to the officer or to another person."[22]

Reverence for all life is the foundation on which the use of deadly force rests. This reverence is not solely directed at the subject, it includes the life of the officer him/herself and of others.

<u>Deadly Force Training Standards: "Fleeing Subject"</u>

Officers are trained that deadly force may be used against a fleeing subject under certain conditions. This training includes that, "In 1985, the United States Supreme Court decided the case of Tennessee v. Garner. The Court applied the following points with regards to when it would be reasonable for an officer to use deadly force against a fleeing subject in this particular set of circumstances (e.g., using a firearm to stop a fleeing suspect escaping on foot)." The particular set of circumstances include:

- "...if the subject threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical injury [or death]..."
- "...*probable cause* to believe that the subject poses a threat of death or serious physical harm, either to the officer or others..."
- "...*probable cause* to believe that the use of deadly force is reasonably necessary..."[to prevent escape]
- "...some warning be given prior to the use of deadly force where feasible..."[23]

Officers are trained that this standard does not require the subject to be actually armed at the moment of the deadly force application but rather it is based on the dangerousness of the subject based on his/her actions and behaviors (*probable cause* to believe that he has committed a crime involving the infliction of serious physical injury [or death]) that may create the threat of death or serious bodily injury to others if allowed to escape.[24]

Officers are trained that they may use deadly force to apprehend a fleeing subject for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended. Where feasible, a peace officer shall, prior to the use of force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts per California Penal Code §835a(c)(B).[25]

[22] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[23] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[24] Forrett v. Richardson, 112 F.3d 416 (9th Cir. 1997) - A burglary suspect shot a victim during the burglary. Then the burglary suspect fled - while unarmed. The court found that "... the suspect need to not be armed or pose an immediate threat to the officers or others at the time of the shooting."
[25] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

I would agree with Mr. Bryce that none of the deadly force guidelines/principles were present in the moments leading into the collision. However, Mr. Bryce's analysis and opinion is fundamentally flawed based on the evidence and lack of supporting evidence.

Officers are trained that in 1989, the United States Supreme Court decided the case of Graham v. Connor, 490 U.S. 386, (1989), which established that a peace officer's use of force, under the Fourth Amendment, would be judged using the "objective reasonableness" standard. The Court's analysis began by balancing the subject's Fourth Amendment right to remain free from any unreasonable seizure against the government's interest in maintaining order through effective law enforcement.[26]

Officers are trained that a "seizure" of a person occurs: (1) when a peace officer physically applies force with the intent to restrain or (2) when a person voluntarily submits to a peace officer's authority. Also, the search or seizure must be intentional, rather than merely an accident. The Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct.[27]

Clearly, in order to be evaluated as a force response by Williamson, it must be shown that the actions of Williamson were an intentional "use of a patrol vehicle to block or strike the rider of an e-bike."

It is my professional opinion that there is no independent and objective evidence to support Mr. Bryce's opinion that Williamson intentionally used "a patrol vehicle to block or strike the rider of an e-bike."

Indeed, there is evidence that there was no intention by Williamson to intentionally use "a patrol to block or strike the rider of an e-bike is a use of force capable of causing serious bodily injury or death" and that the collision was unintentional due to the facts and circumstances at the time and the time allowed for any decision making choices by Williamson.

I would so testify to the aforementioned findings and opinions under penalty of perjury if called upon in any subsequent civil proceedings. Signed under penalty of perjury in accordance with the laws of California and of the United States on September 8, 2026, in Fullerton, California.

Respectfully submitted,

Edward T. Flosi, M.S.
Justitia Consulting, Inc.

[26] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[27] California Peace Officer's Legal Sourcebook

TANNER NAVAROLI v. CITY OF SIMI VALLEY, et al.
Case No. 2:25-cv-11601-MEMF (RAOx)

Joint Brief on Defendants' Motion for Summary Judgment

# EXHIBIT M

*An exhibit to the Declaration of Cooper Alison-Mayne, ¶ 6*

**VIDEO EXHIBIT**

Surveillance Video, City camera facing the Michael Clark Parkway and Alamo Street intersection, February 7, 2025.

| | |
|---|---|
| **File name:** | [CITY 00058] CONFIDENTIAL - PD Alamo EntrPTZ-2025-02-07_19h30min00s000ms.mp4 |
| **Bates No.:** | CITY 00058 |

The video file identified above cannot be filed electronically. A copy was lodged concurrently with the Court on a USB flash drive and served on all parties.

# EXHIBIT N

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
# TRAFFIC CRASH REPORT
CHP 555 Page 1 (Rev. 2-22) OPI 060



| SPECIAL CONDITIONS | NUMBER INJURED | HIT & RUN FELONY | CITY | JUDICIAL DISTRICT | LOCAL REPORT NUMBER |
|---|---|---|---|---|---|
| COURTESY REPORT<br>ON-DUTY EMERGENCY VEHICLE | 1 | ☐ | SIMI VALLEY | SIMI VALLEY COURT | 9770-2025-00120 |
| | NUMBER KILLED: 0 | HIT & RUN MISDEMEANOR: ☐ | COUNTY: VENTURA | REPORTING DISTRICT: / BEAT: | DAY OF WEEK: S M T W T (F) S — TOW AWAY: [X] YES ☐ NO |

## LOCATION

| CRASH OCCURRED ON | CRASH DATE (MO. DAY YEAR) | CRASH TIME (2400) | NOTIFICATION DATE (MO. DAY YEAR) | NOTIF. TIME (2400) | NCIC # | OFFICER ID |
|---|---|---|---|---|---|---|
| MICHAEL CLARK PARKWAY | 02/07/2025 | 1934 | 02/07/2025 | 2010 | | |

[X] AT INTERSECTION WITH ☐ OR: ALAMO STREET

STATE HWY REL: ☐ YES [X] NO

DIGITAL MEDIA: [X] YES ☐ NO — AREA PHOTO FILE

GPS COORDINATES FOR LOCATION (LOC.) AND AREA(S) OF IMPACT (AOI) — [X] SAME AS LOCATION — ☐ REFER TO NARRATIVE

| | LAT. | LONG. |
|---|---|---|
| LOC. | 34.286308 | -118.720328 |
| AOI 1 | 34.286308 | -118.720328 |
| AOI 2 | 34.286338 | -118.720410 |
| AOI 3 | 34.286359 | -118.720396 |
| AOI 4 | | |
| AOI 5 | | |

ADDTL. AOI(s) ☐

## PARTY 1

| DRIVER'S LICENSE NUMBER | STATE | CLASS | AIR BAG | SAFETY EQUIP. | VEH. YEAR | MAKE/MODEL/COLOR | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|---|
| | | | P | W | 2024 | TALARIA POWER TECH TL5500 BLK | | CA |

DRIVER ☐ / PEDESTRIAN ☐ / PARKED VEHICLE ☐ / BICYCLIST [X] / OTHER ☐ / OPERATOR ☐

NAME (FIRST, MIDDLE, LAST): TANNER JAMES NAVAROEL

STREET ADDRESS: 5420 PLACERITA DRIVE

CITY/STATE/ZIP: SIMI VALLEY CA 93063

| SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE | RACE |
|---|---|---|---|---|---|---|
| M | BRN | BRN | 5' 8" | 190 | 03/18/2008 | W |

HOME PHONE: (818) 634-1993 — BUSINESS PHONE: UNKNOWN

INSURANCE CARRIER: — POLICY NUMBER:

| DIR OF TRAVEL | ON STREET OR HIGHWAY | LANE | THRU LANES | TOTAL LANES | SPEED LIMIT |
|---|---|---|---|---|---|
| N | MICHAEL CLARK PARKWAY | S/B | 1 | 2 | 15 |

OWNER'S NAME: ☐ SAME AS DRIVER — WILLIAM MARTIN NAVAROLI

OWNER'S ADDRESS: [X] SAME AS DRIVER

DISPOSITION OF VEHICLE ON ORDERS OF: [X] OFFICER ☐ DRIVER ☐ OTHER — SIMI VALLEY POLICE DEPARTMENT

PRIOR MECHANICAL DEFECTS: [X] NONE APPARENT ☐ REFER TO NARRATIVE

VEHICLE IDENTIFICATION NUMBER: CTL5500R0003661

VEHICLE TYPE: 04

DESCRIBE VEHICLE DAMAGE: ☐ UNK. ☐ NONE [X] MINOR ☐ MOD. ☐ MAJOR ☐ ROLL-OVER

BIKE - LEFT



CA ____ DOT ____ CAL-T ____ TCP/PSC ____ MC/MX ____

## PARTY 2

| DRIVER'S LICENSE NUMBER | STATE | CLASS | AIR BAG | SAFETY EQUIP. | VEH. YEAR | MAKE/MODEL/COLOR | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|---|
| F2929346 | CA | C | M | G | 2022 | FORD EXPLORER BLK/WHI | 1626739 | CA |

DRIVER [X] / PEDESTRIAN ☐ / PARKED VEHICLE ☐ / BICYCLIST ☐ / OTHER ☐ / OPERATOR ☐

NAME (FIRST, MIDDLE, LAST): ON-DUTY EMERGENCY VEHICLE — TYLER JACOB WILLIAMSON

STREET ADDRESS: 3901 ALAMO STREET

CITY/STATE/ZIP: SIMI VALLEY CA 93063

| SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE | RACE |
|---|---|---|---|---|---|---|
| M | BLK | BRN | 5' 9" | 165 | [redacted] | [redacted] |

HOME PHONE: NONE — BUSINESS PHONE: (805) 583-6950

INSURANCE CARRIER: SELF — POLICY NUMBER: SELF

| DIR OF TRAVEL | ON STREET OR HIGHWAY | LANE | THRU LANES | TOTAL LANES | SPEED LIMIT |
|---|---|---|---|---|---|
| S | MICHAEL CLARK PARKWAY | S/B | 1 | 2 | 45 |

OWNER'S NAME: ☐ SAME AS DRIVER — CITY OF SIMI VALLEY

OWNER'S ADDRESS: ☐ SAME AS DRIVER — 2929 TAPO CANYON ROAD SIMI VALLEY CA 93063

DISPOSITION OF VEHICLE ON ORDERS OF: ☐ OFFICER [X] DRIVER ☐ OTHER — DRIVEN

PRIOR MECHANICAL DEFECTS: [X] NONE APPARENT ☐ REFER TO NARRATIVE

VEHICLE IDENTIFICATION NUMBER: 1FM5K8AB3NGA08165

VEHICLE TYPE: 48 98

DESCRIBE VEHICLE DAMAGE: ☐ UNK. ☐ NONE ☐ MINOR [X] MOD. ☐ MAJOR ☐ ROLL-OVER

SUV – TOP



CA ____ DOT ____ CAL-T ____ TCP/PSC ____ MC/MX ____

## PARTY 3

| DRIVER'S LICENSE NUMBER | STATE | CLASS | AIR BAG | SAFETY EQUIP. | VEH. YEAR | MAKE/MODEL/COLOR | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

DRIVER ☐ / PEDESTRIAN ☐ / PARKED VEHICLE ☐ / BICYCLIST ☐ / OTHER ☐ / OPERATOR ☐

NAME (FIRST, MIDDLE, LAST):

STREET ADDRESS:

CITY/STATE/ZIP:

| SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE (Mo. Day Year) | RACE |
|---|---|---|---|---|---|---|
| | | | | | | |

HOME PHONE: — BUSINESS PHONE:

INSURANCE CARRIER: — POLICY NUMBER:

| DIR OF TRAVEL | ON STREET OR HIGHWAY | LANE | THRU LANES | TOTAL LANES | SPEED LIMIT |
|---|---|---|---|---|---|
| | | | | | |

OWNER'S NAME: ☐ SAME AS DRIVER

OWNER'S ADDRESS: ☐ SAME AS DRIVER

DISPOSITION OF VEHICLE ON ORDERS OF: ☐ OFFICER ☐ DRIVER ☐ OTHER

PRIOR MECHANICAL DEFECTS: ☐ NONE APPARENT ☐ REFER TO NARRATIVE

VEHICLE IDENTIFICATION NUMBER:

VEHICLE TYPE:

DESCRIBE VEHICLE DAMAGE: ☐ UNK. ☐ NONE ☐ MINOR ☐ MOD. ☐ MAJOR ☐ ROLL-OVER

CA ____ DOT ____ CAL-T ____ TCP/PSC ____ MC/MX ____

| PREPARER'S NAME | DISPATCH NOTIFIED | REVIEWER'S NAME | DATE REVIEWED |
|---|---|---|---|
| ALEXANDER RIOS, 023577 | [X] YES ☐ NO ☐ N/A | | |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**TRAFFIC CRASH CODING**
CHP 555 Page 2 (Rev. 2-22) OPI 060



| CRASH DATE (MO. DAY YEAR) | CRASH TIME (2400) | NCIC # | OFFICER ID | NUMBER |
|---|---|---|---|---|
| 02/07/2025 | 1934 | | | 9770-2025-00120 |

**PROPERTY DAMAGE** OWNER'S NAME: OWNER'S ADDRESS:

PERSON NOTIFIED: ☐ SAME AS OWNER TELEPHONE NUMBER: METHOD OF NOTIFICATION (MARK ALL THAT APPLY) ☐ IN PERSON ☐ PHONE ☐ DISPATCH ☐ CHP 422 LOG / INCIDENT NUMBER:

DESCRIPTION OF DAMAGE:

**SEATING POSITION**

1 TO 9 – STANDARD SEATING POSITION
10 – REAR OCC. TRK., VAN, STATION WAGON, ETC.*
11 – POSITION UNKNOWN*
0 – OTHER*

1 2 3
4 5 6
7 8 9
10

**SAFETY EQUIPMENT**

OCCUPANTS
A – NONE IN VEHICLE
B – UNKNOWN
C – LAP BELT USED
D – LAP BELT NOT USED
E – SHOULDER HARNESS USED
F – SHOULDER HARNESS NOT USED
G – LAP/SHOULDER HARNESS USED
H – LAP/SHOULDER HARNESS NOT USED
J – PASSIVE RESTRAINT USED
K – PASSIVE RESTRAINT NOT USED
P – NOT REQUIRED

CHILD RESTRAINT
Q – IN VEHICLE USED
R – IN VEHICLE NOT USED
S – IN VEHICLE USE UNKNOWN
T – IN VEHICLE IMPROPER USE
U – NONE IN VEHICLE

M / C BICYCLE- HELMET
DRIVER: V – NO, W – YES
PASSENGER: X – NO, Y – YES

AIR BAG
B – UNKNOWN
L – AIR BAG DEPLOYED
M – AIR BAG NOT DEPLOYED
N – OTHER
P – NOT REQUIRED

EJECTED FROM VEHICLE
0 – NOT EJECTED
1 – FULLY EJECTED
2 – PARTIALLY EJECTED
3 – UNKNOWN

**INATTENTION CODES**
A – CELLPHONE HANDHELD
B – CELLPHONE HANDSFREE
C – ELECTRONIC EQUIPMENT
D – RADIO / CD
E – SMOKING
F – EATING
G – CHILDREN
H – ANIMALS
I – PERSONAL HYGIENE
J – READING
K – OTHER

**ITEMS MARKED BELOW FOLLOWED BY AN ASTERISK (*) SHOULD BE EXPLAINED IN THE NARRATIVE.**

**PRIMARY CRASH FACTOR — LIST NUMBER (#) OF PARTY AT FAULT: 1**
A CVC SECTION VIOLATED: VC 21453(A) CITED: ☐ YES ☒ NO
B OTHER IMPROPER DRIVING*:
C OTHER THAN DRIVER*
D UNKNOWN*

**WEATHER (MARK 1 TO 2 ITEMS)**
X A CLEAR
B CLOUDY
C RAINING
D SNOWING
E FOG / VISIBILITY ___ FT.
F OTHER*:
G WIND

**LIGHTING**
A DAYLIGHT
B DUSK - DAWN
X C DARK - STREET LIGHTS
D DARK - NO STREET LIGHTS
E DARK - STREET LIGHTS NOT FUNCTIONING*

**ROADWAY SURFACE**
X A DRY
B WET
C SNOWY - ICY
D SLIPPERY (MUDDY, OILY, ETC.)

**ROADWAY CONDITION(S)** (MARK 1 TO 2 ITEMS)
A HOLES, DEEP RUT*
B LOOSE MATERIAL ON ROADWAY*
C OBSTRUCTION ON ROADWAY*
D CONSTRUCTION - REPAIR ZONE
E REDUCED ROADWAY WIDTH
F FLOODED*
G OTHER*:
X H NO UNUSUAL CONDITIONS

**TRAFFIC CONTROL DEVICES** (1 2 3)
A CONTROLS FUNCTIONING — 2: X
B CONTROLS NOT FUNCTIONING*
C CONTROLS OBSCURED
X D NO CONTROLS PRESENT / FACTOR*

**TYPE OF CRASH**
A HEAD - ON
B SIDE SWIPE
C REAR END
X D BROADSIDE
E HIT OBJECT
F OVERTURNED
G VEHICLE / PEDESTRIAN
H OTHER*:

**MOTOR VEHICLE INVOLVED WITH** (MARK 1 TO 2 ITEMS)
A NONCOLLISION
B PEDESTRIAN
C OTHER MOTOR VEHICLE
D MOTOR VEHICLE ON OTHER ROADWAY
E PARKED MOTOR VEHICLE
F TRAIN
X G BICYCLE
H ANIMAL:
I FIXED OBJECT:
J OTHER OBJECT:
K ADDITIONAL OBJECT(S) STRUCK

**PEDESTRIAN'S ACTIONS**
X A NO PEDESTRIANS INVOLVED
B CROSSING IN CROSSWALK AT INTERSECTION
C CROSSING IN CROSSWALK - NOT AT INTERSECTION
D CROSSING - NOT IN CROSSWALK
E IN ROAD - INCLUDES SHOULDER
F NOT IN ROAD
G APPROACHING / LEAVING SCHOOL BUS

**VEHICLE AUTOMATION LEVEL** (1 2 3)
A SAE LEVEL - 0
B SAE LEVEL - 1 — 2: X
C SAE LEVEL - 2
D SAE LEVEL - 3
E SAE LEVEL - 4 — 1: X
F SAE LEVEL - 5
G UNKNOWN*

**VEHICLE AUTOMATION ENGAGED** (1 2 3)
A NO AUTOMATION — 2: X
B DRIVER ASSISTANCE
C PARTIAL AUTOMATION
D CONDITIONAL AUTOMATION
E HIGH AUTOMATION
F FULL AUTOMATION
G UNKNOWN*

**OTHER ASSOCIATED FACTOR(S)** (MARK 1 TO 2 ITEMS) (1 2 3)
A CVC SECTION VIOLATION: VC 22350 CITED: ☐ YES ☒ NO — 1: X
B CVC SECTION VIOLATION: CITED: ☐ YES ☐ NO
C CVC SECTION VIOLATION: CITED: ☐ YES ☐ NO
D
E VISION OBSCUREMENT:
F INATTENTION*:
G STOP & GO TRAFFIC
H ENTERING / LEAVING RAMP
I PREVIOUS CRASH
J UNFAMILIAR WITH ROAD
K DEFECTIVE VEH. EQUIP.: CITED ☐ YES ☐ NO
L UNINVOLVED VEHICLE
M OTHER*:
N NONE APPARENT — 2: X
O RUNAWAY VEHICLE

**MOVEMENT PRECEDING CRASH**
A STOPPED
B PROCEEDING STRAIGHT
C RAN OFF ROAD
D MAKING RIGHT TURN
E MAKING LEFT TURN
F MAKING U TURN
G BACKING
H SLOWING / STOPPING
I PASSING OTHER VEHICLE
J CHANGING LANES
K PARKING MANEUVER
L ENTERING TRAFFIC
M OTHER UNSAFE TURNING
N XING INTO OPPOSING LANE
O PARKED
P MERGING
Q TRAVELING WRONG WAY
R OTHER *:
S LANE SPLITTING

**SOBRIETY - DRUG - PHYSICAL** (MARK ALL THAT APPLY) (1 2 3)
A HAD NOT BEEN DRINKING — 1: X, 2: X
B HBD - UNDER INFLUENCE
C HBD - NOT UNDER INFLUENCE*
D HBD - IMPAIRMENT UNKNOWN*
E UNDER DRUG INFLUENCE*:
DRE EXAM. CONDUCTED
STIMULANT
HALLUCINOGEN
DISSOCIATIVE ANESTHETICS
NARCOTIC ANALGESIC
INHALANT
CANNABIS
DEPRESSANT
F IMPAIRMENT - PHYSICAL*
G IMPAIRMENT NOT KNOWN
H NOT APPLICABLE
I SLEEPY / FATIGUED*

**SKETCH**

REFER TO SKETCH PAGE(S)

INDICATE NORTH

**MISCELLANEOUS**

☐ REFER TO NARRATIVE FOR ADDITIONAL INFORMATION

**SPECIAL INFORMATION** (1 2 3)
A HAZARDOUS MATERIAL
B CELL PHONE HANDHELD IN USE
C CELL PHONE HANDSFREE IN USE
D CELL PHONE NOT IN USE — 1: X, 2: X
E CELL PHONE USE UNKNOWN
F SCHOOL BUS RELATED

**BIKEWAY FACILITY** (1 2 3)
A SHARED ROADWAY
B CLASS I - BIKE PATH*
C CLASS II - BIKE LANE* — 1: X, 2: X
D CLASS III - BIKE ROUTE*
E CLASS IV - SEPARATED BIKEWAY*

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*An Internationally Accredited Agency*

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**INJURED / WITNESS / PASSENGERS**
CHP 555 Page 3 (Rev. 2-22) OPI 060



| CRASH DATE (MO. DAY YEAR) | CRASH TIME (2400) | NCIC # | OFFICER ID | NUMBER |
|---|---|---|---|---|
| 02/07/2025 | 1934 | | | 9770-2025-00120 |

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | EXTENT OF INJURY ("X" ONE): FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | INJURED WAS ("X" ONE): DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | 16 | M | ☐ | X | ☐ | ☐ | ☐ | ☐ | ☐ | X | ☐ | ☐ | 1 | 0 | P | W | 1 |

NAME / D. O. B. / ADDRESS: TANNER JAMES NAVAROEL (03/18/2008) 5420 PLACERITA DRIVE SIMI VALLEY CA 93063
TELEPHONE: (818) 634-1993/UNKNOWN
(INJURED ONLY) TRANSPORTED BY: AMERICAN MEDICAL RESPONSE - (805)482-8869
EMS RUN NUMBER: 25-0013295
TAKEN TO: LOS ROBLES HOSPITAL, THOUSAND OAKS,...
DESCRIBE INJURIES: FRACTURED RIGHT TIBIA AND FIBULA
☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| X # 1 | ☐ | | M | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D. O. B. / ADDRESS: OFFICER ERIC COOKE 3901 ALAMO STREET SIMI VALLEY CA 93063
TELEPHONE: NONE/(805) 583-6950
(INJURED ONLY) TRANSPORTED BY:
EMS RUN NUMBER:
TAKEN TO:
DESCRIBE INJURIES:
☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D. O. B. / ADDRESS:
TELEPHONE:
(INJURED ONLY) TRANSPORTED BY:
EMS RUN NUMBER:
TAKEN TO:
DESCRIBE INJURIES:
☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D. O. B. / ADDRESS:
TELEPHONE:
(INJURED ONLY) TRANSPORTED BY:
EMS RUN NUMBER:
TAKEN TO:
DESCRIBE INJURIES:
☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D. O. B. / ADDRESS:
TELEPHONE:
(INJURED ONLY) TRANSPORTED BY:
EMS RUN NUMBER:
TAKEN TO:
DESCRIBE INJURIES:
☐ VICTIM OF VIOLENT CRIME NOTIFIED

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | OPER. | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ # | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D. O. B. / ADDRESS:
TELEPHONE:
(INJURED ONLY) TRANSPORTED BY:
EMS RUN NUMBER:
TAKEN TO:
DESCRIBE INJURIES:
☐ VICTIM OF VIOLENT CRIME NOTIFIED

| PREPARER'S NAME | ID NUMBER | MO. DAY YEAR | REVIEWER'S NAME | MO. DAY YEAR |
|---|---|---|---|---|
| ALEXANDER RIOS | 023577 | 02/07/2025 | | |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

# SKETCH DIAGRAM

CHP 555 Page 4 (Rev. 2-22) OPI 060



| CRASH DATE (MO. DAY YEAR) | CRASH TIME (2400) | NCIC # | OFFICER ID | NUMBER |
|---|---|---|---|---|
| 02/07/2025 | 1934 | | | 9770-2025-00120 |

ALL MEASUREMENTS ARE APPROXIMATE AND NOT TO SCALE UNLESS STATED (SCALE = )




CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| PREPARED BY | ID NUMBER | MO. DAY YEAR | REVIEWER'S NAME | MO. DAY YEAR |
|---|---|---|---|---|
| ALEXANDER RIOS | 023577 | 02/07/2025 | | |

*An Internationally Accredited Agency*

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

**FACTUAL DIAGRAM**

CHP 555 Page 4 (Rev. 2-22) OPI 060



| CRASH DATE (MO. DAY YEAR) | CRASH TIME (2400) | NCIC # | OFFICER ID | NUMBER |
|---|---|---|---|---|
| 02/07/2025 | 1934 | | | 9770-2025-00120 |

ALL MEASUREMENTS ARE APPROXIMATE AND NOT TO SCALE UNLESS STATED (SCALE = )




| PREPARED BY | ID NUMBER | MO. DAY YEAR | REVIEWER'S NAME | MO. DAY YEAR |
|---|---|---|---|---|
| ALEXANDER RIOS | 023577 | 02/07/2025 | | |

*An Internationally Accredited Agency*

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL** PAGE 6 OF 12

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/07/2025 | 1934 | | | 9770-2025-00120 |

*All times, speeds, and measurements throughout this report are approximate. Measurements were obtained using visual estimation and GPS unless otherwise stated. All opinions and conclusions were based on evidence and/or statements.*

**FACTUAL DIAGRAM LEGEND**

**POINTS OF REST**

Vehicle #1

Front tire- 23 feet north of the south roadway edge line of Alamo Street and 30 feet west of the west roadway edge line prolongation of Michael Clark Parkway.

Rear tire- 26 feet north of south roadway edge line of Alamo Street and 34 feet west of the west roadway edge line prolongation of Michael Clark Parkway.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEXANDER RIOS | 023577 | 02/07/2025 | | |

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**



| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
| --- | --- | --- | --- | --- |
| 02/07/2025 | 1934 | | | 9770-2025-00120 |

**FACTS**

**SCENE DESCRIPTION**

This crash occurred in the intersection of Michael Clark Parkway and Alamo Street, within the city of Simi Valley and the county of Ventura. There were no visual obstructions note or claimed. The weather was cool, clear, dry, and the roadways were dry. This crash occurred during the hours of darkness. Refer to the factual diagram for further details.

Alamo Street at this location, was an east-west aligned, six lane, straight, flat, asphalt-concrete, roadway. The eastbound and westbound traffic lanes were separated by a concrete median. The eastbound traffic lanes west of the intersection had two 12-foot-wide through lanes, one 12-foot-wide left turn lane, and one 8-foot-wide bike lane. The westbound traffic lanes had two 12-foot-wide through lanes, one 12-foot-wide left turn lane, and one 3-foot-wide bike lane, one 9-foot-wide right turn lane. Alamo Street was controlled by 3-phase traffic signals at the entrance to the intersection with Michael Clark Parkway. The traffic signals were in good working condition at the time of the crash. Concrete sidewalks bordered both Alamo Street and Michael Clark Parkway in all directions. The speed limit on Alamo Street was 45 MPH.

Michael Clark Parkway at this location, was a north-south, straight, flat, asphalt-concrete, roadway. Michael Clark Parkway, north of Alamo Street had four lanes of traffic. The northbound and southbound traffic lanes were separated by a concrete median. The northbound traffic lanes had one 10-foot-wide traffic lane and one 12-foot-wide traffic lane. The southbound traffic lanes had one 12-foot-wide traffic lane and one 10-foot-wide right turn lane. Michael Clark Parkway, south of Alamo Street, was a two-way three lane roadway. The northbound and southbound traffic lanes were separated by painted double solid white lines. The northbound traffic lanes had one 12-foot-wide right turn lane and one 12-foot-wide through lane. The southbound traffic lane was 12-foot-wide. There was no posted speed limit for Michael Clark Parkway.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
| --- | --- | --- | --- | --- |
| ALEXANDER RIOS | 023577 | 02/07/2025 | | |

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/07/2025 | 1934 | | | 9770-2025-00120 |

**PARTIES**

Party #1 (P-1, Navaroel) was contacted at Los Robles Hospital. P-1 was identified by his Simi Valley High School student identification card. P-1 was placed as the driver of V-1 based upon, P-1's admission to riding V-1 at the time of the crash, P-2 observed P-1 riding V-1 and P-1 had injuries consistent with being the rider in this crash.

Vehicle #1 (V-1, Talaria) was located at the scene of this crash on its left side, facing an easterly direction, within the #1 lane of eastbound Alamo Street, west Michael Clark Parkway. V-1 sustained minor damage including but not limited to a scrape to the left side frame and left handlebar. There was no prior damage or defects noted or claimed.

Party #2 (P-2, Williamson) was contacted on scene. P-2 was placed as the driver of V-2 based upon his statement of driving V-2 at the time of the crash, P-2 was an on-duty peace officer per Penal Code 830.2, P-2 was assigned to drive V-2 at the time of the crash, and P-2 was employed by the registered owner of V-2.

Vehicle #2 (V-2, Ford) was moved prior to CHP arrival. V-2 sustained moderate damage, including but not limited to the front left side push bumper and the front right side push bumper torn off. There was no prior damage or defects noted or claimed.

**PHYSICAL EVIDENCE**

There were 18 digital images captured of the scene by Officer C. Bautista, ID 23849. Two videos of the crash were captured by the Simi Valley Police Department's surveillance cameras. The images and videos were transferred onto a compact disc and are available at the CHP Moorpark Area office.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEXANDER RIOS | 023577 | 02/07/2025 | | |

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/07/2025 | 1934 | | | 9770-2025-00120 |

**STATEMENTS**

**Statements are not verbatim and were written in summary form. The statements were related back to its respective party for verification.**

Party #1 (P-1, Navaroel) was contacted by me at Los Robles Hospital. P-1 related the following: He was at Regal Simi Valley civic center with his friends. P-1 related he saw a motorcycle officer and began to leave Regal Simi Valley civic center. P-1 was riding Vehicle #1 (V-1, Talaria), northbound on Michael Clark Parkway, south of Alamo Street at 30 miles per hour on the south crosswalk. P-1 was attempting to go to the northwest sidewalk of Alamo Street. P-1 related he observed V-2 approaching him, swerved to the left and collided into the front right side of V-2. P-1 related after colliding with V-2, he felt pain on his right leg and laid in the roadway.

Party #2 (P-2, Williamson) was contacted on scene. P-2 related the following: He was notified by Simi Valley Police Department (SVPD) dispatch his partner Officer E. Cooke, ID 5033, was following a motorized bicycle who was traveling northbound on Michael Clark Parkway. Officer Cooke had been dispatched to a call of a group of motorized bicycles causing a disturbance at the Regal Simi Valley civic center. P-2 exited the SVPD parking lot and began to drive southbound on Michael Clark Parkway. P-2 turned on his emergency lights and sirens to clear the intersection of Michael Clark Parkway and Alamo Street at 10 miles per hour. P-2 then observed P-1 riding V-1 at a high rate of speed towards him. P-2 related he turned to the right in attempt to avoid a crash with P-1. P-2 related P-1 turned left into the left side of V-2. P-2 related V-1 slid from the west crosswalk of Michael Clark Parkway and Alamo Street, into the #1 lane of eastbound Alamo Street, west of Michael Clark Parkway. After the crash, P-2 positioned V-2 behind P-1 to block the left turn lane and the #1 lane eastbound on Alamo Street, west of Michael Clark Parkway.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

STATE OF CALIFORNIA

**NARRATIVE/SUPPLEMENTAL**



| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/07/2025 | 1934 | | | 9770-2025-00120 |

Witness #1 (W-1, Officer Cooke) was contacted by Officer Herzer, ID 17435, on February 20, 2025, and related the following: W-1 responded to the Regal Theater Plaza to investigate a disturbance call. The reporting party stated there three to five electric bikes riding recklessly in the parking lot. When W-1 arrived in the area, he observed the riders doing wheelies in the parking lot. W-1 entered from the south area of the parking lot and rode toward Panda Express. Two of the riders were further north towards Starbucks. The two riders looked at each other, made a U-turn and drove north in the parking lot at a high rate of speed. W-1 began to follow the two riders. As W-1 caught up to the riders, one of them pulled over near the front entrance of Regal Theater. W-1 continued riding towards the other rider traveling northbound in the parking lot. W-1 observed the other rider, later identified as P-1, continue northbound and turned left onto the beginning part of Michael Clark Parkway. W-1 observed P-1 ride between two vehicles traveling westbound to northbound on the roadway. P-1 passed both vehicles and continued northbound towards the intersection. As W-1 rounded the corner, P-1 was traveling at 30 miles per hour up the incline in the roadway as P-1 positioned himself on the right side of the roadway. W-1 saw his partner ahead of him light up the intersection with his code 3 emergency lights. As P-1 passed over the incline, the suspension of V-1 compressed downward which caused P-1 to make a wide turn to the left. P-1 entered the intersection and collided with the front of the patrol vehicle. W-1 saw P-1 become ejected from the bike and land in the roadway. W-1 then contacted P-1 and began to provide medical aid and asses potential injuries. P-1 spontaneously stated to W-1, “I’m sorry I ran. Don’t take me to jail.” P-1 kept repeating these statements. P-1 called his mother on his cell phone through his helmet. P-1 talked to her while being medically treated. Then W-1 used P-1’s cell phone to talk to P-1’s mother to explain what had happened. It should be noted, while following P-1, W-1 did not have any of his emergency lights activated on his police motorcycle.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEXANDER RIOS | 023577 | 02/07/2025 | | |

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/07/2025 | 1934 | | | 9770-2025-00120 |

**OPINIONS AND CONCLUSIONS**

**AREA(S) OF IMPACT**

AOI #1 (V-1 vs V-2) 16 feet north of the south roadway edge line of Alamo Street and 8 feet west of the east roadway edge prolongation of Michael Clark Parkway.

AOI #2 (V-1 vs Concrete Ground) 24 feet north of south roadway edge line of Alamo Street and 30 feet west of the west roadway edge prolongation of Michael Clark Parkway.

AOI #3 (P-1 vs Concrete Ground) 35 feet north of south roadway edge line of Alamo Street and 30 feet west of the west roadway edge prolongation of Michael Clark Parkway.

**SUMMARY/CAUSE**

Party #1 (P-1, Navaroel) was riding Vehicle #1 (V-1, Talaria), northbound on the southeast sidewalk of Michael Clark Parkway, south of Alamo Street at 30 miles per hour. Party #2 (P-2, Williamson) was notified by Simi Valley Police Department (SVPD) dispatch his partner, Officer E. Cooke, was following a motorized bicycle traveling northbound on Michael Clark Parkway. P-2 was driving Vehicle #2 (V-2, Ford), southbound on Michael Clark Parkway, north of Alamo Street at 10 miles per hour. P-2 activated V-2's emergency lights and siren to clear the intersection. Due to P-1 failing to stop at a circular red light (a violation of 21453(a) VC), P-1 entered the intersection. P-2 saw P-1 and turned to the right attempting to avoid a crash. P-2 was unable to avoid V-1 and the right side of V-1 and P-1 crashed into the front of V-2 (AOI #1). In addition, an associated factor of this crash was that P-1 rode V-1 at an unsafe speed and P-2 was unable to slow down in time prior to the crash. After being struck, V-1 continued to travel and slid from the west crosswalk of Michael Clark Parkway and Alamo Street, into the #1 lane of eastbound Alamo Street, west of Michael Clark Parkway (AOI #2). As a result of the collision, P-1 was ejected from V-1 and P-1 came to rest in the left turn lane of eastbound Alamo Street, west of Michael Clark Parkway (AOI #3).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEXANDER RIOS | 023577 | 02/07/2025 | | |

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/07/2025 | 1934 | | | 9770-2025-00120 |

After the crash, V-1 came to rest in the #1 lane on eastbound Alamo Street, west of Michael Clark Parkway facing an easterly direction. P-1 came to rest in the left turn lane of eastbound Alamo Street, west of Michael Clark Parkway, facing an easterly direction. V-2 was driven behind P-1's point of rest to block the left turn lane and #1 lane of eastbound Alamo Street, west of Michael Clark Parkway.

**RECOMMENDATIONS**

None.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEXANDER RIOS | 023577 | 02/07/2025 | | |

# EXHIBIT O

**Edward T. Flosi, M.S.**
Law Enforcement Practices Expert
Law Enforcement Trainer
Justitia Consulting
1519 E Chapman Ave #34
Fullerton, CA 92831
Cell: (408) 315-0520
Email: ed.flosi@gmail.com

I have been retained by Burke, Williams & Sorensen, LLP as a rebuttal witness in the civil action of Navaroli vs. City of Simi Valley, et al. This rebuttal report is an analysis of the report submitted by Plaintiff's Expert Richard Bryce.

The findings and opinions in this report are based upon my review of the documents as presented to me by counsel and other evidence related to this incident. These findings are an overview analysis based on the information currently available.

My findings and opinions are formed from: (1) the materials I have reviewed to date thus far which provides me with information concerning the facts and circumstances as perceived by the officers about what occurred during this incident, and (2) how a reasonable officer would have acted when presented with similar circumstances, based upon his or her law enforcement and other related professional training and experience.

As is my custom and practice, I reserve the right to amend, alter, enhance or delete findings and opinions based upon my receipt and review of any subsequent new information pertaining to this case.

I have been retained by the Santa Clara County District Attorney's Office on thirteen occasions. In each of these cases I was consulted on the officer's use of force regarding a case where a defendant had resisted, delayed or obstructed the officer's arrest process. In each of these cases, I was not consulted until after the Santa Clara County District Attorney's Office had already made the decision to prosecute the case believing the elements had been satisfied. I had not been consulted on any cases prior to the filing of the case.

A more detailed list of my consultations/retentions and testimony history can be found in the attached Curriculum Vitae.

In 2007, I was contacted by the San Mateo County District Attorney's Office to provide testimony in a case where a police officer was being prosecuted. I had agreed to provide testimony to assist in the prosecution of the officer but was prohibited from doing so by the San Jose Police Department Assistant Chief of Police.

I have been retained as the "person most knowledgeable" witness in civil proceedings by the San Jose City Attorney's Office on six occasions and have given depositions in three of the cases. These cases involved my testimony regarding the San Jose Police Department Use of Force Policy and Training. In one case, I provided consultation that the officers had acted outside of policy and training.

I have been consulted three times by the San Jose Police Department Internal Affairs Unit regarding a complaint of excessive force. In these consultations, I was asked several questions regarding

the training standards specifically related to the use of force. I was never told the specific details of the case being investigated and was not asked to render an opinion as to the conformance with San Jose Police Policy.

The breakdown of my case retention is described on the table below (as of 6/3/2026). It should be noted that retention in any of the cases does not necessarily imply that my opinion would have supported or not supported the officer's actions. For example, on several retentions by the attorney representing the officer, my opinion(s) of the officer's actions did not support the defense.

| Type | Number | Deposition Given | Testimony |
|---|---|---|---|
| Criminal Prosecution (during PD) | 12 | | 3 |
| Criminal Prosecution (after PD) | 12* | | 7 |
| Criminal Defense | 2 | | |
| Civil Defense | 385 | 111 | 62 |
| Civil Plaintiff | 20 | 5 | 1 |
| Civil Plaintiff (Sub-contractor) | 2 primary expert / 3 assisting | 1 | |
| PMK for CSJ | 7 | 4 | |
| SJPD IA Consults | 3 | | |
| Other IA Consults | 3 | | |
| Employment Arbitration | 6 | | 4 |
| Civilian Civil Defense | 1 | | 1 |

* Five cases involved the prosecution of an on-duty deputy/officer

I was a full-time sworn Peace Officer for the City of San Jose from December 9, 1984, to December 30, 2011. I was awarded an Advanced Peace Officer (December 1990) and Supervisory Peace Officer (September 2004) certificate from the California Commission on Peace Officer Standards and Training (POST).

I have a Master of Science degree from the California State University at Long Beach in Emergency Services Administration. I graduated with Honors and was selected to the Graduate Dean's List of University Scholars and Artists. This honor is reserved for the top 1% of the graduating class.

I have a Clear Designated Subjects (Law Enforcement Occupations) Adult Teaching Credential from the California Commission on Teacher Credentialing. I was an Adjunct Instructor at West Valley College for the Administration of Justice Department. I was a member of the West Valley College Administration of Justice Advisory Board.

I am currently an Adjunct Instructor at Fullerton College (Administration of Justice Department) and El Camino College (Administration of Justice Department).

As a fulltime sworn member of the San Jose Police Department, I served in several capacities that lend to my expertise in rendering my opinions. One such assignment was from March 2005 to September 2007. During this period, I was assigned to the Research and Development Unit. One of my assigned tasks was to assist in updating the Use of Force Policy and to create a Force Response

Reporting System. In this position, I became intimately familiar with the genesis of the policy and the reasoning and meaning of the involved sections.

I was a defensive tactics instructor (California POST Learning Domain 33) at the South Bay Regional Training Consortium and/or the San Jose Police Department Academy for approximately twelve years. In my capacity as a defensive tactics instructor for the San Jose Police Department, I commonly taught the legal aspects of an officer's use of force and policy concerns as they related to arrest and control techniques and defensive tactics. I have attended an 80-hour California POST approved Defensive Tactics Instructor course to become a POST certified Defensive Tactics Instructor. For a period of approximately seven years, I acted as a lead instructor for Defensive Tactics for both organizations. In my capacity as a lead instructor, I have assisted in the instruction of two Defensive Tactics Instructor courses and had been the primary lead instructor in four other Defensive Tactics Instructor courses.

I was a lead instructor for Use of Force – cognitive (California POST Learning Domain 20) at the South Bay Regional Training Consortium and/or the San Jose Police Department Academy for approximately nine years. In my capacity as a Use of Force – cognitive instructor for the San Jose Police Department, I commonly taught the legal aspects of an officer's use of force and policy concerns as they related to use of force. I have been directly involved as a California POST committee member in two prior revisions of the Learning Domain 20 Workbook and participated remotely in the 2015 revision.

I have been a California POST approved Force Options Simulator (FOS) instructor since January 2000. In order to become a FOS instructor, I attended the 40-hour California POST approved FOS Instructor Course. I was a Force Options Simulator (FOS) Instructor for the San Jose Police Department starting in the year 2000 when I was designated as the lead instructor for the San Jose Police Department FOS program. Shortly after becoming the lead instructor, I was asked by California POST to become the lead instructor for the FOS Instructor course for the Northern California Regional Skills Centers. In my capacity as a FOS instructor for the San Jose Police Department, I commonly taught the legal aspects of an officer's use of force and policy concerns as they related to use of force. I retained this title until my promotion in September 2001. I continued to teach the FOS program for South Bay Regional Training Center for several years after my promotion.

I was an active member of the California POST FOS committee from 2000 up until my retirement. This committee met approximately every six months to discuss training trends and use of force issues within the curriculum. I have been directly involved in developing the past and present curriculum for the California POST FOS program. I was the supervisor for the San Jose Police Department FOS program from March 2009 to December 2011.

I was a member of the California POST Law Enforcement Officers Killed and Assaulted (LEOKA) Council for approximately six years. In this capacity, I reviewed the facts and circumstances surrounding several officer involved killings. I assisted in the preparation of the California POST LOEKA 2000-2004 report and in the production of the California POST LOEKA 2005-2009 report. In 2017, I was invited to rejoin the LEOKA committee.

I have been retained as a "Subject Matter Expert" to assist California POST on two video productions involving the use of force by a peace officer. These projects developed training guidelines for the use of O.C. Spray, Electronic Weapons and Projectile Impact Weapons.

I participated as a "Subject Matter Expert" in a California POST committee to develop an end-user and instructor level Electronic Weapons Course.

As a "Subject Matter Expert" I assisted California POST in the production of the web-based training program designed to test an officer's perception of danger which could lead to an assault.

I have been a TASER instructor since September 2005. I attended my original TASER Instructor course in September 2005 and recertified as a TASER Instructor in May 2009, July 2011 and June 2014. These courses were certified as instructor level courses by TASER International.

From 2005 – 2007, I taught "Force Documentation" at the San Jose Police Department Supervisors Course. This course is given to newly promoted supervisors. My block of instruction covered how to; (1) properly document a force response event, and (2) properly evaluate an officer's use of force.

I was one of the primary developers of the Institute for the Prevention of In-Custody Deaths (IPICD) Amendment based use of force training course titled, "Use of Force by the Numbers: 4, 8, 14." This 16-hour course was designed to teach students how to train officers to make force options decisions and evaluate an officer's use of force without a continuum model. The course focuses on using the 4th, 8th, and 14th Amendment based analyses and based on judicial interpretation of various case law decisions. My primary responsibility was to assist in the development of curriculum and to present on the topic of the 4th Amendment application as described in Graham v Connor (490 U.S. 386, 397 (1989)).

I presented twice at the IPICD Forensic Analyst Course on Amendment-based Force Analysis in Criminal and Internal Investigations, once in Nevada and once in Maryland. My two-hour presentation topic included how to properly evaluate a police officer's use of force using Amendment based analyses based on judicial interpretation of various case law decisions specifically including discussion on; (1) the Supreme Court's decision in Graham v. Connor and its application to the 4th Amendment, and (2) California Penal Code § 835a as an example of State statutory law.

In September of 2006, I attended an eight (8) hour training session from the Force Science Institute taught by Dr. Bill Lewinski. I also attended and successfully completed the certification process of the forty (40) hour Force Science Institute Certification Course in June of 2009. Attendees who successfully complete the program are certified in "Force Science Analysis." This designation attests that the holder has been trained to recognize and articulate important psychological, biological, and physiological factors that can influence human behavior and memory in force encounters and pursuit situations.

I have published several articles involving a police officer's use of force and/or defensive tactics issues. I have been a regular contributor to PoliceOne.com on the topic of police training specifically involving defensive tactics and the use of force.

I attended a 40-hour California POST certified Crisis Intervention Team (CIT) Academy in November of 2008 and remained a San Jose Police Department CIT member until my retirement in December of 2011.

I taught the Excited Delirium Response segment at the San Jose Police Department CIT Academy from 2007-2019 and at the Santa Clara County CIT Academy from 2010-2012.

In April of 2010, I attended an eight (8) hour Threat Assessment, De-Escalation of EDP (Emotional Disturbed Persons) training provided by Edgework Crisis Intervention Training.

I served as a "Subject Matter Expert" assisting the Santa Clara County Mental Health Department with "Innovation Project 8." This project involved the use of interactive video simulation training for Crisis Intervention Team (CIT) training and was designed to teach officers to effectively communicate and problem solve with a person with mental illness.

My qualifications to provide expert testimony about perception, memory and reaction time of law enforcement officers and eyewitnesses; and the interactions of officers and suspects during use-of-force encounters are based on:

- My education, personal experiences, and training (both formal and informal) I have received and have conducted for other police officers;
- The scope of my expertise in these areas concerns investigating and analyzing police use-of-force events, how involved officers and eyewitnesses perceive and remember these events, why involved officers and/or witnesses to such events might have inaccurate recall, reaction time, lag time, and officer-suspect interactions;
- My analysis is similar to that of other police practices experts in these areas and has a factual foundation based on widely accepted and consistently cited facts about the dynamics of human perception and memory and research during officer-suspect interactions;
- My understanding of the facts of this case; and
- My recognition that there will be factors or evidence that may either support, not support, or have a neutral effect upon my opinion.

Like many other police practices experts, I have taken classes taught by Dr. William Lewinski, founder of the Force Science Institute (FSI) and other instructors, speakers and presenters. The FSI is comprised of three divisions, including the Force Science Research Center (FSRC). The FSRC conducts scientific research designed to increase the understanding of officer and suspect behaviors in force encounters. While much of the research has focused on deadly force encounters, the same human performance factors apply to events involving less or non-deadly encounters. In addition to attending a total of 8 hours of classroom instruction from Dr. Lewinski and others in September of 2006, I successfully completed the 40-hour Force Science Certification Course in June of 2009.

The Certification Course covers the basics of anatomy and physiology of perception, including how people acquire, retain and recall memories; the biomechanics of officer movements in relation to suspect movements during force encounters; reaction time; and exploring why an officer's or witness' account of an incident might be in conflict with physical evidence. In addition to conducting a case study and presentation within a work group, I had to pass a 60-question, multiple-choice exam to graduate from the course as a certified "Force Analyst."

FSI also has published articles and studies on these topics for several years. I consistently read the articles and studies published by FSI prior to attending the classes and Certification Course. I also have continued my reading to increase and reinforce my understanding of these areas.

Based on my training, experience and research, I have a good comprehension of the mechanics of these areas and have applied it in my teaching and actual field work.

I have published articles on police tactics that included reaction time and lag time and that have been used to teach law enforcement officers on these subjects, including a peer-reviewed article including the topic (2003, Submission Recognition, *The Police Chief*).

I have taught law enforcement defensive tactics to recruit officers and in-service officers for over 15 years. In teaching this subject, I include human factor issues. I also assisted in creating a drill to teach officers how to mitigate/shorten reaction time to a fisted strike attack. The drill was tested to measure its efficacy.

I have taught law enforcement use of force for about 20 years. In these teachings, I have used lecture-based learning to reinforce tactics and techniques to mitigate/shorten reaction times based on my education on the topic and on my own personal experiences. I have used scenario-based training to observe human performance issues and to create strategies to mitigate reaction time and stress factors based on my education on the topic and on my own personal experiences. In these scenario training settings, I have witnessed perception/reaction time gaps thousands of times and used those examples in the debriefing of the officer taking the training, including possible tactics/techniques to mitigate the gap in future encounters.

I taught law enforcement emergency vehicle operations for approximately 10 years and the Law Enforcement Driving Simulator (LEDS) program for approximately 5 years. As a driving instructor, I had to have a better than average understanding of reaction time issues and how to address them in lecture-based training and on-track training. Some of the basic principles that were reinforced were; (1) scanning your surroundings, keeping a high visual horizon and keeping a safe distance around your vehicle, and (2) how fatigue or drowsiness can affect your vision and increase reaction time to hazards. It is noted that these same principles are so generally accepted that they are included in the California Driver's Handbook.

As a law enforcement practitioner, I have experienced the perception/reaction time gap several hundreds of times in both driving situations and in situations dealing with subjects involved in use of force investigations.

I have received advanced training through the Force Science Institute (including the 40-hour Force Analyst certification course) – as well as law enforcement training sessions/articles – in and have instructed law enforcement personnel on the topic of human performance science, including:

- The physiological effects of stress
- The reactionary gap at the beginning of a force response
- The reactionary gap at the end of a force response
- Visual narrowing
- Audio exclusion
- Focal attention
- Memory recall
- Fear and anger management in a force response incident

I have testified in federal court trials on the subject of human factors.

I have received advanced training through the Force Science Institute (including the 40-hour Force Analyst certification course) – as well as law enforcement training sessions/articles – and have instructed law enforcement personnel on the topic of the limitations of video evidence, including:

- Angle of view
- Distance from subject(s)
- Two dimensional limitations
- Environmental factors
- Video may not show what the officer was looking at
- Video may show more than what the officer's focus was
- Video cannot capture emotion

I have testified in federal court trials on the subject of the limitations of video evidence.

My training and experience in regard to the investigation and documentation of law enforcement force responses includes:

- I have used various tools and techniques in order to control subjects in field situations.
- I have applied this training and experience to multiple situations involving violent subjects.
- I am a POST-certified Force-options Simulator (FOS) Instructor and I served as an instructor for the San Jose Police Department and the South Bay Regional Public Safety Training Consortium. The FOS program concentrated on teaching the state and constitutional laws regarding the use of force by peace officers, as well as the decision-making involved in using various force options.
- I was recruited by POST and taught the Train-the-Trainer course for the FOS program for instructor candidates for the POST Perishable Skills Program presentation.
- As a supervisor in the Training Division at the San Jose Police Department, I supervised the POST FOS program, which was implemented in order to fulfill POST Perishable Skills Program requirements. In this program, my staff and I delivered this training to the sworn members of the San Jose Police Department, as well as other peace officers within Santa Clara County.
- I am a POST-certified arrest and control / defensive-tactics / baton instructor. I served as an arrest and control / defensive tactics/ baton instructor in the basic academy at the San Jose

Police Department and the South Bay Regional Public Safety Training Consortium as a lead instructor.

- I have taught the 80-hour POST certified arrest and control / defensive-tactics / baton instructor course for instructor candidates.
- I have taught force response investigation and documentation in POST certified courses to law enforcement personnel.
- I have taught the POST Regular Basic Academy Learning Domain 20 (Use of Force) to academy recruits that includes a chapter on force response documentation.
- I have taught in-service team training sessions upon request within the San Jose Police Department.
- While in the SJPD Training Unit, I supervised and taught classes in defensive tactics and officer safety.
- I was three times certified as a TASER device instructor.
- I am a POST certified OC Spray instructor.
- I taught Police Report Writing at West Valley College.
- I have personally responded to several force-response incidents and investigated them as a patrol supervisor.

I taught California POST Basic Academy Learning Domain 19 –Vehicle Operations for approximately 10 years and the California POST Perishable Skills Program Law Enforcement Driving Simulator (LEDS) program for approximately 5 years. In both courses, we taught and evaluated pursuit and Code 3 driving.

As a police supervisor, I was often tasked with reviewing a pursuit to determine if the pursuit was conducted within the current policies of the agency and in compliance with California Vehicle Code provisions.

As a police supervisor, I was often tasked with reviewing a collision involving a law enforcement vehicle to determine if the pre-collision driving was conducted within the current policies of the agency and in compliance with California Vehicle Code provisions.

I am currently the President of Justitia Consulting, Inc. My duties in this capacity include case consultation and expert witness testimony. I am currently the Principal Instructor for PROELIA Defense and Arrest Tactics. My duties in this capacity include use of force and defensive tactics instruction, curriculum development and course coordination.

A more detailed list of my education, publications, training and experience can be found in the attached Curriculum Vitae.

I am an impartial investigator and expert.

As of January 2025, I am being compensated for my services at the following rates:

- $225/hour* – Report review/report writing
- $350/hour* – Live or telephonic conferencing/consulting

- $350/hour – Deposition and/or testimony
- $2000/day – Daily rate for consultation/trial or site visit
- $100/hour* – Travel rate (not including travel expenses)
- $100/hour* – Trial or testimony stand-by time
- $150 – Filing, billing, administrative and office supply fee (one-time fee per case)
- Travel expenses will be billed at actual costs, including but not limited to; (1) airfare, (2) ground transportation, (3) lodging, and (4) meals at GSA rate, and (5) reasonable incidentals
- *billed per half hour

**DOCUMENTS REVIEWED FOR THIS ANALYSIS**

Commencing in August 2026, counsel began presenting me with a compilation of evidentiary documents for my review in preparation for opining on this case.

As is usually the practice in cases such as this, I am aware that there will be additional documents or other evidence that might subsequently become available during the discovery process that I will want to review which may assist me in developing more detailed findings and opinions. Therefore, I reserve the right to amend my findings and opinions at some later date based upon my ability to review any additional records and/or items of evidence I might subsequently receive.

The documents, evidence and research I have reviewed and performed to date are listed below:

1. Rule 26 Report from Richard Bryce, August 26, 2026
2. City's Production
    a. [CITY 00001-CITY 00009] Incident Rpt GO#25-5366 -Unit 41 WILLIAMSON, Tyler Redacted
    b. [CITY 00010-CITY 00021] CHP Rpt - Navaroli Redacted
    c. [CITY 00022-CITY 00033] Policy 307 - Vehicle Pursuits (Lexipol)
    d. [CITY 00034-CITY 00051] Axon Capture Photos (18)
    e. Audio Files
        i. [CITY 00052] CONFIDENTIAL - 2025-02-07_19.29.09_Ch92923333[911 Call]
        ii. [CITY 00053] CONFIDENTIAL - Merged File 2025-02-07 at 19.32.09 [RADIO]
    f. Video Files
        i. [CITY 00056] CONFIDENTIAL - Axon_Body_3_Video_2025-02-07_1936_X60A7712N
        ii. [CITY 00057] CONFIDENTIAL - Axon_Body_3_Video_2025-02-07_1950_X60A7461P
        iii. [CITY 00058] CONFIDENTIAL - PD Alamo Entr- PTZ-2025-02-07_19h30min00s000ms
        iv. [CITY 00059] CONFIDENTIAL - PD_Alamo_Entr-_PTZ-2025-02-07_19h33min00s000ms
        v. [CITY 00060] CONFIDENTIAL - PD Emp Parking Lot - West #2-2025-02-07_19h30min00s000ms
3. Plaintiff's Production

   a. 2025.05.19 - Claim for Damages (filed)
   b. Incident Report_reduced
   c. traffic crash report
   d. Photos
      i. family photo
      ii. IMG_1995
      iii. IMG_1999
      iv. IMG_2002
      v. IMG_2003
      vi. IMG_2627
      vii. IMG_2628
      viii. IMG_2629
      ix. IMG_2630
      x. IMG_2631
4. Depositions
   a. William Navaroli
   b. Eric Cook
   c. T.J.N. (Volume 1 and 2)
   d. Tyler Williamson
5. California POST Basic Academy Workbook Learning Domain 19 –Vehicle Operations
6. California POST Basic Academy Workbook Learning Domain 28 – Traffic Enforcement

**DETAILS OF THE INCIDENT**

**<u>Summary per the Rule 26 Report from Richard Bryce, August 26, 2026</u>**

On February 7, 2025, at approximately 7:30 p.m., Simi Valley Police officers responded to a call of motorized bicycles allegedly causing a disturbance in a parking lot in the City of Simi Valley.

Upon arrival at the location Officer Cook observed T.J.N. leaving the parking lot on his electric bicycle. Officer Cook followed T.J.N. on his police motorcycle. Officer Williamson responded to the incident driving his marked patrol vehicle southbound on Michael Clark Parkway toward the intersection with Alamo Street.

As T.J.N approached the intersection traveling northbound, Officer Williamson entered the intersection in the opposite direction in a collision path with T.J.N. T.J.N. attempted to swerve left to avoid a collision with Officer Williamson. However, T.J.N. was unable to avoid the patrol vehicle and collided with the front of Officer Williamson’s vehicle.

T.J.N. was seriously injured as a result of the collision with Officer Williamson. T.J.N. was ejected from the “e-bike” and thrown approximately 15 to 20 feet, and suffered comminuted fractures of the distal tibia and fibula in his right lower extremity and a 2 cm laceration to his right knee.

**<u>Summary per the Claim for Damages</u>**

The incident from which this claim arises occurred on February 7, 2025 at approximately 7:30 p.m., at or around the intersection of Michael Clark Parkway and Alamo Street, in the City of Simi Valley,

in the County of Ventura. Officer Tyler Jacob Williamson and Officer Eric Cooke were on duty as sworn law enforcement officers with the Simi Valley Police Department on the date and at the time of the incident. Officer Cooke responded to a call of motorized bicycles allegedly causing a disturbance at the Regal Simi Valley civic center and observed several motorized bicycle riders, including Claimant, in the parking lot of the civic center. Officer Cooke did not observe any of the riders committing any crimes, yet he still initiated a vehicle pursuit of Claimant, without activating his patrol unit's lights or siren, simply because Claimant rode his bicycle away from Officer Cooke. Officer Williamson also responded to the scene and drove his marked patrol vehicle into the path of Claimant Tanner James Navaroli's bicycle as he turned to travel through the intersection, causing a vehicle collision. Mr. Navaroli was thrown from his bicycle as a result of the collision and suffered abrasions to his body, a fractured right tibia and fractured right fibula. Officers Cooke and Williamson were working under color of law and in the course and scope of their employment as sworn police officers for the Simi Valley Police Department.

**<u>Summary per Simi Valley Incident Report #25-5366, Authored by Simi Valley Police Department Officer Williamson</u>**

On February 7, 2025, Williamson was working uniformed patrol in a marked black and white police vehicle (# 41) for the Simi Valley Police Department. At approximately 19:32 hours, Williamson responded to a disturbance at 2667 Tapo Canyon Rd of multiple Class 3 electric dirt bikes traveling at high rates of speed. Officer Cooke arrived on scene and put out radio traffic of a class 3 electric dirt bike fleeing the scene toward Alamo St. Williamson was stopped at the intersection of Michael Clark Memorial Parkway/Alamo St., facing S/B. Williamson turned on the on emergency lights and sirens to proceed through the intersection and stop traffic in compliance of California vehicle code 21055. As Williamson was almost through the intersection, Williamson observed a black class 3 electric dirt bike with no lights coming toward his direction at a high rate of speed going N/B. Williamson quickly hit the brakes to avoid the class 3 electric dirt bike. The class 3 electric dirt bike entered the intersection against a red traffic light and attempted to turn in front of the police vehicle going W/B into opposing E/B traffic. The class 3 electric dirt bike collided into the side of the front push bar of Williamson's vehicle. The driver side of the push bar is where the initial contact occurred. C H P handled the traffic collision.

**<u>Summary per CHP 555 Report 9770-202-00120, Authored by CHP Officer Rios</u>**

<u>Parties</u>

Party #1 (P-1, T.J.N.) was contacted at Los Robles Hospital. P-1 was identified by his Simi Valley High School student identification card. P-1 was placed as the driver of V-1 based upon, P-1 's admission to riding V-1 at the time of the crash, P-2 observed P-1 riding V-1 and P-1 had injuries consistent with being the rider in this crash.

Vehicle #1 (V-1, Talaria) was located at the scene of this crash on its left side, facing an easterly direction, within the #1 lane of eastbound Alamo Street, west Michael Clark Parkway. V-1 sustained minor damage including but not limited to a scrape to the left side frame and left handlebar. There was no prior damage or defects noted or claimed.

Party #2 (P-2, Williamson) was contacted on scene. P-2 was placed as the driver of V-2 based upon his statement of driving V-2 at the time of the crash, P-2 was an on-duty peace officer per Penal

Code 830.2, P-2 was assigned to drive V-2 at the time of the crash, and P-2 was employed by the registered owner of V-2.

Vehicle #2 (V-2, Ford) was moved prior to CHP arrival. V-2 sustained moderate damage, including but not limited to the front left side push bumper and the front right side push bumper torn off. There was no prior damage or defects noted or claimed.

Statements

Party #1 (P-1, T.J.N.) was contacted by me at Los Robles Hospital. P-1 related the following: He was at Regal Simi Valley civic center with his friends. P-1 related he saw a motorcycle officer and began to leave Regal Simi Valley civic center. P-1 was riding Vehicle #1 (V-1, Talaria), northbound on Michael Clark Parkway, south of Alamo Street at 30 miles per hour on the south crosswalk. P-1 was attempting to go to the northwest sidewalk of Alamo Street. P-1 related he observed V-2 approaching him, swerved to the left and collided into the front right side of V-2. P-1 related after colliding with V-2, he felt pain on his right leg and laid in the roadway.

Party #2 (P-2, Williamson) was contacted on scene. P-2 related the following: He was notified by Simi Valley Police Department (SVPD) dispatch his partner Officer E. Cooke, ID 5033, was following a motorized bicycle who was traveling northbound on Michael Clark Parkway. Officer Cooke had been dispatched to a call of a group of motorized bicycles causing a disturbance at the Regal Simi Valley civic center. P-2 exited the SVPD parking lot and began to drive southbound on Michael Clark Parkway. P-2 turned on his emergency lights and sirens to clear the intersection of Michael Clark Parkway and Alamo Street at 10 miles per hour. P-2 then observed P-1 riding V-1 at a high rate of speed towards him. P-2 related he turned to the right in attempt to avoid a crash with P-1 . P-2 related P-1 turned left into the left side of V-2. P-2 related V-1 slid from the west crosswalk of Michael Clark Parkway and Alamo Street, into the #1 lane of eastbound Alamo Street, west of Michael Clark Parkway. After the crash, P-2 positioned V-2 behind P-1 to block the left turn lane and the #1 lane eastbound on Alamo Street, west of Michael Clark Parkway.

Witness #1 (W-1, Officer Cooke) was contacted by Officer Herzer, ID 17435, on February 20, 2025, and related the following: W-1 responded to the Regal Theater Plaza to investigate a disturbance call. The reporting party stated there three to five electric bikes riding recklessly in the parking lot. When W-1 arrived in the area, he observed the riders doing wheelies in the parking lot. W-1 entered from the south area of the parking lot and rode toward Panda Express. Two of the riders were further north towards Starbucks. The two riders looked at each other, made a U-turn and drove north in the parking lot at a high rate of speed. W-1 began to follow the two riders. As W-1 caught up to the riders, one of them pulled over near the front entrance of Regal Theater. W-1 continued riding towards the other rider traveling northbound in the parking lot. W-1 observed the other rider, later identified as P-1 , continue northbound and turned left onto the beginning part of Michael Clark Parkway. W-1 observed P-1 ride between two vehicles traveling westbound to northbound on the roadway. P-1 passed both vehicles and continued northbound towards the intersection. As W-1 rounded the corner, P-1 was traveling at 30 miles per hour up the incline in the roadway as P-1 positioned himself on the right side of the roadway. W-1 saw his partner ahead of him light up the intersection with his code 3 emergency lights. As P-1 passed over the incline, the suspension of V-1 compressed downward which caused P-1 to make a wide turn to the left. P-1 entered the intersection and collided with the front of the patrol vehicle. W-1 saw P-

1 become ejected from the bike and land in the roadway. W-1 then contacted P-1 and began to provide medical aid and asses potential injuries. P-1 spontaneously stated to W-1, "I'm sorry I ran. Don't take me to jail." P-1 kept repeating these statements. P-1 called his mother on his cell phone through his helmet. P-1 talked to her while being medically treated. Then W-1 used P-1 's cell phone to talk to P-1 's mother to explain what had happened. It should be noted, while following P-1, W-1 did not have any of his emergency lights activated on his police motorcycle.

Party #1 (P-1, T.J.N.) was riding Vehicle #1 (V-1, Talaria), northbound on the southeast sidewalk of Michael Clark Parkway, south of Alamo Street at 30 miles per hour. Party #2 (P-2, Williamson) was notified by Simi Valley Police Department (SVPD) dispatch his partner, Officer E. Cooke, was following a motorized bicycle traveling northbound on Michael Clark Parkway. P-2 was driving Vehicle #2 (V-2, Ford), southbound on Michael Clark Parkway, north of Alamo Street at 10 miles per hour. P-2 activated V-2's emergency lights and siren to clear the intersection. Due to P-1 failing to stop at a circular red light (a violation of 21453(a) VC), P-1 entered the intersection. P-2 saw P-1 and turned to the right attempting to avoid a crash. P-2 was unable to avoid V-1 and the right side of V-1 and P-1 crashed into the front of V-2 (AOI #1 ). In addition, an associated factor of this crash was that P-1 rode V-1 at an unsafe speed and P-2 was unable to slow down in time prior to the crash. After being struck, V-1 continued to travel and slid from the west crosswalk of Michael Clark Parkway and Alamo Street, into the #1 lane of eastbound Alamo Street, west of Michael Clark Parkway (AOI #2). As a result of the collision, P-1 was ejected from V-1 and P-1 came to rest in the left turn lane of eastbound Alamo Street, west of Michael Clark Parkway (AOI #3).

It is noted that the CHP Officer Rios listed the primary collision factor as T.J.N. failing to stop for a red light, in violation of California Vehicle Code §21453(a).[1]

It is noted that the CHP Officer Rios listed an associated factor as T.J.N. unsafe speed for conditions, in violation of California Vehicle Code §22350.[2]

---

[1] 21453(a): A driver facing a steady circular red signal alone shall stop at a marked limit line, but if none, before entering the crosswalk on the near side of the intersection or, if none, then before entering the intersection, and shall remain stopped until an indication to proceed is shown

[2] 22350: No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent having due regard for weather, visibility, the traffic on, and the surface and width of, the highway, and in no event at a speed which endangers the safety of persons or property.




## ANALYSIS OF INCIDENT, POLICE PRACTICES AND LAW ENFORCEMENT ACTIONS TAKEN; EXPERT'S OPINIONS & FINDINGS

The findings and opinions are based upon my initial review of the documents as presented to me by counsel and other evidence related to this incident. My findings and opinions are formed from

and based upon: (1) the totality of facts and circumstances known/perceived by the officers, (2) my own training and experience, (3) California POST standards, and (4) what the appropriate reactions would have been from an officer when presented with similar circumstances, based upon their law enforcement and other related professional training and experience.

I reserve my right as an expert to alter, amend, enhance, or delete my findings and opinions as necessary following my review of any additional discovery in this case.

Based on the totality of my training, education, and experience in law enforcement; as a law enforcement trainer; as a criminal justice educator; and, as a police practices consultant, I have developed the following opinions to a reasonable degree of professional certainty in the field of law enforcement practice.

The following paragraphs will examine the opinions of Mr. Bryce and provide rebuttal to each opinion. The format will show each of Mr. Bryce's opinions in bold text with no indentation. After each of Mr. Bryce's opinions, the following paragraphs will offer rebuttal specific to that opinion.

It is also noted that throughout Mr. Byrce's report and in some of the testimony, the vehicle that was being ridden by T.J.N. is described as an "e-bike." The vehicle was described by T.J.N. as a Talaria MX5 Pro. This vehicle does not have pedals and is described by the manufacturer as, "The stunning new Talaria Sting MX5 Pro, Talaria's newest model, is built to provide the best possible electric off-road performance. With its new 72V/40Ah battery, Talaria's most potent model to date, the MX5 Pro, stands out from the competition. A 45% boost in power over current 60V Talaria models allows you to feel more torque, accelerate more quickly, and reach higher top speeds."[3]

The manufacturer claims one of the key features to be, "72V 40Ah battery with Samsung 50S cells (2,880 WH)."[4]

A class 3 electric dirt bike is generally not considered a legal electric bicycle ("e-bike") if its motor exceeds 750 watts or if it functions primarily as a lightweight motorcycle, regardless of manufacturer marketing labels. An Internet search shows the rated power of this vehicle as 5,500 watts.

California Vehicle Code §436.1 defines an "off-highway electric motorcycle," commonly referred to as an eMoto, is an off-highway motorcycle subject to identification under this code that meets all of the following requirements:

(a) Is designed by the manufacturer for operation primarily off the highway.
(b) Is powered by an electric motor for which a motor number is not required.
(c) Has handlebars for steering control.
(d) Has a straddle seat provided by the manufacturer.
(e) Has two wheels.

[3] https://talaria.us.com/shop/ebikes/talaria-mx5-pro/
[4] https://talaria.us.com/shop/ebikes/talaria-mx5-pro/

(f) Is not equipped with pedals from the manufacturer.

The correct vehicle classification in this incident is therefore an off-highway electric motorcycle, or “eMoto.” I did not change Mr. Bryce’s use of “e-bike” within his quoted language.

**Mr. Bryce Opinion #1. The pursuit of T.J.N. was in violation of Simi Valley Police Department Policy and generally accepted law enforcement policy and procedures involving Vehicle Pursuits.**

I respectfully disagree with Mr. Bryce’s opinion as written.

Mr. Bryce begins this opinion by citing to two sections of the SVPD policy. It is noted that the pursuit definition in the SVPD policy manual is consistent with the language in California POST Basic Academy Workbook Learning Domain 19 – Vehicle Operations.

Officers are trained that a vehicle pursuit is an event involving one or more law enforcement officers attempting to apprehend a suspect operating a motor vehicle while attempting to avoid arrest by using high speed driving or other evasive tactics, such as driving off a highway, turning suddenly, ***or*** (emphasis added) driving in a legal manner but willfully failing to yield to the officers signal to stop.[5]

Officers are trained that the non-use of emergency equipment does not necessarily exclude their actions as a vehicle pursuit. The definition includes the word “or” as a disjunctive conjunction to sperate two different situations. While the second described situation includes the use of emergency equipment, the first described situation does not.

Mr. Bryce writes, “The radio call to which the officers were responding reported a disturbance only. No injuries, weapons, or threats were reported, and Officer Williamson stated in his deposition that he had no information as to the identity of any of the juveniles.”

In his report, Williamson wrote that the disturbance included “multiple Class 3 electric dirt bikes traveling at high rates of speed.”

The radio dispatch included the following information as broadcasted to the officers:

- Disturbance at 2667 Tapo Canyon Road at Panda Express.
- Three to four male juveniles wearing dark clothing, riding “e-bikes” on the sidewalks and in the street in front of Panda. RP says they're racing at 50 miles an hour.[6]

Based on the information contained within the broadcasted call for service, a reasonable officer could conclude that criminal activity may be afoot and that the “e-bike” riders were involved in the criminal activity (e.g., unsafe speed for conditions, speed contests, reckless driving, assault with a deadly weapon).

[5] California POST Basic Academy Workbook Learning Domain 19 – Vehicle Operations
[6] [CITY 00053] CONFIDENTIAL - Merged File 2025-02-07 at 19.32.09 [RADIO]

Based on the temporal and spatial association of the call for service and the initial observations of Cook, it can be reasonably deduced that T.J.N. was involved in the reported activities.

TJ.N. testified that there were about three other "e-bike" riders and one pedal bike rider present prior to the incident. He only knew one as "Reef." T.J.N. did not recall if the riders were doing tricks (e.g., "wheelies") or speeding because he was not paying attention to them. At some point, T.J.N. saw a motorcycle officer arrive in the area.

Mr. Bryce noted that Cook had previously contacted T.J.N. about 2 months prior. This would have no bearing on Cook's legitimate law enforcement purpose to contact T.J.N. again based on the current facts and circumstances. It is noted that T.J.N. was wearing a helmet on the night of the incident.

Although Cook testified that he did not believe that he was in pursuit of T.J.N., in order to determine if Cook was in pursuit of T.J.N. as defined in the first situation described in the definition, there are factors in Cook's deposition that could lead a reasonable officer to determine that he was not.

Cook testified that he was planning to stop T.J.N.[7]

Cook's statement that he "never felt I was close enough to engage - - or to try to conduct a traffic enforcement stop. I was, for lack of a better term, still playing 'catchup.' I never felt close enough that I would - - that he would have the knowledge of me behind him, trying to conduct a traffic enforcement stop"

The remaining variable would be if Cook believed that T.J.N. was "attempting to avoid arrest by using high speed driving or other evasive tactics, such as driving off a highway, turning suddenly." Cook testified that he did not believe that T.J.N.'s driving behaviors were motivated by avoiding an arrest.

T.J.N. testified as to his belief that he was not "attempting to avoid arrest by using high speed driving or other evasive tactics, such as driving off a highway, turning suddenly" as described in the first situation in the definition of a vehicle pursuit:

- T.J.N. testified that when he saw the motorcycle offer arrive, the officer did not give him any commands to stop.
- T.J.N. did not believe that he was in trouble.
- He left the area because it was time for him to go home and his mother was calling him to go home.
- T.J.N. turned left out of the parking lot and drove northbound towards Kaiser at approximately "in the 20's" mph.
- T.J.N. was not aware that the officer was behind him.
- T.J.N. was not aware that the officer wanted to contact him.

[7] Cook Deposition; 24: 17-18

It is noted that the approximate roadway distance from the area of the Regal Theaters/Panda Express to the intersection of Michael Calrk Parkway and Alamo is 750 feet.

The following is a screenshot from Google Satillite View showing the Regal Plaza and the intersection of the collision. It is noted that there is a slight bend in the roadway that could cause a visual obstruction of northbound vehicles approaching the intersection.




It is my professional opinion that Cook was not engaged in a vehicle pursuit – as defined above – with T.J.N. at the moments leading into the collision.

**Mr. Bryce Opinion #2: Officer Williamson used his patrol vehicle to block T.J.N.'s path of travel as T.J.N. was making a left turn at the intersection of Michael Clark Parkway and Alamo Street.**

I respectfully disagree with Mr. Bryce's opinion as written.

The SVPD policy defining "blocking" reads, "A low-speed tactic where one or more authorized police department emergency vehicles intentionally restrict the movement of a suspect vehicle, with the goal of containment or preventing a pursuit. Blocking is not boxing in or a roadblock." This is clearly defined as an intentional act.

The SVPD policy defining "pursuit intervention" reads, "An attempt to stop the suspect's ability to continue to flee in a vehicle through tactical application of technology, tire deflation devices, blocking or vehicle intercept, boxing-in, the PIT (known as Pursuit Intervention Technique or Precision Immobilization Technique), ramming, or roadblock procedures."

The SVPD policy defining "ramming" reads, "The deliberate act of impacting a suspect's vehicle with another vehicle to functionally damage or otherwise force the suspect's vehicle to stop." This is clearly defined as an intentional act.

Mr. Bryce writes, "Overhead surveillance video clearly shows Officer Williamson ramming his patrol vehicle into the electric bicycle of T.J.N. as T.J.N. attempts to make a left turn within the intersection of Michael Clark Parkway and Alamo Street." This language is inflammatory and speculative at best.

The only person that can truly know Williamson's intention is Williamson. A person watching a video file with the benefit of hindsight and at a different angle of view for the officer from the comfort of a desk without the pressure of real-time decision making limitations can only speculate as to Williamson's intent.

Williamson testified that when he activated his emergency lights, his intention was to drive straight through the intersection to the Regal Plaza. It can therefore be reasonably deduced that Williamson was not aware of T.J.N. driving towards the intersection and Cook attempting to catch up to T.J.N.

Williamson testified that he activated his emergency lights to clear the intersection. It is noted that the north/south traffic on Michael Clark Parkway had a solid red facing light. A reasonable officer would not anticipate northbound traffic coming from the south to proceed through the red light. A reasonable officer under these circumstances would believe that on-coming vehicle hazards would be traveling east-west on Alamo, therefore more focal attention would be given to potential east-west traffic. Williamson said that he looked left and right to clear the intersection before entering the intersection. Williamson proceeded through the intersection when he determined that is would be safe based on the east-west traffic approaching.

It is noted that officers are trained to clear the intersection for hazards prior to entering the intersection and while crossing the intersection. Therefore, it is likely that Williamson was also clearing east-west lanes while entering the intersection.

Williamson testified that he was about halfway through the intersection when he saw the eMoto. Williamson testified that he was traveling at approximately 5-10 mph. The eMoto was northbound on Michael Clark Parkway and was "very close" to Alamo and approaching the limit line near the east curb line. Williamson believed that the eMoto was going to continue northbound and pass him.

Williamson testified that the eMoto was approximately 20-40 feet away when he first saw it and was traveling at approximately 30 mph. After seeing the eMoto and within a couple seconds, the eMoto changed directions and abruptly turned left to go westbound. At that point, Williamson was "already well within the intersection." He was not expecting the eMoto to "make that sharp turn."

Williamson testified that he believed he began to brake just prior to the collision as he turned the vehicle to the right. Williamson testified that he believes that his vehicle was not travelling at the time of the collision.

Regarding the moments immediately leading into the collision, Williamson testified, "It happened within a matter of seconds. Being in a vehicle that large, only, you know, a limited amount of ability to move it within a certain direction, I just know that I tried to maneuver it in a way that I deemed best, in order to attempt to prevent a traffic collision from occurring."

Wiliamson continued, "I mean, again, in that moment, and, you know, just being, you know -- just trying -- yeah, doing everything I can to avoid a collision, sometimes you're only faced with a limited amount of solutions or options that you can make in an attempt to avoid a collision."

Williamson added, "I tried to do everything in my power to avoid a traffic collision."

Mr. Bryce writes about what Cook's observations were regarding; (1) T.J.N. putting his left leg out indicating preparing for a left turn, and (2) the speed of Williamson's vehicle. Mr. Bryce writes about Cook's understanding of the blocking technique as well. While these factors are informative to Cook's perceptions and understandings, they have no bearing on what Williamson perceived and/or understood prior to the collision. A reasonably trained evaluator would understand that it is the perceptions/knowledge of the officer that must be used to evaluate the actions of the officer.

The following is an analysis of the timing from; (1) when Williamson was approximately in the middle of the intersection to, (2) the time when Williamson began to turn to the right, using Camtasia. Camtasia is a video editing program that allows the user to advance the video one frame at a time and references the frame time within the video. This video has 30 frames per second. With Camtasia, the user can view all 30 frames within the second of video. The program will display which frame is showing on a format similar to a standard video playing program with the addition of the frame number within the second. For example, 0:00:22;23 would translate to zero minutes and 22 23/30 seconds into the video.

<u>[CITY 00059] CONFIDENTIAL - PD_Alamo_Entr-_PTZ-2025-02-07_19h33min00s000ms</u>

At approximately frame 0:00:22;23, Williamson's vehicle is seen entering the frame from the left. The vehicle makes a left turn towards the intersection of Michael Clark Parkway and Alamo. The traffic light from the traffic on Michael Clark Parkway is red.

At approximately frame 0:00:31;09, Williamson's vehicle stopped at the intersection facing south.

At approximately frame 0:00:37;10, Williamson's vehicle begins to very slowly move forward and into the intersection.

At approximately frame 0:00:39;07, the eMoto is seen approaching the intersection northbound from the south. The eMoto does not appear to have a headlight activated and the eMoto is black, and the rider appears to be dressed in black.




At approximately frame 0:00:40;03, The emergency lights are activated.




At approximately frame 0:00:40;24, the eMoto appears to start to turn left into the path of Williamson's vehicle. The eMoto is obscured by the tree in the foreground.

At approximately frame 0:00:41;23, the eMoto is visible again and is moving west towards the path of Williamson's vehicle. Williamson's vehicle appears to be nearing the middle of the intersection.




At approximately frame 0:00:42;03, Williamson's vehicle appears to reach the middle of the intersection.



At approximately frame 0:00:43;00, Williamson's vehicle appears to veer slightly to the right based on the direction of the emergency lights. The vehicle continued to move to the right before the collision.

It is not possible to determine the exact frame that shows the impact moment as the emergency lights glare obscures the view. A zoomed in angle (175%) appears to show the eMoto falling from the front of Williamson's vehicle at approximately frame 0:00:44;00.




According to Williamson, he first saw the eMoto as he was in the middle of the intersection, it can be deduced that he had only approximately less than one second to make a decision in order to attempt to avoid the eMoto.

There is a well-known training principle in law enforcement referred to as the reactionary gap. This is the time that it takes a person to perceive a stimulus and then react to that stimulus. On the average, it takes a person approximately 0.7-1.5 seconds to perceive and react to the stimulus. These times may vary depending on certain factors, but one thing is consistent within the principle. The person that creates the stimulus (actor) is always ahead of the person having to react to the stimulus (reactor).

There are examples of this response time gap. A person is ending a phone call and is reaching for the end button when the other caller says, "Oh, one more thing" but your finger hits the button, ending the call. You heard it, it registered in your brain at some level, but your brain could not catch up to the motor program already being executed to stop it. Another example is a basketball player going up on a layup, but the ball is rejected by a defender. The shooter's hands still complete the motion of the shot, even though the ball is no longer in his or her hands. It takes time to register the change in stimuli and generate a response.

It has been known for decades that reaction time will increase proportionally to the number of possible responses until a point in which it maintains constant despite the increases in possible responses. This is known as Hick's Law, named after William E. Hick, who discovered it in 1952.

Tueller drill published in 1983. It's the principle that an average person can sprint 21 feet in roughly 1.5 seconds. That's about the same time it takes an officer to perceive the threat and draw a firearm and fire two unaimed shots. The drill has been replicated by other researchers.

In the 2026 Winter Olympic Games, the sport of hockey recognized the reactionary gap in their "dead in the head" rule. "Dead in the head" in hockey refers to a referee's determination to stop play, typically during a goal-mouth scramble, because they believe the goalie has frozen the puck, even if the whistle has not officially blown yet. It describes the moment play is deemed dead due to a lost sightline of the puck and recognizes the measurable amount of time from the assumption/perception that the puck has been frozen to the moment that the whistle has been brought to the mouth and blown.

I have received advanced training in the reactionary gap and have read various studies on this topic. I have seen and experienced this reactionary gap in practice. I have personally witnessed this reactionary gap thousands of times in training scenarios that I conducted with in-service and recruit officers.

I was a lead instructor for Use of Force – cognitive (California POST Learning Domain 20) at the South Bay Regional Training Consortium and/or the San Jose Police Department Academy for approximately nine years. In my capacity as a Use of Force – cognitive instructor for the San Jose Police Department, I commonly taught the legal aspects of an officer's use of force and policy concerns as they relate to use of force. In total, I have taught law enforcement use of force for about 20 years. As a use of force instructor, I commonly taught and trained officers on perception-reaction time and on the ways officers could enhance their reaction time. In POST LD 20, officers are taught that "[s]elf-control reflects one's confidence in their skills and abilities which can be improved through training, practice, and experience; thereby enhancing decision-making and reaction time." In my teachings on LD 20, I have used lecture-based learning to reinforce tactics and techniques to mitigate/shorten reaction times based on my education on the topic and on my own personal experiences. As an instructor, I used scenario-based training to observe human performance issues and to create strategies to mitigate reaction time and stress factors. In these scenario training settings, I have witnessed perception/reaction time gaps thousands of times and used those examples in the debriefing of the officer taking the training, including possible tactics/techniques to mitigate the gap in future encounters. I have also been directly involved as a California POST committee member in two prior revisions of the Learning Domain 20 Workbook and participated remotely in the 2015 revision.

I am a POST certified Force Options Simulator (FOS) instructor. In order to become a Force Options Simulator instructor, I had to attend a 40-hour instructor level course.

I was the lead FOS instructor for the SJPD In-Service Training Unit. I trained thousands of officers in Santa Clara County.

I was the POST "Train the Trainer" instructor for this block of instruction.

I was a Force Options Simulator instructor for the South Bay Regional Training Consortium. I trained hundreds of officers in the bay area.

The Force Options Simulator (FOS) is a tool used to train the concepts of an objectively reasonable force response based on current law enforcement training guidelines and principles. The student officer will face different scenarios shown on a screen. The student officer will interact with the subjects on the screen and evaluate the subject's actions and behaviors. Some scenarios will resolve with no force response and others will require some type of force response to stop a threat including some that will require a deadly force response to stop an imminent threat of serious bodily injury or death.

When the student officer responds with deadly force, the simulator would capture the amount of time that it took from when the threat began to when the deadly force was applied. As an instructor, I saw this happen thousands of times and found it consistent with the findings of previous reactionary gap studies.

In addition, during the portion of the training where the simulator is used, and when an officer would respond with deadly force, we would replay the video portion showing the "hits" that were recorded by the simulator. On numerous occasions, the time of the "hit" would show a different body position of the subject portrayed on the screen as described by the officer during the debriefing of the scenario. I would take this opportunity to discuss the reactionary gap to describe why the "hit" appeared after the perception of danger.

In my capacity as a FOS instructor for the San Jose Police Department, I commonly taught the legal aspects of an officer's use of force and policy concerns as they related to use of force. I also taught the principle of reactionary gaps at the end of force responses.

I was an active member of the California POST FOS committee from 2000 up until my retirement. This committee met approximately every six months to discuss training trends and use of force issues within the curriculum. I have been directly involved in developing the past and present curriculum for the California POST FOS program. I was the supervisor for the San Jose Police Department FOS program from March 2009 to December 2011.

I am a POST certified Learning Domain 33 (Arrest and Control) instructor. In order to become a Learning Domain 33 instructor, I had to attend an 80-hour instructor level course.

I was a lead instructor for the SJPD Basic Academy. I taught hundreds of recruits.

I was a lead instructor for the South Bay Regional Training Consortium Basic Academy. I taught hundreds of recruits.

This domain included the defensive principles of time and distance in reference to the reactionary gap.

At one point, I was involved in creating a blocking drill to mitigate the reactionary gap. This drill was taught and a significant improvement was noted in the recruits' performance.

I am a POST certified Learning Domain 19 (Vehicle Operations) instructor. In order to become a Learning Domain 19 instructor, I had to attend a two instructor level courses.

The concepts of "Perception - reaction time" are included in this learning domain as shown below:

> The average driver's perception time is .75 seconds and their reaction time (which includes the decision making process) is another .75 seconds. It takes a total of 1.5 seconds to perceive and react to a problem on the road. Depending on the speed of the vehicle, a significant distance can be covered during the 1.5 second period.
>
> For example, a vehicle traveling at 60 MPH will cover 132 feet in 1.5 seconds during an average driver's perception-reaction time. The calculation for the distance covered during 1.5 seconds is:
>
> Speed x 1.1 = distance traveled in .75 seconds (perception time)
>
> Speed x 1.1 = distance traveled in .75 seconds (reaction time)
>
> (60 x 1.1 = 66) + (60 x 1.1 = 66) = 132 feet
>
> A safe minimum following distance is at least three seconds of time between
>
> vehicles. This allows sufficient time for a driver to react to sudden hazards.
>
> For example, a vehicle traveling at 60 MPH should be approximately 270 feet from the vehicle in front.
>
> Speed x 1.5 = feet per second (approximately)
>
> (60 x 1.5 = 90) x 3 seconds = 270 feet

I am a POST certified Law Enforcement Driving Simulator instructor. In order to become a Law Enforcement Driving Simulator instructor, I had to attend a 32-hour instructor level course.

The Law Enforcement Driving Simulator (LEDS) is a tool used to introduce/train the concepts of emergency vehicle operations in a simulated environment. This includes introduction to driving in a simulator, decision making processes, emergency response and pursuit. The concepts of perception-reaction time and the reactionary gap were covered during the instructor course. The same driving principles on the reactionary gap, as provided in LD 19, apply to the LEDS training as well. I taught the LEDS program for approximately 5 years.

It is noted that reaction time is referenced in the California DMV Handbook. In several places, the handbook references allowing enough time to react to hazards.

After I retired, I co-authored a POST approved 8-hour course, "Use of Force Liability Prevention for Supervisors." This was an 8-hour course that I designed and taught as a POST approved course through my company. The course included aspects of the reactionary gap to help instruct reviewing supervisors to understand certain human performance concerns. To lead into the discussion, one of the PowerPoint slides read, "The actions of the individual subject will determine the type of force applied by peace officers…subject actions cause officer reactions."

It is my professional opinion that there is no independent and objective evidence to support Mr. Bryce's opinion that Williamson intentionally "used his patrol vehicle to block T.J.N.'s path of travel as T.J.N. was making a left turn at the intersection of Michael Clark Parkway and Alamo Street."

Indeed, there is evidence that there was no intention by Williamson to intentionally use his patrol vehicle to block T.J.N.'s path of travel as T.J.N. was making a left turn at the intersection of Michael Clark Parkway and Alamo Street and that the collision was unintentional due to the facts and circumstances at the time and the time allowed for decision making choices by Williamson.

**Mr. Bryce's Opinion #3: The use of a patrol vehicle to block or strike the rider of an e-bike is a use of force capable of causing serious bodily injury or death, and the use of that force against T.J.N. was contrary to POST training standards, Penal Code section 835a, and generally accepted law enforcement standards.**

I respectfully disagree with Mr. Bryce's opinion as written.

Mr. Bryce simply cites some of the training guidelines and principles listed in California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation. Specifically, Mr. Bryce focuses on deadly force standards.

Mr. Byrce then simply states that none of the listed guidelines/principles were present so therefore, Williamson's "use of a patrol vehicle to block or strike the rider of an e-bike is a use of force capable of causing serious bodily injury or death, and the use of that force against T.J.N. was contrary to POST training standards, Penal Code section 835a, and generally accepted law enforcement standards."

Peace officers are trained that they are permitted to use reasonable force to effect an arrest, prevent the escape or to overcome the resistance of a suspect:

> Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to:
> - effect the arrest,
> - prevent escape, or
> - overcome resistance.
>
> A peace officer who makes or attempts to make an arrest:
> - need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested
> - shall not be deemed an aggressor
> - shall not lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance.[8]

[8] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

Police Officers receive training that the United States Supreme Court established how force must be judged from an objectively reasonable standard (Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865 (1989)).[9] The Court's analysis began by considering the subject's Fourth Amendment right to remain free from any unreasonable seizure against the government's interest in maintaining order through effective law enforcement.

When reviewing and analyzing an officer's use of force under a standard of "objective reasonableness," officers are trained that the Graham decision gave an overarching guideline to those that are charged with analyzing an officer's force response. Officers are told that the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation.[10]

The California POST Learning Domain 20 workbook states, "In some instances, peace officers may have time to evaluate and assess all aspects of a situation. In most situations, split-second decisions must be made."[11]

The California POST Learning Domain 20 workbook states:

The Court noted that determining the objective reasonableness for the use of force must be fact specific, and established the following components for determining reasonableness:

The reasonableness of a particular use of force must be...

1. judged from the perspective of a reasonable officer.
2. examined through the eyes of an officer on the scene at the time the force was applied, not the 20/20 vision of hindsight.
3. based on the facts and circumstances confronting the officer without regard to the officer's underlying intent or motivation.[12]

A reasonable officer is defined as would another officer, facing a similar set of circumstances, act in the same way or use similar judgement.[13]

In addition to the guideline listed above, other important factors to consider include, but are not limited to; (1) the severity of the crime at issue, (2) whether the subject poses an immediate threat to the safety of the officers or others, (3) and whether the subject is actively resisting.[14] These factors are described as "governmental interests" and weighed as a totality of the circumstances and balanced

[9] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[10] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[11] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[12] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[13] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[14] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

against the quantum (or level) of force used by the officers. The quantum of force is determined by the type of force option used and the manner in which it was used.

Since the Graham decision, officers are trained that other courts have added to and rearranged the factors listed. Officers within the 9th Circuit have been trained to recognize these factors listed in "importance" as:

1. The threat of the suspect to officer/others
2. The resistance of the suspect
3. The "Pace of the Event"
4. The severity of the crime at issue
5. The nature of the escape attempt

Regarding subject resistance, officers are provided with a table in California POST Basic Academy Workbook Learning Domain 20 that describes the type of resistance and possible force options that an officer may choose. It is noted that an officer may decide to choose an option from a lesser resistance level if the facts and circumstances allow and that option is tactically feasible, but under no circumstances are officers trained that they must attempt a lesser intrusive force option than what would be objectively reasonable – based on current law enforcement training – at the time.

| Subject's Actions | Description | Possible Force Options |
|---|---|---|
| Compliant | Subject offers no resistance | - Mere professional appearance<br>- Nonverbal actions<br>- Verbal requests and commands<br>- Handcuffing and control holds |
| Passive non-compliant | Does not respond to verbal commands but also offers no physical form of resistance | - Officer's strength to take physical control, including lifting/carrying<br>- Pain compliance control holds, takedowns and techniques to direct movement or immobilize a subject |
| Actively resistant | Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally or physically signaling an intention to avoid or prevent being taken into or retained in custody | - Control holds and techniques to control the subject and situation<br>- Use of personal body weapons to gain advantage over the subject |
| Assaultive | Aggressive or combative; attempting to assault the officer or another person, verbally or physically displays an intention to assault the officer or another person | - Use of devices and/or techniques to secure compliance and ultimately gain control of the situation<br>- Use of personal body weapons in self-defense and to gain advantage over the subject |

| | | |
|---|---|---|
| Life-threatening | Any action likely to result in serious bodily injury or death of the officer or others | - Utilizing firearms or any other available weapon or action in defense of self and others to stop the threat |

Other factors that have been identified and that officers have been trained to understand that may or may not be applicable to the specific situation are:

1. Number of Officers vs. Suspects
2. Were cover officers enroute or on-scene?
3. Access to Potential Weapons
4. Age; Size; Relative Strength
5. Special Knowledge or Skill Level
6. Injury or Exhaustion
7. Mental Illness or Drug Usage
   a. Higher pain tolerance
   b. Unable to understand commands
8. Prior Contacts
9. Environmental Factors
   a. Lighting, space limitations, footing, crowds, traffic
10. Availability of other reasonable force options
11. Was there an opportunity to warn and was there a warning given?
12. Was the subject able to cease resistance and/or comply with commands?

Officers are trained that there are three general categories of force options, including:

- Non-Deadly Force: Force which creates a minimal risk of injury
- Intermediate (Non-Deadly) Force: Force which has a significant risk of injury[15]
- Deadly Force: Force which has a substantial risk of serious bodily injury or death[16]

Understanding the importance of what an officer reasonably believed based on facts and circumstances known or perceived is paramount to the analysis of any force response by an officer. As previously stated, the force must be judged from the perspective of a reasonable officer and examined through the eyes of an officer on the scene at the time the force was applied. To understand the perspective, one must understand the perception of the officer on scene. While it is important to learn the perception of other involved parties to better understand the incident in an overall sense, the

[15] In Black's Law Dictionary and general legal contexts, deadly force refers to force that is intended or likely to cause death or great bodily injury. Black's Law Dictionary defines non-deadly force as force that is neither intended nor likely to cause death or serious bodily harm, or force intended to cause only minor bodily harm. While Black's Law Dictionary doesn't offer a specific entry for "intermediate force," legal context defines intermediate force as a level of physical force that causes significant pain, physiological effects, and a foreseeable risk of physical injury, though it's not intended to cause death or serious injury. This term is used in use-of-force analysis, distinguishing it from lesser forms of force and from deadly force.

[16] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

appropriateness of the force response must rely upon the perception of the officer responding with the force option.

The evaluation must be made from the perspective of the officer. In simple terms, the officer does not need to be correct for his/her actions to be objectively reasonable under the totality of the facts and circumstances known and perceived by the officer.

Perception is the process of applying stored knowledge to sensory input (see, feel, hear, smell, taste) and forming an interpretation and is truly key to evaluating the reasonableness of any force application. It is important to also note that perception is individual to each officer based on the facts and circumstances known to the officer and his training and experience. It is important to also understand that sometimes an action outside the expected can raise a perceived threat level.

In evaluating the objective reasonableness of an officer's use of force, there must be a reasonable balance between; (1) "why" the officer used the force option (governmental interests), and (2) "what" type of force option was used and "how" it was used (level/quantum of force).

One way police officers are trained to determine the reasonable level/quantum of force is to examine the reasonably likely injury expectation of the force option. It is important to evaluate the expectation based on what the officer knew and perceived rather than the actual outcome as they can be drastically different in some cases.

Police officers are trained that they need not use lesser intrusive force options that may be ineffective or not feasible before using a reasonable force option for the facts and circumstances. Considering all possible options may be difficult and even impossible in high-risk environments due to the time pressure, task complexity, and environmental uncertainty. In these types of situations officers often must rely on intuitive decision making during potential use of force encounters.

In any incident, there are uncertainties and there are numerous option choices available to the officer(s) throughout the incident as it unfolds. Many of them are not well defined. Much of what officers do is based on; (1) experience, and (2) the totality of the facts and circumstances known/perceived by the officer. Manuals and training simply cannot cover everything. Officers do not have the ability to predict the future with 100% certainty.

Officers are trained that there is no legal requirement that an officer choose the "best" or "most" reasonable force, but one that is objectively reasonable under the totality of the circumstances, and conforms to agency policy, federal and state law.[17]

In the California POST Basic Academy, officers receive training regarding the use of force. On two occasions while still an active peace officer I participated directly in assisting California POST review and update the Learning Domain 20 (Use of Force) workbook giving me a unique understanding of the

[17] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

content of the workbook and I base my opinions on these writings. In the 2015 update, I participated remotely.

Police officers are taught that deadly force is force that creates a substantial risk of causing death or serious bodily injury.[18]

Police officers are trained that they may use deadly force under certain circumstances.

Deadly Force Training Standards: "Force on Force"

"Force on Force" refers to a situation when an officer perceives that a subject is presenting an imminent threat of serious bodily injury or death to the officer or to others based on the totality of the facts and circumstances known/perceived by the officer at the time.

Officers are trained that they are justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary per California Penal Code §835a(c).[19]

Officers are trained that they are justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary… to defend against an imminent threat of death or serious bodily injury to the officer or to another person per California Penal Code Section 835a(c)(1)(A).[20]

Officers are trained that imminent means, "a threat of death or serious injury is "imminent" when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed."[21]

As far as "apparent intent" is concerned, officers are trained that the apparent intent need not be vocalized or specifically signaled. The apparent intent is to be evaluated based on the totality of facts and circumstances known/perceived by the officer at the time and would another reasonable officer also believe that the subject was demonstrating the apparent intent.

As far as "fear of future harm," officers are trained that this would not be controlled by an immediate future that is about to happen within seconds. Imminent harm is one that from appearance must be instantly confronted and addressed to prevent that harm.

This is taught as "to protect life" and reads in relevant part, "a peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the

[18] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[19] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[20] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[21] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

circumstances, that such force is necessary to defend against an imminent threat of death or serious bodily injury to the officer or to another person."[22]

Reverence for all life is the foundation on which the use of deadly force rests. This reverence is not solely directed at the subject, it includes the life of the officer him/herself and of others.

Deadly Force Training Standards: "Fleeing Subject"

Officers are trained that deadly force may be used against a fleeing subject under certain conditions. This training includes that, "In 1985, the United States Supreme Court decided the case of Tennessee v. Garner. The Court applied the following points with regards to when it would be reasonable for an officer to use deadly force against a fleeing subject in this particular set of circumstances (e.g., using a firearm to stop a fleeing suspect escaping on foot)." The particular set of circumstances include:

- "...if the subject threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical injury [or death]..."
- "...*probable cause* to believe that the subject poses a threat of death or serious physical harm, either to the officer or others..."
- "...*probable cause* to believe that the use of deadly force is reasonably necessary..."[to prevent escape]
- "...some warning be given prior to the use of deadly force where feasible..."[23]

Officers are trained that this standard does not require the subject to be actually armed at the moment of the deadly force application but rather it is based on the dangerousness of the subject based on his/her actions and behaviors (*probable cause* to believe that he has committed a crime involving the infliction of serious physical injury [or death]) that may create the threat of death or serious bodily injury to others if allowed to escape.[24]

Officers are trained that they may use deadly force to apprehend a fleeing subject for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended. Where feasible, a peace officer shall, prior to the use of force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts per California Penal Code §835a(c)(B).[25]

[22] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[23] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[24] Forrett v. Richardson, 112 F.3d 416 (9th Cir. 1997) - A burglary suspect shot a victim during the burglary. Then the burglary suspect fled - while unarmed. The court found that "... the suspect need to not be armed or pose an immediate threat to the officers or others at the time of the shooting."
[25] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

I would agree with Mr. Bryce that none of the deadly force guidelines/principles were present in the moments leading into the collision. However, Mr. Bryce's analysis and opinion is fundamentally flawed based on the evidence and lack of supporting evidence.

Officers are trained that in 1989, the United States Supreme Court decided the case of Graham v. Connor, 490 U.S. 386, (1989), which established that a peace officer's use of force, under the Fourth Amendment, would be judged using the "objective reasonableness" standard. The Court's analysis began by balancing the subject's Fourth Amendment right to remain free from any unreasonable seizure against the government's interest in maintaining order through effective law enforcement.[26]

Officers are trained that a "seizure" of a person occurs: (1) when a peace officer physically applies force with the intent to restrain or (2) when a person voluntarily submits to a peace officer's authority. Also, the search or seizure must be intentional, rather than merely an accident. The Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct.[27]

Clearly, in order to be evaluated as a force response by Williamson, it must be shown that the actions of Williamson were an intentional "use of a patrol vehicle to block or strike the rider of an e-bike."

It is my professional opinion that there is no independent and objective evidence to support Mr. Bryce's opinion that Williamson intentionally used "a patrol vehicle to block or strike the rider of an e-bike."

Indeed, there is evidence that there was no intention by Williamson to intentionally use "a patrol to block or strike the rider of an e-bike is a use of force capable of causing serious bodily injury or death" and that the collision was unintentional due to the facts and circumstances at the time and the time allowed for any decision making choices by Williamson.

I would so testify to the aforementioned findings and opinions under penalty of perjury if called upon in any subsequent civil proceedings. Signed under penalty of perjury in accordance with the laws of California and of the United States on September 8, 2026, in Fullerton, California.

Respectfully submitted,

Edward T. Flosi, M.S.
Justitia Consulting, Inc.

---

[26] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[27] California Peace Officer's Legal Sourcebook